## UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

| | |
|---|---|
| In re | : |
| Inspection of | : |
| | :     NO. 21-mj-1854 |
| Lloyd Industries, Inc. | : |
| located at 231 Commerce Drive | : |
| Montgomeryville, Pennsylvania 18936 | : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

### APPLICATION FOR INSPECTION WARRANT

TO THE HONORABLE UNITED STATES MAGISTRATE JUDGE:

Jean G. Kulp, Area Director of the Allentown Area Office, Occupational Safety and Health Administration (OSHA), United States Department of Labor, hereby applies for a warrant pursuant to section 8 of the Occupational Safety and Health Act of 1970, 29 U.S.C. § 657, to inspect the workplace described in the above caption. As grounds for the issuance of the warrant, after first being sworn, I depose and state:

1.      I am the Area Director of OSHA's Allentown Area Office. In that capacity, I supervise the inspection activities of OSHA's Compliance Safety and Health Officers assigned to the Allentown Area Office. Moreover, I have the responsibility of making applications for inspection warrants under section 8(a) of the Act, 29 U.S.C. § 657(a).

2.      Lloyd Industries, Inc. is a corporation engaged in the business of manufacturing fire and smoke dampers.

3.      Lloyd Industries, Inc. is an employer within the meaning of section 3(5) of the Act, 29 U.S.C. § 652(5), in that it employs employees within the meaning of section 3(6) of the Act, 29 U.S.C. § 652(6), in a business affecting commerce.

4.     The OSHA Allentown Area Office intends to conduct a follow-up inspection of the workplace identified in the caption above pursuant to a neutral administrative plan, which is described in detail below.

5.     OSHA seeks an administrative warrant in anticipation of arriving at the workplace because Lloyd Industries, Inc. (the employer) has, in the past, refused to allow OSHA to conduct inspections without a warrant and, on one occasion, denied entry even after OSHA obtained a warrant, necessitating that U.S. Marshals accompany OSHA back to the worksite.  We anticipate that the employer will very likely deny or at least delay entry again, and therefore seek to obtain a warrant prior to our initial visit to the worksite.

6.     The authority for issuance of an administrative inspection warrant is found at Section 8(a) of the Occupational Safety and Health Act ("the OSH Act"), 29 U.S.C. § 651 *et seq.*, and *Marshall v. Barlow's Inc.*, 436 U.S. 307 (1978).  Sections 8(a)(1) and (a)(2) of the OSH Act, 29 U.S.C. §§ 657(a)(1) and (a)(2), specifically authorize the Secretary of Labor to make inspections and investigations at any reasonable time, at any plant, factory, establishment, construction site, or other area, workplace, or environment where work is performed by an employee of any employer.

7.     The Fourth Amendment's Warrant Clause applies to OSHA inspections.  *See Marshall*, 436 U.S. 307.  Therefore, OSHA must obtain an administrative warrant to conduct an inspection if the employer denies entry.

8.     The administrative probable cause standard for issuance of an OSHA inspection warrant may be met by showing that the workplace has been identified through "an administrative plan containing specific neutral criteria" that are satisfied with respect to the

workplace.  *Martin v. Int'l Matex Tank Terminals-Bayonne*, 928 F.2d 614, 622 (3d Cir. 1991)

(citing *Barlow's*, 436 U.S. at 320).

9.      In this case, that probable cause standard is satisfied, since the employer has been

identified through an administrative plan containing specific, neutral criteria that are satisfied

here.

10.     This inspection is an "Enhanced Follow-Up Inspection" pursuant to OSHA's

"Severe Violator Enforcement Program (SVEP)."  *See* OSHA CPL 02-00-149, attached as

Exhibit A and available online at https://www.osha.gov/enforcement/directives/cpl-02-00-149.

11.     This neutral administrative program establishes "Severe Violator Enforcement

Cases," defined as any case that meets one or more of four listed criteria.  *See* SVEP Section XI.

One of the four criteria, and the one relevant here, is, "An inspection in which OSHA finds two

or more willful or repeated violations . . . based on high gravity serious violations related to a

High-Emphasis Hazard as defined in Section XII."

12.     That definition encompasses several terms unique to OSHA: (1) willful

violations; (2) high gravity serious violations; and (3) violations related to a High-Emphasis

Hazard.

13.     A willful violation of the OSH Act is one "done voluntarily with either an

intentional disregard of, or plain indifference to, the [OSH] Act's requirements."  *Bianchi Trison

Corp. v. Chao*, 409 F.3d 196, 208 (3d Cir. 2005) (citation omitted).

14.     A "high gravity serious violation" is a violation that has a relatively high

probability (or substantial probability) of resulting in death or serious injury.[1]

---

[1] This definition is found in part in the OSH Act and in part in OSHA Instruction CPL 02-00-
164, Field Operations Manual ("FOM"), https://www.osha.gov/enforcement/directives/cpl-02-
00-164.  Under the OSH Act, a "serious" violation exists when conditions or practices at a
workplace create a "substantial probability that death or serious physical harm could result."  29

15.     Violations related to High-Emphasis Hazards are violations involving a variety of different types of hazards, including standards intended to prevent amputations (such as 29 C.F.R. § 1910.212, discussed below).  *See* SVEP Section XII.F.

16.     All Severe Violator Enforcement Cases are then subject to certain procedures, including "Enhanced Follow-up Inspections."  *See* SVEP Section XV.A.  Specifically, "a follow-up inspection must be conducted after the citations become final orders . . . . The purpose of the follow-up inspection is to assess not only whether the cited violation(s) were abated, but also whether the employer is committing similar violations."  SVEP Section XV.A.1.

17.     Here, a follow-up inspection is required because the employer was previously the subject of a Severe Violator Enforcement Case.

18.     In 2015, OSHA inspected the workplace and issued citations, which the employer contested.  A two-week trial was conducted in 2016 that resulted in an Administrative Law Judge issuing an order in 2017 affirming most of the OSHA violations.  *See* Decision and Order, attached as Exhibit B.

19.     That decision included affirming several high gravity serious violations of 29 C.F.R. § 1910.212 (the standard mentioned above), two of which were classified as "willful." *See* Ex. B at 15-35.

20.     Thus, the case was a Severe Violator Enforcement Case because the ALJ affirmed (1) two willful violations (2) based on high gravity serious violations that were (3) related to a

---

U.S.C. § 666(k).  Pursuant to the FOM, a "high gravity" violation is a violation classified by OSHA as both "high severity" (involving the potential for death or a permanent disabling injury) and "greater probability" (when the likelihood that an injury or illness will occur is relatively high).  *See* FOM at Chapter 6, Section III.A.4.

High-Emphasis Hazard in that they were violations of 29 C.F.R. § 1910.212 which is a standard

intended to prevent amputations.

21.     The ALJ decision became a final order of the Commission on July 21, 2017.  *See*

Notice of Docketing of Administrative Law Judge's Decision, attached as Exhibit C.

22.     OSHA is therefore required by the SVEP to conduct this follow-up inspection.

23.     An anticipatory warrant is needed for this follow-up inspection because this

employer has, on multiple occasions, denied or delayed OSHA's entry into the workplace and

has interfered with OSHA's inspections of the workplace.  *See* 29 C.F.R. § 1903.4(b)(1)

(discussing when anticipatory warrants may be appropriate).

24.     On one occasion, in 2008, the employer initially denied entry and, after OSHA

obtained and returned with a warrant, the employer refused to honor the warrant and again

denied entry.  After OSHA reported to the District Court that the employer had refused to honor

the warrant, the Court issued an order directing U.S. Marshals to escort OSHA back to the

worksite and accompany OSHA during its inspection.  Only then did the employer allow OSHA

to enter the worksite and conduct its inspection.

25.     On another occasion, in 2016, when OSHA obtained an anticipatory warrant, the

employer delayed OSHA's entry into the worksite while the owner and employees altered unsafe

conditions before OSHA could observe and document them.  Thus, the employer has proven its

willingness to use delay as a tactic to hide the unsafe conditions to which its employees are

exposed.[2]

---

[2] At trial, the OSHA compliance officer testified that the owner Mr. Lloyd made him wait in a
conference room for 15 minutes before allowing him to enter the shop, and a current employee
testified that during that time, he was instructed to correct, and did correct, multiple unsafe
conditions.  *See* Portions of Trial Transcript, attached as Ex. D, at 145:22-146:22; 1457:24-
1459:19.

26.     If the Court issues the proposed administrative warrant, OSHA compliance officers will be accompanied by special agents from the U.S. Department of Labor Office of Inspector General.  Based on this employer's history of denying entry even when OSHA has a warrant, and delaying entry to alter conditions even when OSHA has a warrant, the presence of the Office of Inspector General will help ensure that OSHA can immediately enter the workplace without delay.

27.     The OSHA inspection will be conducted during regular working hours, within reasonable limits, and in a reasonable manner, and the compliance officer's credentials will be presented to the employer.

28.     The scope of the inspection will be consistent with the purposes of the SVEP's Enhanced Follow-Up Inspection requirement, namely "to assess . . . whether the employer is committing similar violations."  SVEP Section XV.A.1.  In particular, the proposed warrant limits the scope of the inspection to violations similar to those that were affirmed in Docket Nos. 15-0846 and 15-0847, which became a final order of the Occupational Safety and Health Review Commission on July 21, 2017, and any hazards in plain view.

29.     The inspection will also include the taking of photographs and/or videotaping for evidentiary purposes, and the questioning of employers, owners, operators, agents and employees privately during working hours at the worksite, as authorized by 29 C.F.R. § 1903.7(b).  The inspection may also include the affixing of monitoring devices upon employees to determine the extent of their exposure to airborne contaminants and/or noise, as authorized by 29 C.F.R. § 1903.7(b).

30.     The inspection and investigation shall also include the opportunity for a representative of the employer and a representative authorized by employees to accompany the

OSHA compliance officer during the physical inspection of the workplace.  In the alternative, if

there is no authorized representative of employees pursuant to section 8(e) of the OSH Act, 29

U.S.C. § 657(e) and 29 C.F.R. § 1903.8, the compliance officer shall consult with a reasonable

number of employees during the inspection of the worksite concerning matters of health and

safety in the workplace.

31.     The inspection shall commence within fourteen (14) days after the issuance of the

warrant, and shall proceed for a reasonable period of time in order to fulfill the objectives of the

SVEP's follow-up inspection requirement.  OSHA may return to the worksite on subsequent

days if the inspection cannot be completed within one day.

17.     A return will be made to the Court within seven (7) calendar days after the

completion of the on-site inspection.

Jean G. Kulp
Digitally signed by Jean
G. Kulp
Date: 2021.12.10
10:12:14 -05'00'

_____

Jean G. Kulp, Area Director
Allentown Area Office
Occupational Safety and Health
Administration, Region III
United States Department of Labor

OF COUNSEL:

Seema Nanda
Solicitor of Labor

Oscar L. Hampton III
Regional Solicitor

Michael P. Doyle
Regional Counsel for OSHA

Judson H. Dean
Senior Trial Attorney

Post Office Address:

U.S. Department of Labor
1835 Market Street Mailstop SOL/22

Philadelphia, PA 19103
(215) 861-5139

Sworn to before me and subscribed in my presence this 10th day of  December  2021.


                /s/ Elizabeth T. Hey
                ELIZABETH T. HEY
                UNITED STATES MAGISTRATE JUDGE

# Exhibit A to Lloyd Industries Warrant Application

Directives  /  Severe Violator Enforcement Program (SVEP)

- **Record Type:**          OSHA Instruction
  **Current Directive**
- **Number:**               CPL 02-00-149
  **Old Directive**
- **Number:**               CPL 02-00-149
- **Title:**                Severe Violator Enforcement Program (SVEP)
- **Information Date:**      06/18/2010

OSHA INSTRUCTION

| **DIRECTIVE NUMBER:** CPL 02-00-149 | **EFFECTIVE DATE:** June 18, 2010 |
|---|---|
| **SUBJECT:** Severe Violator Enforcement Program (SVEP) | |

## ABSTRACT

| | |
|---|---|
| **Purpose:** | This Instruction establishes enforcement policies and procedures for OSHA's Severe Violator Enforcement Program (SVEP), which concentrates resources on inspecting employers who have demonstrated indifference to their OSH Act obligations by willful, repeated, or failure-to-abate violations. This Instruction replaces OSHA's Enhanced Enforcement Program (EEP). |
| **Scope:** | OSHA-wide. |
| **References:** | OSHA Instruction CPL 02-00-069, Special Emphasis: Trenching and Excavation, September 19, 1985; OSHA Instruction CPL 02-00-080, Handling of Cases To Be Proposed for Violation-By-Violation Penalties, October 21, 1990; OSHA Instruction CPL 02-00-136, National Emphasis Program (NEP) on Shipbreaking, March 16, 2005; OSHA Instruction CPL 02-00-148, Field Operations Manual (FOM), November 9, 2009; OSHA Instruction CPL 03-00-003, National Emphasis Program on Amputations, October 27, 2006; OSHA Instruction CPL 03-00-010, Petroleum Refinery Process Safety Management National Emphasis Program, August 18, 2009; OSHA Instruction CPL 03-00-007, National Emphasis Program - Crystalline Silica, January 24, 2008; OSHA Instruction CPL 03-00-008 - Combustible Dust National Emphasis Program (Reissued), March 11, 2008; and OSHA Notice 09-06 (CPL 02) PSM Covered Chemical Facilities National Emphasis Program, July 27, 2009. |
| **Cancellations:** | OSHA Instruction CPL 02-00-145, Enhanced Enforcement Program (EEP), January 1, 2008. |

| State Impact: | Notice of Intent, Adoption and Submission of a Plan Change Required. See section VI. |
| --- | --- |
| **Action Offices:** | National, Regional, Area Offices and State Plan States. |
| **Originating Office:** | Directorate of Enforcement Programs. |
| **Contact:** | Directorate of Enforcement Programs<br>Office of General Industry Enforcement<br>200 Constitution Avenue, NW, N-3119<br>Washington, DC 20210 |

By and Under the Authority of

David Michaels, PhD, MPH
Assistant Secretary

## Executive Summary

This Instruction establishes enforcement policies and procedures for OSHA's Severe Violator Enforcement Program (SVEP), which concentrates resources on inspecting employers who have demonstrated indifference to their OSH Act obligations by committing willful, repeated, or failure-to-abate violations. Enforcement actions for severe violator cases include mandatory follow-up inspections, increased company/corporate awareness of OSHA enforcement, corporate-wide agreements, where appropriate, enhanced settlement provisions, and federal court enforcement under Section 11(b) of the OSH Act. In addition, this Instruction provides for nationwide referral procedures, which includes OSHA's State Plan States. This Instruction replaces OSHA's Enhanced Enforcement Program (EEP).

### Significant Changes from the Enhanced Enforcement Program (EEP)

- High-Emphasis Hazards are targeted, which include fall hazards and specific hazards identified from selected National Emphasis Programs.

- The Assistant Secretary has determined that Nationwide Inspections of Related Workplaces/ Worksites are critical inspections for the purpose of 29 CFR §1908.7(b)(2)(iv).

- Creates a nationwide referral procedure for Regions and State Plan States.

**TABLE OF CONTENTS**

I. Purpose

II. Scope

III. References

IV. Cancellations

V. Action Information

    A. Responsible Office
    B. Action Offices
    C. Information Offices

VI. State Impact

VII. Background

VIII. Transition between the EEP and the SVEP

IX. Significant Changes

X. Handling Severe Violator Enforcement Cases

XI. Criteria for a Severe Violator Enforcement Case

    A. Fatality/Castastrophe Criterion
    B. Non-Fatality/Catastrophe Criterion Related to High-Emphasis Hazards
    C. Non-Fatality/Catastrophe for Hazards Due to the Potential Release of a Highly Hazardous Chemical
       (Process Safety Management)
    D. Egregious Criterion

XII. Definition of High-Emphasis Hazards

    A. Fall Hazards Covered Under General Industry Standards
    B. Fall hazards Covered Under Construction Industry Standards
    C. Fall hazards Covered Under Shipyard Standards
    D. Fall hazards Covered Under Marine Terminal Standards
    E. Fall hazards Covered Under Longshoring Standards
    F. Amputation Hazards
    G. Combustible Dust Hazards

    H. Crystalline Silica Hazards
    I. Lead Hazards
    J. Excavation/Trenching Hazards
    K. Shipbreaking Hazards

XIII. Hazards due to the potential release of a highly hazardous chemical (Process Safety Management)

XIV. Enforcement Considerations - Two or More Inspections of the Same Employer

XV. Procedures of the Severe Violators Enforcement Program (SVEP)

    A. Enhanced Follow-up Inspections
    B. Nationwide Inspections of Related Workplaces/Worksites
    C. Increased Company Awareness of OSHA Enforcement
    D. Enhanced Settlement Provisions
    E. Federal Court Enforcement under Section 11(b) of the OSH Act

XVI. SVEP Log

    A. General
    B. Lining-Out Establishments from the SVEP Log

XVII. Relationship to Other Programs
    A. Unprogrammed Inspections
    B. Programmed Inspections

XVIII. Recording and Tracking inspections

    A. SVEP Code
    B. NEP Codes for High-Emphasis Hazards
    C. Significant Enforcement Actions and Enhanced Settlement Codes
    D. Other Program Codes

XIX. Dun & Bradstreet Number

XX. End of the Fiscal Year Report

    Appendix A.   Information Needed for Monthly Report

    Appendix B.   CSHO Guidance: Determining Company Structure

    Appendix C.   Sample Letter to Company Headquarters

I. **Purpose**. This Instruction establishes enforcement policies and procedures for OSHA's Severe Violator Enforcement Program (SVEP), which concentrates resources on inspecting employers who have demonstrated indifference to their OSH Act obligations by committing willful, repeated, or failure-to-abate violations. This Instruction replaces OSHA's Enhanced Enforcement Program (EEP).

II. **Scope**.

This Instruction applies OSHA-wide.

III. **References**.

A. OSHA Instruction CPL 02-00-069 - CPL 2.69 - Special Emphasis: Trenching and Excavation, September 19, 1985.

B. OSHA Instruction CPL 02-00-136, National Emphasis Program (NEP) on Shipbreaking, March 16, 2005.

C. OSHA Instruction CPL 02-00-148 - Field Operations Manual (FOM), November 9, 2009.

D. OSHA Instruction CPL 03-00-003 - National Emphasis Program on Amputations, October 27, 2006.

E. OSHA Instruction CPL 03-00-010 - Petroleum Refinery Process Safety Management National Emphasis Program, August 18, 2009.

F. OSHA Instruction CPL 03-00-007 - National Emphasis Program — Crystalline Silica, January 24, 2008.

G. OSHA Instruction CPL 03-00-008 - Combustible Dust National Emphasis Program (Reissued), March 11, 2008.

H. OSHA Instruction CPL 03-00-009 - OSHA Instruction; National Emphasis Program-Lead, August 14, 2008.

I. OSHA Instruction 09-06 (CPL 02) - PSM Covered Chemical Facilities National Emphasis Program, July 27, 2009.

J. OSHA Instruction CSP 01-00-002, State Plan Policies and Procedures Manual, March 21, 2001.

K. OSHA Instruction CPL 02-00-080 Handling of Cases To Be Proposed for Violation-By-Violation Penalties, October 21, 1990.

IV. **Cancellations**.

OSHA Instruction CPL 02-00-145, Enhanced Enforcement Program (EEP), January 1, 2008.

V. **Action Information**.

A. **Responsible Office**.

Directorate of Enforcement Programs (DEP).

B. **Action Offices**.

National Office, Regional Offices, Area Offices, and State Plan States.

C. **Information Offices**.

OSHA Training Institute, Consultation Project Managers, VPP Managers and Coordinators, OSHA Strategic Partnership Coordinators, Compliance Assistance Coordinators, and Compliance Assistance Specialists.

VI. **State Impact**.

**Notice of Intent, Adoption and Submission of a Plan Change Supplement Required.** This Instruction is a Federal program change which cancels OSHA's Enhanced Enforcement Program and establishes the Severe Violator Enforcement Program (SVEP). The purpose of the SVEP is to focus increased enforcement attention on significant hazards and violations by concentrating on employers who have demonstrated indifference to their occupational safety and health obligations through willful, repeated, or failure-to-abate violations in (1) a fatality or catastrophe situation; (2) in industry operations or processes that expose employees to the most severe occupational hazards and those identified as "High-Emphasis Hazards," as defined in Section XII. of this Instruction (p. 5); (3) exposing employees to hazards related to the potential release of a highly hazardous chemical; or (4) all egregious enforcement actions. Because the significant nature of this program requires nationwide applicability, States are required to either adopt this program or establish their own equivalent program which must include enforcement procedures for identifying and taking action with regard to these recalcitrant and indifferent employers and for making referrals to, and responding or referrals from, Federal OSHA. As set out in paragraph XV.B.3. (p.12), Federal OSHA will accept referrals from State plans and conduct appropriate inspections.

Each State must provide notice of its intent to adopt either policies or procedures identical to those set out in this instruction, or alternative policies and procedures that are at least as effective. State policies and procedures must be adopted within six months of issuance of this instruction. If the State adopts policies and procedures that differ from the Federal program, the State must submit its different policies and procedures as a plan change supplement with identification of the differences, within 60 days of adoption, and either post its different policies on its State plan website and provide the link to OSHA or provide OSHA with information on how the public may obtain a copy. If the State adopts identical policies and procedures, it must provide the date of adoption to OSHA and information on any State-specific procedures. OSHA will provide summary information on the State responses to this instruction on its website.

VII. **Background**.

The SVEP is intended to focus enforcement efforts on significant hazards and violations by concentrating inspection resources on employers who have demonstrated recalcitrance or indifference to their OSH Act obligations by committing willful, repeated, or failure-to-abate violations in one or more of the following circumstances: (1) a fatality or catastrophe situation; (2) in industry operations or processes that expose employees to the most severe occupational hazards and those identified as "High-Emphasis Hazards," as defined in Section XII. of this Instruction (p.5); (3) exposing employees to hazards related to the potential release of a highly hazardous chemical; or (4) all egregious enforcement actions.

Cases meeting the severe violator enforcement criteria are those in which the employer is found to be recalcitrant or indifferent to its obligations under the OSH Act, thereby endangering employees. The SVEP procedures in Section XV. (p.10) are intended to increase attention on the correction of hazards found in these

workplaces and, where appropriate, in other worksites of the same employer where similar hazards and deficiencies may be present. This program applies to all employers regardless of size.

VIII. **Transition between the EEP and the SVEP**.

On the effective date of this Instruction, both the original EEP (referred to as EEP or EEP1) and the revised EEP (referred to as EEP2) will terminate (including any follow-up inspections that have not yet been performed). However, Area Directors have the discretion to conduct any follow-up inspections related to the EEP in accordance with the policies and procedures in the FOM (CPL 02-00-148, Chapter 2, *Program Planning*).

IX. **Significant Changes**.

A. High-Emphasis Hazards are targeted and include fall hazards and hazards identified from the following National Emphasis Programs (NEPs): amputations, combustible dust, crystalline silica, excavation/trenching, lead, and shipbreaking. See section XII. (p.5).

B. The Assistant Secretary by this Instruction determines that the specific inspections under the Nationwide Inspections of Related Workplaces/Worksites process are critical inspections for the purpose of 29 CFR §1908.7(b)(2)(iv) and delegates to the Director of the Directorate of Enforcement Programs the authority to determine site selections of those related workplaces/worksites. See paragraph XV.B.7.b. (p.16).

C. A nationwide referral procedure is being initiated in which OSHA may inspect related worksites/workplaces of a SVEP employer. See section XV.B. (p.11).

X. **Handling Severe Violator Enforcement Cases**.

A. Compliance Officers (CSHOs) must become familiar with Appendix B to effectively evaluate employers during all inspections likely to result in a severe violator enforcement case.

B. The Area Director will identify severe violator enforcement cases no later than at the time the citations are issued, in accordance with criteria set forth in this Instruction.

C. Federal Agency cases that meet the SVEP case criteria will also be classified as severe violator enforcement cases, and where the term "employer-wide" or "company-wide" is used, it will apply agency-wide or department-wide, as appropriate. Appropriate SVEP actions for such cases will be determined by the Area Director in consultation with the Regional Administrator.

D. When a case meets the severe violator enforcement case criteria, the Area Director will notify the Regional Administrator, who in turn will notify the Directorate of Enforcement Programs (DEP).

E. Regional Administrator notification to DEP must be by e-mail using the SVEP-group e-mail address on OSHA's Global Address list: "zzOSHA-SVEP." The notification must be at least monthly (by the 20th of the month) and include the information requested in Appendix A. Regions must use the Excel spreadsheet format that will be sent to the SVEP Regional Coordinators shortly after this Instruction becomes effective.

XI. **Criteria for a Severe Violator Enforcement Case**.

Any inspection that meets one or more of criteria A. through D., at the time that the citations are issued, will be

considered a severe violator enforcement case.

**Willful** and **repeated** citations and **failure-to-abate** notices must be based on serious violations, except for recordkeeping, which must be egregious (e.g., per-instance citations). See *FOM*, CPL 02-00-148, Chapter 6, paragraphs V.A.1. and VI.A.1.

A. **Fatality/Catastrophe Criterion**.

A fatality/catastrophe inspection in which OSHA finds **one** or more **willful** or **repeated** violations or **failure-to-abate** notices based on a serious violation related to a death of an employee or three or more hospitalizations.

NOTE: The violations under this criterion **do not have to be High-Emphasis Hazards** as defined in Section XII. (p.5).

B. **Non-Fatality/Catastrophe Criterion Related to High-Emphasis Hazards**.

An inspection in which OSHA finds **two** or more **willful** or **repeated** violations or **failure-to-abate** notices (or any combination of these violations/notices), based on **high gravity serious** violations related to a **High-Emphasis Hazard** as defined in Section XII. (p. 5).

C. **Non-Fatality/Catastrophe Criterion for Hazards Due to the Potential Release of a Highly Hazardous Chemical (Process Safety Management)**.

An inspection in which OSHA finds **three** or more **willful** or **repeated** violations or **failure-to-abate** notices (or any combination of these violations/notices), based on **high gravity serious** violations related to hazards due to the potential release of a highly hazardous chemical, as defined in the PSM standard.

D. **Egregious Criterion**.

All **egregious** (e.g., per-instance citations) enforcement actions will be considered SVEP cases.

XII. **Definition of High-Emphasis Hazards**.

High-Emphasis Hazards as used in this Instruction means only **high gravity serious** violations of the following specific standards covered under falls or the National Emphasis Programs (NEPs) listed in paragraphs F. through K. below, **regardless of the type of inspection** being conducted (e.g., complaint, SST, Local Emphasis Programs, National Emphasis Programs). Low and moderate gravity violations **will not** be considered for a SVEP case. See Chapter 4, section II, *Serious Violations*, and Chapter 6, section III.A *Gravity of Violation* of the FOM (CPL 02-00-148) for determining what constitutes a **high gravity serious** violation.

Example 1: A CSHO conducts an **SST inspection** and cites the employer for one high gravity willful violation of 29 CFR §1910.23 and one low gravity willful violation of 29 CFR §1910.28. The inspection has not met the Non-Fatality/Catastrophe Criterion Related to High-Emphasis Hazards and is not subject to the SVEP.

Example 2: A CSHO conducts a **Local Emphasis Program** inspection for Residential Construction. While on-site, the CSHO observes employees working in an unsupported trench and cites the employer for two high gravity willful violations of 29 CFR §1926.651. The inspection has met the Non-Fatality/Catastrophe Criterion Related to High-Emphasis Hazards and the case is subject to the SVEP.

Example 3: A CSHO conducts a **National Emphasis Program** inspection for Shipbreaking. While on-site, the CSHO observes a piece of scrap metal from the dismantled vessel being lifted with a crane over top of an employee with a kinked wire rope. The employer is cited for one high gravity repeat violation of 29 CFR §1915.112 and one high gravity willful violation of 29 CFR §1915.116. The inspection has met the Non-Fatality/Catastrophe Criterion Related to High-Emphasis Hazards and the case is subject to the SVEP.

A. **Fall hazards covered under the following general industry standards:**

1. 29 CFR §1910.23 - Guarding floor and wall openings and holes [Walking-Working Surfaces]

2. 29 CFR §1910.28 - Safety requirements for scaffolding [Walking-Working Surfaces]

3. 29 CFR §1910.29 - Manually propelled mobile ladder stands and scaffolds (towers) [Walking-Working Surfaces]

4. 29 CFR §1910.66 - Powered platforms for building maintenance [Powered Platforms, Manlifts, and Vehicle-Mounted Work Platforms]

5. 29 CFR §1910.67 - Vehicle-mounted elevating and rotating work platforms [Powered Platforms, Manlifts, and Vehicle-Mounted Work Platforms]

6. 29 CFR §1910.68 - Manlifts [Powered Platforms, Manlifts, and Vehicle-Mounted Work Platforms]

B. **Fall hazards covered under the following construction industry standards:**

1. 29 CFR §1926.451 - General requirements [Scaffolds]

2. 29 CFR §1926.452 - Additional requirements applicable to specific types of scaffolds

3. 29 CFR §1926.453 - Aerial lifts [Scaffolds]

4. 29 CFR §1926.501 - Duty to have fall protection

5. 29 CFR §1926.502 - Fall protection systems criteria and practices

6. 29 CFR §1926.760 - Fall protection [Steel Erection]

7. 29 CFR §1926.1052 - Stairways [Ladders]

C. **Fall hazards covered under the following shipyard standards:**

1. 29 CFR §1915.71 - Scaffolds or staging [Scaffolds, ladders and Other Working Surfaces]

2. 29 CFR §1915.73 - Guarding of deck openings and edges [Scaffolds, ladders and Other Working Surfaces]

3. 29 CFR §1915.74 - Access to vessels [Scaffolds, ladders and Other Working Surfaces]

4. 29 CFR §1915.75 - Access to and guarding of dry docks and marine railways [Scaffolds, ladders and Other Working Surfaces]

5. 29 CFR §1915.159 - Personal fall arrest systems (PFAS) [Personal Protective Equipment (PPE)]

D. **Fall hazards covered under the following marine terminal standards:**

1. 29 CFR §1917.45 - Cranes and derricks [Cargo Handling Gear and Equipment]

2. 29 CFR §1917.49 - Spouts, chutes, hoppers, bins, and associated equipment [Cargo Handling Gear and Equipment]

3. 29 CFR §1917.112 - Guarding of edges [Terminal Facilities]

E. **Fall hazards covered under the following longshoring standards:**

1. 29 CFR §1918.22 - Gangways [Gangways and Other Means of Access]

2. 29 CFR §1918.85 - Containerized cargo operations [Handling Cargo]

F. **Amputation hazards** specified below that are covered under the National Emphasis Program on Amputations. (See CPL03-00-003):

1. 29 CFR §1910.147 - The control of hazardous energy (lockout/tagout)

2. 29 CFR §1910.212 - General requirements for all machines

3. 29 CFR §1910.213 - Woodworking machinery requirements

4. 29 CFR §1910.217 - Mechanical power presses

5. 29 CFR §1910.219 - Mechanical power-transmission apparatus

G. **Combustible dust hazards** specified below that are covered by the Combustible Dust National Emphasis Program (Reissued), including the General Duty Clause (Sec. 5(a)(1) of the OSH Act). (See CPL 03-00-008):

1. 29 CFR §1910.22 - General requirements [Walking-Working Surfaces]

2. 29 CFR §1910.307 - Hazardous (classified) locations [Electrical]

3. Sec. 5(a)(1) of the OSH Act

Any General Duty Clause violation concerning hazards related to dust collectors inside buildings, deflagration isolation systems, and duct-work issues.

H. **Crystalline silica hazards** specified below that are covered by the National Emphasis Program — Crystalline Silica (See CPL 03-00-007):

1. **Overexposure**.

   a. 29 CFR Part §1910.1000 and 29 CFR Part §1915.1000 - Air Contaminants

   b. 29 CFR §1926.55 - Gases, vapors, fumes, dusts, and mists

2. **Failure to Implement Engineering Controls**.

   a. 29 CFR §1910.1000(e) - Air Contaminants

   b. 29 CFR §1926.55(b) - Gases, vapors, fumes, dusts, and mists

3. **When Overexposure Occurs**.

   29 CFR §1910.134; 29 CFR §1926.103; and 29 CFR §1915.154 - Respiratory protection

NOTE: The Silica NEP requires a mandatory follow-up inspection when overexposures to crystalline silica are found. If a follow-up inspection finds the same violations as previously cited, the follow-up inspection will most likely qualify as a SVEP case. See paragraph XV.A.4. (p.11).

I. **Lead hazards** specified below that are covered by the National Emphasis Program — Lead (only violations based on sampling). See CPL 03-00-009.

   1. 29 CFR §1910.1025 - Lead

   2. 29 CFR §1926.62 - Lead

   3. 29 CFR §1915.1025 - Lead and 29 CFR §1915 Subpart D Welding, Cutting, and Heating

J. **Excavation/trenching hazards** specified below that are covered by the Special Emphasis Program - Trenching and Excavation (See CPL 02-00-069)

   1. 29 CFR §1926.651 - Specific excavation requirements

   2. 29 CFR §1926.652 - Requirements for protective systems [Excavations]

K. **Shipbreaking hazards** specified below that are covered by the National Emphasis Program — Shipbreaking. See CPL 02-00-136.

   1. 29 CFR §1915.12 - Precautions and the order of testing before entering confined and enclosed spaces and other dangerous atmospheres [Confined and Enclosed Spaces and Other Dangerous Atmospheres in Shipyard Employment]

   2. 29 CFR §1915.112 - Ropes, chains, and slings [Gear and Equipment for Rigging and Materials Handling]

   3. 29 CFR §1915.116 - Use of Gear [Gear and Equipment for Rigging and Materials Handling]

    4. 29 CFR §1915.159 - Personal fall arrest systems (PFAS) [Personal Protective Equipment (PPE)]

    5. 29 CFR §1915.503 - Precautions for hot work [Fire Protection in Shipyard Employment]

XIII. **Hazards Due to the Potential Release of a Highly Hazardous Chemical (Process Safety Management)**.

**Petroleum refinery hazards** are those hazards that are covered by the Petroleum Refinery Process Safety Management National Emphasis Program (See CPL 03-00-004) and hazards due to the potential release of a highly hazardous chemical as covered by the PSM Covered Chemical Facilities National Emphasis Program See Instruction 09-06 (CPL 02):

> 29 CFR §1910.119 - Process safety management of highly hazardous chemicals

XIV. **Enforcement Considerations — Two or More Inspections of the Same Employer**.

For classification under the SVEP, each individual inspection must be evaluated separately to determine if it meets one of the criteria in XI.A., B., C., or D. (p. 4). If any of the inspections meet one of the severe violator criteria, it will be considered a SVEP case and coded according to paragraph XVIII.A. (p. 20).

XV. **Procedures of the Severe Violator Enforcement Program (SVEP)**.

When the Area Director determines that a case meets one of the SVEP criteria, it will be treated in accordance with paragraphs XV.A. through E below. Only those SVEP actions that are appropriate for the particular employer should be taken.

  A. **Enhanced Follow-up Inspections**.

    1. **General**.

For any SVEP inspection issued on or after the effective date of this Instruction, a follow-up inspection must be conducted after the citations become final orders even if abatement verification of the cited violations has been received. The purpose of the follow-up inspection is to assess **not only** whether the cited violation(s) were abated, **but also** whether the employer is committing similar violations.

    2. **Compelling Reason Not to Conduct**.

If there is a compelling reason not to conduct a follow-up inspection, the reason must be documented in the file. **The Region shall also report these cases monthly to the Director of Enforcement Programs**, along with the reason a follow-up was not initiated.

If a follow-up cannot be initiated, the follow-up column of the SVEP Log must be completed by giving the reason. Examples of compelling reasons not to conduct a follow-up inspection may include: (1) worksite/workplace closed, (2) employer is out of business, (3) operation cited has been discontinued at the worksite/workplace, or (4) case no longer meets any of the SVEP criteria because citation has been withdrawn/vacated.

NOTE: A Corrected During Inspection (CDI) situation does not take the place of a needed follow-up inspection.

If the Area Director learns that a cited operation has been moved from the cited location to a different location, the new location shall be inspected. If the new location is outside the area office jurisdiction, a referral shall be made.

3. **Construction Worksites**.

When the Area Office has reason to believe that a construction worksite is no longer active (or is nearing completion), thus making a follow-up inspection of the same worksite impossible or impractical, the provisions in paragraph XV.B.5. (p. 15) shall apply. When a construction follow-up is attempted but the employer is no longer at the site, it will not be added to the SVEP Log.

4. **Silica Overexposure Follow-ups**.

The Silica NEP (CPL 03-00-007) in paragraph XI.E.1. requires a mandatory follow-up inspection when citations are issued for overexposure to crystalline silica to determine whether the employer is eliminating silica exposures or reducing exposures below the PEL. If a follow-up inspection finds the same or similar violations as previously cited, the follow-up inspection will most likely qualify as a severe violator enforcement case under the criteria in section XI. (p. 4).

B. **Nationwide Inspections of Related Workplaces/Worksites**.

1. **General**.

OSHA has found that employer indifference to compliance responsibilities under the Act may be indicative of broader patterns of non-compliance at related employer worksites. When there are reasonable grounds to believe that compliance problems identified in the initial inspection may be indicative of a broader pattern of non-compliance, OSHA will inspect related worksites of the same employer. Appendix B of this Instruction provides guidance in evaluating whether compliance problems found during the initial SVEP inspection are localized or likely to exist at related facilities. This information should be gathered, to the extent possible, during the initial SVEP inspection. Such information may also be sought by letter, telephone, or if necessary, by subpoena.

The Regional Administrator shall be responsible for assuring that relevant information is gathered and for determining whether the information provides reasonable grounds to believe that a broader pattern of non-compliance may exist. The Regional Administrator shall consult with the Regional Solicitor as appropriate. When sufficient evidence is found, all related establishments of the employer that are in the same 3-digit NAICS code (or 2-digit SIC code) as the initial SVEP case will be identified; establishments will be selected for inspection in accordance with subsection 4 below. Establishments that are not in the same 3-digit NAICS code (or 2-digit SIC code) also may be inspected if there are reasonable grounds to believe hazards and violations may be present at the related sites.

The Directorate of Enforcement programs will serve as the National Office point of contact for all SVEP nationwide referrals. Any questions should be addressed to the Director or Deputy Director in DEP. All Regional Administrators will name a SVEP Coordinator.

2. **Office of Statistical Analysis (OSA)**.

At the request of the Director of the Directorate of Enforcement Programs, the Regional Administrator, or

the Regional Coordinator, OSA will assist in identifying similar and other related worksites nationwide (including in State Plan States) of the same employer.

Establishments are related when there is common ownership. Related establishments include establishments of corporations that are in the same corporate family, including subsidiary, affiliate, or parent corporations with substantial common ownership.

Similar related establishments are related establishments that are in the same 3-digit NAICS code (or 2-digit SIC code).

3. **State Plan State Referrals**.

   OSHA will accept referrals, which include all relevant facts, from State Plan States regarding any inspections conducted pursuant to the State's SVEP. State Plan referrals to Federal OSHA are to be sent to the Regional Administrator, who will forward any referrals not in its Region to the appropriate OSHA Regional Administrator.

4. **General Industry Workplaces**.

   a. **Employer Has Three (3) or Fewer Similar Related Workplaces**.

      When the Regional Administrator determines that additional workplaces within that region should be inspected, and the employer has three or fewer similar related workplaces, **all such workplaces will be inspected** to determine whether those sites have hazardous conditions or violations similar to those in the severe violator enforcement case. The Regional Administrator shall have overall responsibility for coordinating the inspections and planning investigative strategy. The Regional Administrator shall consult with the Regional Solicitor as appropriate.

      When any of the three or fewer workplaces that the Regional Administrator believes should be inspected are in **one or more of the Region's State Plan States**, the information will be forwarded to the State Plan Designee for inspection. A copy of the referral will also be sent to the Director of DEP.

      When any of the three or fewer workplaces that the Regional Administrator believes should be inspected are in **two or more Regions or a State Plan State in another Region**, the information will be forwarded to the appropriate Regional Administrator for inspection. A copy of the referral will also be sent to the Director of DEP.

   b. **Employer Has Four (4) or More Similar Related Workplaces**.

      When the Regional Administrator determines that additional workplaces should be inspected, and the employer has **four or more similar related establishments within the Region or in other Regions**, or the number of workplaces/worksites cannot be determined, the Regional Administrator will send the recommendation for inspection, including all relevant facts, to the Director of DEP. The Director shall consult with the Associate Solicitor as appropriate.

      (1) When the Director of DEP determines that there are reasonable grounds for inspecting similar related establishments, he/she will issue a SVEP Nationwide inspection list. Normally, when the number of similar related establishments nationwide is 10 or less, all will be selected for inspection.

When there are more than 10, the Office of Statistical Analysis will assign random numbers to the complete list of similar related establishments, sort those establishments in random number order, and select the first 10 for inspection.

**All establishments on the inspection list will be inspected to determine whether hazardous conditions or violations similar to those found in the initial SVEP inspection are present**. Based on the results of these inspections, the Director may determine whether inspections of additional establishments should be conducted. Any inspection conducted under a SVEP Nationwide inspection list is to be coded as an unprogrammed-referral, and is to be considered a referral from the National Office. An OSHA-90 is to be generated when a site is discovered where a SVEP Nationwide Referral employer is working.

(2) In addition to or in lieu of (1) above, when the Director has reasonable grounds to believe that hazards may exist at particular other related establishments, he/she may select those establishments for inspection.

(3) The Director shall be responsible for coordinating nationwide inspections of related establishments under this paragraph. Where complex or systemic issue are present, the Director shall convene a team to advise on investigative strategies, such as the use of administrative depositions or experts, and share information among offices participating in the inspections. The team shall include representatives from the OSHA and SOL national offices and regional offices where inspections will be conducted. In the event the inspections result in multiple contested citations, the team will advise SOL on litigation strategies that take account of such matters as distribution of work among affected offices and budget.

c. **SVEP Nationwide Related Inspections that involve process safety management (PSM) hazards**.

A SVEP Nationwide inspection will be limited to investigations of the PSM standard for which the willful or repeated citations or failure-to-abate notices were issued, and will not include units that were inspected in the previous two years.

5. **Construction Worksites**.

a. **Regional Office**.

Whenever an employer in the construction industry has a SVEP case, the Regional Administrator must further investigate the employer's OSH Act compliance. If the initially inspected worksite is closed before a follow-up inspection can be conducted, at least one other worksite of the cited employer must be inspected to determine whether the employer is committing violations similar to those found in the initial severe violator enforcement inspection. Because the worksites of construction employers are often difficult to locate, the following means may be used to identify other worksites of the cited employer.

- If the severe violator enforcement case is resolved through a settlement, the agreement should require the employer to notify the Area Director of its other jobsites prior to when work starts at new construction sites during the following one-year period.

- An administrative subpoena may be issued to an employer prior to the issuance of the citation to identify the location of worksites where employees of that employer are presently working or are expected to be working within the next 12 months. See *FOM*, Chapter 15, section I, (*Administrative Subpoenas*).

- A subpoena may be issued at any time during an inspection if it appears that the inspection is likely to result in a SVEP case and the Area Director determines (after consultation with the RA) that the hazards disclosed by the inspection and the inadequacy of the employer's response to those hazards indicate that a broader response by OSHA is appropriate.

- Whenever a subpoena is to be issued pursuant to the SVEP, the Regional Administrator shall coordinate with the Regional Solicitor.

b. **National Office**.

- When a Regional Administrator determines that a SVEP construction employer is operating in a different region, the Regional Administrator will send a recommendation for inspection, including all relevant facts, to the Director of DEP. The Director shall consult with the Associate Solicitor as appropriate.

- When the Director of DEP deems it necessary to notify Regional Administrators and State Designees regarding activity of a particular construction employer with worksites in more than one Region and/or State Plan States, the Director will issue a SVEP Nationwide referral. The procedures outlined under XV.B.4.b. (p. 13) will be followed.

- Any inspection conducted under a SVEP Nationwide referral is to be coded as an unprogrammed-referral, and is to be considered a referral from the National Office. An OSHA-90 is to be generated when a site is discovered where a SVEP Nationwide Referral employer is operating.

6. **Scope of Related Inspections**.

The scope of inspection of a related establishment will depend upon the evidence gathered in the original SVEP inspection, and will mainly focus on the same or similar hazards to those found in the original case.

7. **Priority of the Inspection**.

a. In accordance with inspection priorities of the FOM (CPL 02-00-148), in Chapter 2, in section IV.B., (*Inspection Priority Criteria*), the SVEP nationwide referral inspections will come after imminent danger, fatality, and complaints, but before other programmed inspections. But see section XVII. (*Relationship to Other Programs*) of this Instruction (p.19), regarding when other inspections may be conducted concurrently.

b. The Assistant Secretary by this Instruction determines that the specific inspections under the Nationwide Inspections of Related Workplaces/ Worksites process are critical inspections for the purpose of 29 CFR §1908.7(b)(2)(iv) and delegates to the Director of the Directorate of Enforcement Programs the authority to determine site selections of those related workplaces/worksites.

C. **Increased Company Awareness of OSHA Enforcement**.

1. **Sending Citations and Notifications of Penalty to Headquarters**.

   a. For all employers that are the subject of a SVEP case, the Area Director shall mail a copy of the Citations and Notifications of Penalty to the employer's national headquarters if the employer has more than one fixed establishment. See sample cover letter in Appendix C.

   b. Employee representatives (e.g., unions) shall receive a copy of the Citations and Notifications of Penalty that is mailed to the employer's national headquarters.

2. **Issuing News Releases**.

   a. **Regional News Releases**.

   The Regional Offices may issue a News Release for all SVEP cases upon issuance of the citations. Regional Administrators have the discretion to determine which SVEP cases will receive a News Release.

   b. **Nationwide Referral Inspection News Releases**.

   In SVEP cases that were a result of a Nationwide Referral, the Regional Office is to issue a News Release at the time the citations are issued. In certain SVEP cases, the National Office may issue a News Release in coordination with the Regional Office.

3. **Sending Letters to Corporate Officers or Coordinating Meetings with the Regional or National Office**.

   In cases where OSHA determines that an establishment's safety and health problems should be addressed at the corporate level, the following actions should be considered:

   a. A letter sent from the Regional Administrator, or the appropriate National Office official, to the company President expressing OSHA's concern with the company's violations. A copy of the citations shall be sent with the letter if the citations and cover letter have not been sent to the company President previously.

   b. A meeting may be held between OSHA, company officials, employees and unions representing affected employees to discuss how the company intends to address safety and health compliance. If the company operates in more than one region, this normally will require National Office coordination.

   c. Employee representatives shall be notified by letter when OSHA determines that the establishment's safety and health problems need to be addressed at the corporate level.

D. **Enhanced Settlement Provisions**.

The following settlement provisions shall be considered to ensure future compliance both at the cited facility and at other related facilities of the employer:

1. Employers shall hire a qualified safety and health consultant to develop and implement an effective and comprehensive safety and health program or, where appropriate, a program to ensure full compliance with the subpart under which the employer was cited under the SVEP;

   NOTE: Employers cannot be required in a settlement agreement to use OSHA's state consultation services; such services are strictly voluntary.

2. Applying the agreement company-wide (See CPL 02-00-090 Guidelines for Administration of Corporate-wide Settlement Agreements. June 3, 1991);

   NOTE: Company-wide Settlement Agreements are to be coordinated with the National Office of the Solicitor.

3. Requiring interim abatement controls if OSHA is convinced that final abatement cannot be accomplished in a short period of time;

4. In construction (and, where appropriate, in general industry), using settlement agreements to obtain from the employer a list of its current jobsites, or future jobsites within a specified time period. The employer should be required to indicate to OSHA the specific protective measure to be used for each current or future jobsite;

5. Requiring the employer for a specified time period to submit to the Area Director its Log of Work-related Injuries and Illnesses on a quarterly basis, and to consent to OSHA conducting an inspection based on the information;

6. Requiring the employer for a specified time period to notify the Area Office of any serious injury or illness requiring medical attention and to consent to an inspection; and

7. Obtaining employer consent to entry of a court enforcement order under Section 11(b) of the Act.

E. **Federal Court Enforcement under Section 11(b) of the OSH Act**.

   SVEP cases should be strongly considered for section 11(b) orders when it appears that such orders may be needed to assure compliance. An employer's obligation to abate a cited violation arises when there is a final order of the Review Commission affirming the citation. For guidance on drafting citations and settlement agreements that can maximize the deterrent effect of a Section 11(b) order, see *FOM* (CPL 02-00-148) Chapter 15, section XIV.

XVI. **SVEP Log**.

   A. **General**.

   The National Office will maintain a SVEP Log in which inspections that meet the SVEP criteria, or are SVEP-related inspections (i.e., SVEP follow-ups, or inspections at other worksites of the same employer), are logged as they are reported to the National Office by the Regional SVEP Coordinators.

   B. **Lining-Out Establishments from the SVEP Log**.

   If an establishment has entered into a settlement agreement (informal or formal) in which a citation that

qualified the establishment for SVEP designation is deleted, or if there has been an Administrative Law Judge, Review Commission, or court decision that has vacated such a citation, then the entry on the SVEP Log will be lined-out and the IMIS "SVEP" code will be removed from that establishment's Internet Inspection Detail summary. The Area Director must notify the Regional SVEP Coordinator of these changes, who in turn must notify DEP to line-out the inspection from the SVEP Log.

## XVII. **Relationship to Other Programs**.

### A. **Unprogrammed Inspections**.

If an unprogrammed inspection arises with respect to an establishment that is to receive an SVEP-related inspection, the two inspections may be conducted either separately or concurrently. This Instruction does not affect in any way OSHA's ability to conduct unprogrammed inspections.

### B. **Programmed Inspections**.

Some establishments selected for inspection under the SVEP may also fall under one or more other OSHA initiatives such as Site-Specific Targeting (SST) or Local Emphasis Programs (LEP). Inspections under these programs may be conducted either separately or concurrently with inspections under this Instruction.

## XVIII. **Recording and Tracking Inspections**.

### A. **SVEP Code**.

This applies to all severe violator enforcement cases issued on or after the effective date of this Instruction. Once a case is identified as a severe violator enforcement case, enter the NEP code "SVEP" from the drop-down list in field 25d, for the inspection.

NOTE: **Only inspections** that meet one of the four criteria for a severe violator enforcement case will be coded with the SVEP NEP code.

### B. **NEP Codes for High-Emphasis Hazards**.

If the SVEP criterion used is that described in paragraph XII.B., the appropriate NEP codes must be entered in field 25d.

### C. **Significant Enforcement Actions and Enhanced Settlement Codes**.

If any inspection in a significant enforcement action qualifies as a severe violator case, it is to be coded "SIGCASE" in item 42, for that inspection.

EXAMPLE:     N          08            SIGCASE

If a severe violator case receives an enhanced settlement agreement, it is to be coded "ENHSA" in item 42.

EXAMPLE:     N          08            ENHSA

### D. **Other Program Codes**.

Remember to enter all applicable SST, REP, NEP, and LEP program codes in Item

25c and 25d when an inspection is conducted and the inspection also meets the protocol for other program(s). Also, enter all applicable Strategic Management Plan hazard/industry codes in Item 25f.

XIX. **Dun & Bradstreet Number**.

If it is available, the Data Universal Numbering System (DUNS) number is to be entered in the appropriate field on the Establishment Detail Screen. In establishments where ownership has changed, enter the DUNS number for the new owner. If the new owner does not have a new DUNS number, enter the old DUNS number, if known. Since the DUNS number is site-sensitive, the old number will give some useful data. The field on the Establishment Detail Screen can be accessed by pressing F5 in Item 8 to access establishment processing. Once establishment processing is completed, the DUNS number will appear in Item 9b.

XX. **End of the Fiscal Year Report**.

The Directorate of Enforcement Programs (DEP) will compile an End of the Fiscal Year Report of each Region's SVEP activity, which will be sent to the Assistant Secretary.

---

## Appendix A

### Information Needed on Each SVEP Inspection for Monthly Report to the National Office

Employer Name      Inspection Number      Regional Office      Area Office

Opening Date      SIC & NAICS codes      # of Employees Controlled

Indicate if inspection is a SVEP, a Follow-up (FU), a Construction-Related (C-R), or a General Industry-Related (GI-R). If inspection is done based on an SVEP Nationwide Expansion Memo the inspection will either be a C-R or a GI-R.

If the inspection is other than a SVEP, give the name and inspection number of the SVEP case to which it is a follow-up or related.

Remember: any FU, C-R, or GI-R inspections can also be a SVEP.

Indicate if construction or non-construction.

What SVEP criteria apply (more than one can apply):

1) Fatality/Catastrophe -- One/more W/R/FTA based on a serious violation of **any gravity** related to death or three or more hospitalized

2) Non-Fatality/Catastrophe -- Two/more W/R/FTA based on high gravity serious violations related to a High-Emphasis Hazard (excluding Process Safety Management)

3) Non-Fatality/Catastrophe for PSM hazards -- Three/more W/R/FTA based on high gravity serious violations

4) Egregious Case

What SVEP actions have been taken (do not report any planned activities):

1) Follow-up inspection conducted; or compelling reason not to conduct

2) Additional construction worksite inspected

3) Additional general industry worksite inspected

4) News Releases issued by Regional Office

5) Letter and citation sent to company headquarters by Region or National Office official

6) Meeting with company officials (separate from informal conference)

7) Enhanced settlement provisions used in informal/formal settlements

8) Court enforcement under Sec. 11(b)

- Case submitted to RSOL

- Case submitted to N.O. SOL

- Petition filed with court [State which court & date]

- Petition granted by court [State which court & date]

- Other actions [State & give date]

Appendix B

CSHO Guidance: Considerations in Determining
Company Structure and Safety and Health Organization

When determining whether to inspect other worksites of a company that has been designated a severe violator enforcement case, it must first be determined whether compliance problems and issues found during the initial SVEP inspection are localized or are likely to exist at other, similar facilities owned and operated by that employer. If violations at a local workplace appear to be symptomatic of a broader company neglect for employee safety and health, either generally or with respect to conditions cited under the SVEP inspection, the company structure must be investigated to help identify other establishments and conditions similar to those found in the initial inspection. At the request of the Director of Directorate of Enforcement Programs, a Regional Administrator, or a Regional Coordinator, the Office of Statistical Analysis will be contacted to assist in identifying similar or related worksites of the employer.

**Extent of Compliance Problems**. Are violative conditions a result of a company decision or interpretation concerning a standard or hazardous condition? Have corporate safety personnel addressed the standard or condition? Ask the following types of questions of the plant manager, safety and health personnel and line employees.

- Who made the decision concerning the violative operation, local management or company headquarters? Was the decision meant to apply to other facilities of the employer as well? If the decision was from company headquarters, what is their explanation?

- Is there a written company-wide safety program? If so, does it address this issue? If so, how is the issue addressed?

- Is there a company-wide safety department? If so, who are they and where are they located? How does company headquarters communicate with facilities/worksites? Are establishment/worksite management and safety and health personnel trained by the company?

- Do personnel from company headquarters visit facilities/worksites? Are visits on a regular or irregular basis? What subjects are covered during visits? Are there audits of safety and health conditions? Were the types of violative conditions being cited discussed during corporate visits?

- Are there insurance company or contractor safety and health audit reports that have been ignored? Are headquarters safety and health personnel aware of the reports and the inaction?

- Does the company have facilities or worksites other than the one being inspected that do similar or substantially similar work, use similar processes or equipment, or produce like products? If so, where are they?

- What is the overall company attitude concerning safety and health? Does the establishment or worksite receive good support from company headquarters on safety and health matters?

- Does the company provide appropriate safety and health training to its employees?

- Ask whether the establishment's/worksite's overall condition is better or worse at present compared to past years? If it is worse, ask why? Has new management or ownership stressed production over safety and health? Is the equipment outdated or in very poor condition? Does management allege that stressed financial conditions keep it from addressing safety and health issues?

- Is there an active and adequately funded maintenance department? Have they identified these problems and tried to fix them?

- Has the management person being interviewed worked at or visited other similar facilities or worksites owned by the company? How was this issue being treated there?

**Identifying Company Structure**. Inquire where other facilities or worksites are located and how they may be linked to the one being inspected? Sometimes establishment/worksite management will not have a clear understanding of the company structure, just an awareness of facts concerning control and influence from the corporate office.

- Is the establishment/worksite, or the company that owns the establishment or uses the worksite, owned by another legal entity (parent company)? If so, what is the name and location? Try to find out whether the inspected establishment/worksite is a "division" or a "subsidiary" of the parent company. (NOTE: A "division" is a wholly-owned part of the same company that may be differently named, e.g., Chevrolet is a division of GM. A "subsidiary" is a company controlled or owned by another company which owns all or a majority of its shares. Try to determine if the parent company has divisions or subsidiaries other than the one that owns or uses the establishment or worksite being inspected. If so, try to get the names and the type of business they are involved in. Sometimes this type of information can be found on a website or in Dun and Bradstreet. Another good source of information is the office of the Secretary of State within the state government.

- Are there other facilities or worksites controlled by these entities that do the same type of work and might have the same kinds of safety and health concerns?

- Are the company entities publicly held (have publicly traded shares) or are they closely held (owned by one or more individuals)?

- What are the names, positions and business addresses of relevant company personnel of whom interviewees are aware? For which entities do the company safety and health personnel work?

- On what kind of safety and health-related issues or subjects do personnel from company headquarters give instructions?

- Are there other companies owned by the same or related persons that do similar work (especially in construction).

---

**Appendix C**

**Sample Letter to Company Headquarters**

Area Office Header

Date

Name of Employer's National Headquarters
Address of Headquarters

Dear _____:

Enclosed you will find a copy of a Citation and Notification of Penalties for violations of the Occupational Safety and Health Act of 1970, which were issued to [establishment name, located in city, state]. This case has been identified as a severe violator enforcement case under the Occupational Safety and Health Administration's (OSHA) Severe Violator Enforcement Program (SVEP).

The violations referred to in this Citation must be abated by the dates listed and the penalties paid, unless they are contested. This Citation and Notification of Penalties is being provided to you for informational purposes so that you are aware of the violations; the original was mailed to [establishment name] on [date]. We encourage you to work with all of your sites to ensure that these violations are corrected.

OSHA is dedicated to saving lives, preventing injuries and illnesses and protecting America's workers. For more information about OSHA programs, please visit our website at www.osha.gov.

Sincerely,

Area Director

Enclosure

# UNITED STATES
# DEPARTMENT OF LABOR

Occupational Safety & Health Administration

200 Constitution Ave NW

Washington, DC 20210

☎ 800-321-6742 (OSHA)

TTY

11/4/21, 3:51 PM    State PlOSHA Nurt Enforcement Program [Filed] 12/10/21 Pad Occupational Safety and Health Administration

Case 2:21-cv-01854 Document 1 Filed 12/10/21 Page 33 of 148

www.OSHA.gov

**FEDERAL GOVERNMENT**

White House
Severe Storm and Flood Recovery
Assistance
Disaster Recovery Assistance
DisasterAssistance.gov
USA.gov
No Fear Act Data
U.S. Office of Special Counsel

**OCCUPATIONAL
SAFETY & HEALTH**

Frequently Asked
Questions
A - Z Index
Freedom of Information
Act - OSHA
Read The OSHA
Newsletter
Subscribe to the OSHA
Newsletter
OSHA Publications
Office of Inspector
General

**ABOUT THIS SITE**

Freedom of Information Act - DOL
Privacy & Security Statement
Disclaimers
Important Web Site Notices
Plug-ins Used by DOL
Accessibility Statement

**Exhibit B to Lloyd Industries Warrant Application**



United States of America
**OCCUPATIONAL SAFETY AND HEALTH REVIEW COMMISSION**
1120 20th Street, N.W., Ninth Floor
Washington, DC 20036-3419

Phone:  (202) 606-5405

Fax:  (202)606-5409

### Notice of Decision

**In Reference To:**

**Secretary of Labor** v.  LLOYD INDUSTRIES, INC.
**OSHRC Docket Nos.**  15-0846 and 15-0847

1.  Enclosed is a copy of my decision.   It will be submitted to the Commission's Executive Secretary on **Monday, June 19, 2017**. The decision will become the final order of the Commission at the expiration of thirty (30) days from the date of docketing by the Executive Secretary unless, within that time, a Member of the Commission directs that it be reviewed.   All parties will be notified by the Executive Secretary of the date of docketing.

2.  Any party that is adversely affected or aggrieved by the decision may file a petition for discretionary review by the Review Commission.  *A petition may be filed with this Judge within ten (10) days from the date of this notice.   Thereafter, any petition must be filed with the Review Commission's Executive Secretary within twenty (20) days from the date of the Executive Secretary's notice of docketing.*   See paragraph No. 1. The Executive Secretary's address is as follows:

**Executive Secretary**
**Occupational Safety and Health**
**Review Commission**
**One Lafayette Center**
**1120 20th Street, N.W. - 9th Floor**
**Washington, D.C.  20036-3419**

3.  The full text of the rule governing the filing of a petition for discretionary review is 29 C.F.R. 2200.91 (2012).   It is appended hereto for easy reference, as are related rules prescribing posthearing procedures.

The Honorable Keith E. Bell
Judge, OSHRC

DATED:   JUN **7 2017**
Washington, D.C.



**United States of America**
**OCCUPATIONAL SAFETY AND HEALTH REVIEW COMMISSION**
1120 20th Street, N.W., Ninth Floor
Washington, DC 20036-3457

| | | |
|---|---|---|
| SECRETARY OF LABOR, | : | |
| | : | |
| Complainant, | : | |
| | : | |
| v. | : | |
| | : | OSHRC DOCKET NOS. 15-0846, 15-0847 |
| LLOYD INDUSTRIES, INC., | : | |
| | : | |
| Respondent. | : | |

Appearances:

      Katherine E. Bissell, Esq., Deputy Solicitor for Regional Enforcement, Oscar L.
Hampton III, Regional Solicitor, Judson H. Dean, Senior Trial Attorney, Jordana L.
Greenwald, Esq., Office of the Regional Solicitor, Philadelphia, PA
          For the Complainant.

      Jonathan L. Snare, Esq., Morgan Lewis & Bockius LLP, Washington, D.C., Brandon J.
Bingham, Esq., Morgan Lewis & Bockius, LLP Philadelphia, PA
          For the Respondent.

Before: Keith E. Bell, Administrative Law Judge

### DECISION AND ORDER

    Following a complaint from a former employee injured while working at Lloyd

Industries, Inc. (Respondent), the Occupational Safety and Health Administration (OSHA)

commenced an investigation. OSHA conducted both a safety (No. 1008085) and health

inspection (No. 1009661) at Respondent's Montgomeryville, PA facility (Facility). These

inspections resulted in the issuance of several citations alleging willful, serious, and other than

serious violations of the Occupational Safety and Health Act of 1970, 29 U.S.C. §§ 651-678 (the

Act). Respondent timely contested all the citations and the dockets from the two inspections

1

(Nos. 1008085 and 1009661) were consolidated for review before the Occupational Safety and

Health Review Commission (Commission).

The hearing in this matter stretched over nine days and occurred on the following dates:

October 17-21 and October 24-27, 2016.  The following witnesses testified:

> two OSHA safety and health compliance officers Glenn Kerschner and Joseph
> Daniel Orach, OSHA Area Director Jean Kulp, Neal Growney (an expert in
> machine guarding), Brian Liddell (an expert in noise exposure measure
> measurement, analysis of noise exposure data, and determining compliance with
> occupational noise standards), four former employees, four current employees,
> Respondent's President, William F. Lloyd,

for the Secretary; and,

> Fred Braker, the business representative of the Sheet Metal Workers Local 19,
> eight current employees, Dennis Driscoll (an expert in occupational noise, noise
> exposure assessments, hearing conservation and regulatory compliance and
> occupational noise data analysis), Michael Taubitz (an expert in machine
> guarding and risk assessment) and Mr. Lloyd,

for the Respondent.  Both parties filed post hearing briefs.

For the reasons set forth below, the undersigned finds that Respondent violated the Act

and affirms Citation 1, Item 3a; Citation 1, Item 3b (except for Instance (e)); Citation 1, Item 3c;

Citation 1, Item 3d (except for Instance (d)); Citation 1, Item 4b; Citation 2, Items 2, 3, 4, 5, 6

and 7 from Inspection No. 1008085; and, from Inspection No. 1009661, Citation 1, Items 1, 2, 3,

4b and 5, and Citation 2, Items 3 and 4.[1]  Separately, for the reasons discussed below, Citation 1,

---

[1] The parties reached a partial settlement agreement resolving Citation 1, Items 1, 2a, and 2b, and
Citation 3, Items 1, 2, and 3, from what was initially designated Docket No. 15-0846.  (Jt. Ex. J-
2.)  In an Order dated March 10, 2107, these items were severed from Docket No. 15-0846 and
assigned Docket No. 17-0381.  The parties also resolved Citation 1, Item 4a, and Citation 2,
Items 1 and 2, which arose out of Inspection No. 1009661 and were previously assigned to
Docket No. 15-0847.  These Citation items were severed from that docket and assigned to
Docket No. 17-0382 by an Order dated March 10, 2017.

Item 3b, Instance (e), Citation 1, Item 3d, Instance (d), and Citation 2, Item 1, each from Inspection No. 1008085, are vacated. In addition, the undersigned denies both the Secretary's Motion to Amend the Citation and the Secretary's Motion to Exclude the Testimony and Report of Michael Taubitz.

## JURISDICTION

The record establishes that Respondent filed a timely notice of contest. As of the date of the alleged violation, the record also establishes that the employer engaged in business affecting commerce within the meaning of sections 3(3) and 3(5) of the Act. (Stip. 1-3.) Based upon the record, the undersigned concludes that the Commission has jurisdiction over the parties and subject matter in this case. Respondent is, therefore, covered under the Act.

## STIPULATIONS

The parties stipulated to the following facts:

1. Mr. Lloyd is the sole owner and President of Lloyd Industries, Inc.

2. Lloyd Industries, Inc. was established in 1981.

3. Lloyd Industries, Inc. has two plants in the United States, one in Montgomeryville, PA and one in Florida.

The parties stipulated to the following legal issues:

1. The Commission has jurisdiction over this matter pursuant to Section 10(c) of the Occupational Safety and Health Act of 1970, 29 U.S.C. § 651 et seq., hereinafter the Act.

2. Respondent is an employer within the meaning Section 3(5) of the Act, 29 U.S.C. Section 652(5).

3. Respondent is an employer engaged in a business effecting commerce within the meaning of Sections 3(3) and 3(5) of the Act, 29 U.S.C. Sections 652(3), (5).

3

4. Respondent is not going to seek EAJA fees.

## SECRETARY'S MOTION TO AMEND

During the hearing, the Secretary formally moved to amend the citation to add a general duty clause violation for failure to guard the foot pedal on the Niagara Model 1R10 Mechanical Shear Machine (1R10 shear).[2]   Federal Rule of Civil Procedure 15(b) permits amendments during trial when the parties tried the unpled issue and there was either express or implied consent to do so.  *McWilliams Forge Co., Inc.*, 11 BNA OSHC 2128, 2129 (No. 80-5868, 1984). "Trial by consent may be found only when the parties knew, that is, squarely recognized, that they were trying an unpleaded issue."  *Id.* at 2129-30.

In his Complaint, the Secretary alleged that points of operation were improperly guarded on two shear machines at the Facility: the Niagara Model 18 shear (Niagara 18 shear) and the 1R10 shear.  (Compl. Ex. A, Citation 2, Items 4-5.)  The Secretary later moved to amend the pleadings to include an allegation that 1R10 shear also violated the general duty clause because it too had an unguarded foot pedal.  (Tr. 994-1001.)  Promptly objecting to the motion, Respondent argued that an amendment would be improper because it would cause Respondent to experience prejudice.  (Tr. 998.)

The undersigned finds that the parties did not fully litigate the issue regarding the foot pedal on the 1R10 shear, and that there was no express or implied consent to do so.  The unguarded foot pedal on the 1R10 shear was only directly addressed during the cross-examination of the Secretary's witness:

---

[2] The Secretary also moved to amend the Complaint to add willful violation of 29 C.F.R. § 1910.212(a)(3)(ii) for failure to guard the point of operation on an Accurshear shear machine, but subsequently withdrew the request.  (Mot. to Amend at 1.)

4

Q. ... for the Niagara press brake, do you have that same concern of a hazard, of an accidental activation of any other foot actuated machines?
A. Well, as a general principle, yes.
Q. And it's true, if I'm understanding your opinion correctly, your concern is an unguarded foot pedal presents a risk or a hazard to employees, due to accidental activation, correct?
A. Yes.
Q. And so do you have that same opinion if there was another unguarded foot pedal on another foot actuated machine?
A. In general principle, yes, I reserve the fact that I have to look specifically at the application but in general, yes.
Q. Are you aware whether there was any other machine at Lloyd Industries' plant that had an unguarded foot pedal?
A. Yes.
Q. All right. If we could turn up photo 47, Government Exhibit 47 please. Now, isn't it true this is a picture of you, as you testified earlier, sticking your – trying to stick your hands under the guard of the shear machine, correct?
A. Yes.
Q. And isn't it also true that the foot pedal on that machine is unguarded?
A. Yes.

(Tr. 939-40.) While this testimony refers to the unguarded foot pedal on the 1R10 shear, it also relates to the expert's opinions on foot pedals in general, including the Niagara Model IB-15-3-4 press brake (Niagara Press Brake), which is the subject of Citation 2, Item 1.[3] As this testimony relates both to a pled and an unpled issue, it is not conclusive evidence of Respondent's intent to try the unpled issue. *See Liberty Lincoln-Mercury, Inc. v. Ford Motor Co.*, 676 F.3d 318, 328 (3d Cir. 2012); *McWilliams*, 11 BNA OSHC at 2129 ("consent is not implied by a party's failure to object to evidence that is relevant to both pleaded and unpleaded issues"). The Secretary points to no other testimony evincing Respondent's intent to litigate the foot pedal on the 1R10 shear. (Sec'y Br. at 1-2.) In addition, Respondent asserts that had the 1R10 shear's foot pedal

---

[3] A former employee also briefly discussed the 1R10's lack of guarding and a photograph of the foot pedal was introduced during the Secretary's questioning of the CO. (Tr. 34, 170-71, 285.) However, like the testimony quoted above, this evidence also relates to pled issues, including Citation 2, Items 4 and 5, and is insufficient to support the amendment. *See Armour Food Co.*, 14 BNA OSHC 1817, 1824 (No. 86-247, 1990).

been initially cited, it would have presented specific information, including expert testimony, about whether it violated the general duty clause. (Tr. 998-1000; Resp't Br. at 8-9.) *See ConAgra Flour Milling Co.*, 15 BNA OSHC 1817, 1822 (No. 88-2572, 1992) (indicating that to evaluate the appropriateness of amendment, the judge should "look at whether the party had a fair opportunity to defend and whether it could have offered any additional evidence"); *Cornell & Co., Inc. v. OSHRC*, 573 F.2d 820, 824-5 (3d Cir. 1978) (rejecting a late stage amendment).

The parties did not fully litigate the issue of the 1R10 shear's foot pedal. As a result, the amendment the Secretary seeks is not appropriate.[4] *See Armour Food*, 14 BNA OSHC at 1824 (finding a court's granting of a motion to amend improper because the parties never agreed on which machine was the basis of the litigation). Accordingly, the Secretary's Motion to Amend the Citation is DENIED.

## FACTUAL BACKGROUND

Respondent manufacturers fire dampers and HVAC products at its Facility. A former employee (JE), whose fingers were amputated by Respondent's Niagara Press Brake, filed a complaint with OSHA alleging numerous safety hazards. (Tr. 26, 30, 34.) In response, OSHA commenced an investigation with Compliance Officer Glen Kerschner (CO) first conducting a site inspection on November 13, 2014. (Tr. 133-5, 139.) An additional safety inspection occurred on November 20, 2014. (Tr. 133-35.)

These inspections resulted in the issuance of one serious citation, of which five items remain contested, and one willful citation, with seven separate items. Specifically, the Secretary

---

[4] Respondent also asserts that the 1R10 shear's foot pedal cannot be cited because it does not arise out of the same "conduct, transaction, or occurrence" set out in the original pleading. (Resp't Br. at 9-10 discussing Fed. R. Civ. P. 15(c)(1)(B).) Because the undersigned finds that the proposed amendment is not appropriate, there is no need to address the issue of whether such an amendment would relate back to the date of the original pleadings.

alleges the Respondent willfully violated the Act by: (1) failing to guard the foot pedal for the Niagara Press Brake as required by section 5(a)(1) of the Act; and (2) failing to guard points of operation as required by 29 C.F.R. § 1910.212(a)(3)(ii) on the Niagara Press Brake, the Accurpress Model 7606 Press Brake (Accurpress), the Niagara 18 shear, the 1R10 shear, the Roll Former/Frame Maker Machine (Roll Former), and the Milford brand rivet machines (Rivet Machines). The serious citation relates to Respondent's alleged failure to: (1) guard flywheels on four machines in violation of 29 C.F.R. § 1910.219(b)(1); (2) guard pulleys on five machines in violation of 29 C.F.R. § 1910.219(d); (3) guard horizontal belts on the Niagara Press Brake in violation of 29 C.F.R. § 1910.219(e)(1)(i); (4) guard vertical or inclined belts on four machines in violation of 29 C.F.R. § 1910.219(e)(3)(i); and (5) effectively close unused openings in boxes, cabinets or fittings on two machines in violation of 29 C.F.R. § 1910.305(b)(1)(ii).[5]

In addition to the safety inspections, Compliance Officer Joseph Daniel Orach (Orach) also conducted a health inspection and noise surveys for the Facility. His inspection ultimately led to the issuance of one willful citation, of which six items remain in dispute, and one other-than-serious citation with two items still contested.[6] Specifically, the willful citation alleges that Respondent failed to: (1) annually obtain audiograms for three employees in violation of 29 C.F.R. § 1910.95(g)(6); (2) conduct a training program and ensure participation in that program in violation of 29 C.F.R. § 1910.95(k)(1); (3) conduct annual training for each employee in the hearing conservation program in violation of 29 C.F.R. § 1910.95(k)(2); and (4) provide effective information and training on hazardous chemicals in the work area in violation of 29

---

[5] As noted above, these inspections also led to one other-than-serious citation, which the parties settled prior to the hearing. (Jt. Ex. 2.)

[6] As indicated above, the parties resolved Citation 1, Item 4a and Citation 2, Items 1 and 2 arising out of this health inspection.

C.F.R. § 1910.1200(h)(1). The other-than-serious citation alleges that Respondent: (1) utilized

an improper sampling strategy to identify employees for inclusion in the hearing conservation

program in violation of 29 C.F.R. § 1910.95(d)(1)(i); and (2) failed to calibrate instruments used

to measure employee noise exposure in violation of 29 C.F.R. § 1910.95(d)(2)(ii).


**I.     Safety Inspection - Inspection No. 1008085**

**A.     Expert Testimony**

Both parties proffered expert testimony on the issue of machine guarding: Neal Growney

for the Secretary and Michael Taubitz for Respondent. There was no objection to Growney's

qualification as an expert witness. (Tr. 610.) In contrast, the Secretary objected to designating

Taubitz as an expert, asserting that his opinions contradict OSHA standards and that he has

expressed bias against the agency. (Tr. 2672-73.) The undersigned permitted Taubitz to testify;

but, the final ruling on the expert designation was held in abeyance. (Tr. 2673.)

The Commission follows Federal Rule of Evidence 702, which requires judges to serve

as a gatekeeper to "ensure that any and all scientific testimony or evidence admitted is not only

relevant, but reliable." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993); *Kumho

Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999) (extending the court's gatekeeper function to

all expert testimony); Commission Rule 71, 29 C.F.R. § 2200.71. The undersigned finds that

Taubitz's opinions are admissible. The Secretary's challenges go primarily to the relevance and

accuracy of his opinions. *In re TMI Litig.*, 193 F.3d 613, 692 (3d Cir. 1999) (stating that "[s]o

long as the expert's testimony rests upon 'good grounds', it should be tested by the adversary

process—competing expert testimony and active cross-examination—rather than excluded"); *In

re Unisys Savings Plan Litig.*, 173 F.3d 145, 157-58 (3d Cir. 1999) (acknowledging that the

difference between determining admissibility and the weighing of evidence is often a close question).

The Secretary's concerns about the reliability and utility of Taubitz's testimony, while not enough to exclude the testimony, are relevant in determining what weight to give it. *See U.S. Steel v. OSHRC*, 537 F.2d 780, 783 (3d Cir. 1976) (explaining that expert testimony need not be accepted even if uncontradicted); *Conn. Nat. Gas Corp.*, 6 BNA OSHC 1796, 1800 (No. 13964, 1978) (noting that it is up to the trier of fact to determine what weight, if any, to give expert testimony). Taubitz's advised approach to safety appears to conflict with the machine guarding standard. (Tr. 2615; Ex. R. 34.) His recommendations were based on work with a prior employer, and he did not convincingly explain why his methodology offered protection at least as sufficient as what the standard provides. *Id.* As described, his approach to safety put most of the burden on employees to avoid hazards, rather than the employer's responsibility to install appropriate guarding. (Tr. 2492-93, 2615-16.) However, the Commission has long accepted the view of the guarding standard as being one designed to protect against employee error and inadvertence. *H.B. Zachary Co.*, 8 BNA OSHC 1669, 1674-75 (No. 76-2671, 1980); *Oberdorfer Indus., Inc.*, 20 BNA OSHC 1321, 1327-28 (No. 97-0469, 2003) (consolidated) (noting that skill may lessen the probability of an injury but did not negate exposure to unguarded parts); *Pride Oil Well Serv.*, 15 BNA OSHC 1809, 1815 (No. 87-692, 1992) (holding that "final responsibility for compliance" rests with the employer). Even when there is little chance of injury when the machine is operated appropriately, "the standard is plainly intended to eliminate danger" that may arise from carelessness or an outright failure to follow training and work rules. *Zachary*, 8 BNA OSHC at 1674-75; *Gen. Elec. Co.*, 10 BNA OSHC 1687, 1690 (No. 77-4472, 1982) (finding that the standard requires physical guarding that is not dependent upon correct employee

9

behavior). For this reason, training and work rules are not a substitute for the guarding standard's requirements. *Am. Luggage Works, Inc.*, 10 BNA OSHC 1678, 1682 (No. 77-893, 1982) (rejecting claim that there was no exposure because employer instructed employees to keep out of the point of operation). Taubitz seemed to ignore or at least pay little heed to the reduction of risk that occurs as a result of guarding. (Tr. 2472, 2503-4, 2507-16, 2519, 2622-23.)

Further, Taubitz described a systematic approach to safety that he would suggest employers follow; but, there is no evidence that Respondent had any such system in place. (Tr. 2397-98, 2503, 2644; Ex. R. 24.) Respondent itself did not indicate that the machines were being operated in some way to protect the employees from injury. (Tr. 252.) Taubitz's approach relied heavily on employee behavior. But, delegating employee safety to employees themselves is "inconsistent with the purposes and policies of the Act." *PBR, Inc.*, 643 F.2d 890, 895-96 (1st Cir. 1981). Without evidence that Respondent embraced Taubitz's approach, his testimony is not particularly helpful in evaluating the conditions at the Facility.

In addition, the undersigned finds Taubitz's demeanor at the hearing undermined his credibility. His answers to certain questions, including some put forth by the undersigned, were occasionally evasive.[7] They also lacked the depth of the answers provided by Growney, the Secretary's expert. Thus, while Taubitz's opinions are admissible, the undersigned finds Growney's opinions to be of more overall value and, as discussed below, credits his testimony over that of Taubitz to the extent that the two disagreed. *See i4i Ltd. P'ship v. Microsoft Corp.*,

---

[7] The undersigned notes that Taubitz said he testified as an expert in machine guarding in one previous case, *General Motors,* No. 917-2834-E, 1994 WL 16511004 (O.S.H.R.C.A.L.J. Apr. 19, 1994) (consolidated). (Tr. 2395-96.) This case only involved violations of the lockout/tagout standard. 1994 WL 16511004.

598 F.3d 831, 852 (Fed. Cir. 2010) (noting that a judge can give little weight to expert testimony although found reliable enough to pass the threshold of Federal Rule of Evidence 702), *aff'd*, 564 U.S. 91 (2011).

### B.   Citation 2, Item 1 - Alleged Willful Violation of The General Duty Clause (Section 5(a)(1)) by Failing to Guard the Foot Pedal on the Niagara Press Brake

To prove a violation of the general duty clause (§ 5(a)(1)), the Secretary must establish that the employer failed to render its workplace free of a hazard, which was "recognized by the employer or its industry and which was causing or likely to cause death or serious physical harm." 29 U.S.C. § 654(a)(1). The Secretary also bears the burden of demonstrating a feasible and useful means of abatement that would eliminate or materially reduce the hazard. *See Active Oil Serv., Inc.*, 21 BNA OSHC 1184, 1187 (No. 00-0553, 2005); *Babcock & Wilcox Co. v. OSHRC*, 622 F.2d 1160, 1164 (3d Cir. 1980) (general duty clause violation). Because § 5(a)(1) was designed to augment, rather than supplant standards, a citation cannot be sustained if a specific standard applies. *Active Oil*, 21 BNA OSHC at 1185.

The Niagara Press Brake is a mechanical press brake actuated by pressing fully down on a foot pedal. (Tr. 154-5, 634, 1867-68; Gov. Ex. 4.) This action engages the clutch, causing a ram on the machine to move up and down, allowing the operator to use the machine to bend sheet metal. (Tr. 154-6, 627-9.) The Secretary alleges that there should have been a guard preventing the accidental actuation of the foot pedal. (Sec'y Br. at 3-4.)

Respondent contends that § 5(a)(1) is inapplicable because a more specific standard (29 C.F.R. § 1910.212(a)(3)(ii)) applies and also alleges that the Secretary failed to meet his burden of proof. (Resp't Br. at 24.) Respondent does not suggest that § 1910.212(a)(3)(ii), which focuses on guarding points of operation, requires guarding of foot pedals. *Id.* at 25. Its

11

contention is that point of operation guarding would prevent the existence of any hazard arising from accidental actuation of an unguarded foot pedal. *Id.*

The application of § 5(a)(1) is preempted, and thus inapplicable, when a specific standard addresses a particular hazard. *See, e.g., Nat'l Realty & Constr. Co. v. OSHRC*, 489 F.2d 1257, 1261 n.9 (D.C. Cir. 1973). Preemption does not occur merely because another standard also addresses the same machine or a similar hazard. *Gen. Dynamics Land Sys. Div., Inc.*, 15 BNA OSHC 1275, 1276-77 (No. 83-1293, 1991). It is not enough for the hazards to be interrelated— the specific standard must address the particular hazard for which the Secretary cited the employer. *Armstrong Cork Co.*, 8 BNA OSHC 1070, 1073 (No. 76-2777, 1980).

The Secretary's expert, Growney, explained that abating the point of operation hazard would not address the hazard of accidental actuation presented by the unguarded foot pedal.[8] (Tr. 672-75.) The standard Respondent points to (29 C.F.R. § 1910.212(a)(3)(ii)) prevents injuries at one location. In contrast, the hazard of accidental actuation (the basis for the Secretary's § 5(a)(1) citation) relates to any part of the energized machine, not just the point of operation. *Id.* Because of the difference in hazards, 29 C.F.R. § 1910.212(a)(3)(ii) does not preempt citation under § 5(a)(1).

Having found that the § 5(a)(1) is not preempted, we must examine whether the Secretary showed a recognized hazard. As noted above, the Secretary describes the hazard as the accidental actuation of the Niagara Press Brake's foot pedal. (Sec'y Br. at 3; Gov. Ex. 226.) So, the first issue is whether accidental actuation can occur. The foot pedal was located underneath the frame of the machine and the work table. (Tr. 2485-7; Gov. Exs. 2, 4.) The parties agree that

---

[8] Respondent itself notes that the Secretary has promulgated standards requiring guarding of both foot pedals and the point of operation for some types of machines. (Resp't Br. at 26 n. 5 discussing 29 C.F.R. § 1910.217.)

this location provided some protection from accidental actuation. (Tr. 656, 2497-99.) Growney suggested that the metal around the foot pedal was not close enough to the pedal itself to prevent an object from falling on it or an operator from stepping on it accidentally. (Tr. 643-45.)

However, even accepting that these scenarios could occur, the Secretary did not show that they would be sufficient to actuate the machine. Partially pressing on the foot pedal would not start the machine—the operator needed to fully press down with the ball of his or her foot before the clutch would engage. (Tr. 1466, 1871, 2486-87.) Nor did the Secretary explain what kind of object could be small enough to fit under the table and still be heavy enough to completely depress the foot pedal as was necessary for the machine to function. Considering how much force was necessary to actuate the foot pedal, as well as its partially guarded location, the Secretary failed to show that the hazard of accidental actuation was present. *Id.* Therefore, Citation 2, Item 1 is VACATED and no penalty is assessed.

### C.   Failure to Guard Points of Operation in Violation of 29 C.F.R. § 1910.212(a)(3)(ii)

For the Secretary to establish a violation of any specific OSHA standard, he must prove that: (1) the cited standard applies; (2) its terms were violated; (3) employees were exposed to the violative condition; and (4) the employer knew or could have known with the exercise of reasonable diligence of the violative condition. *See Astra Pharm. Prods., Inc.*, 9 BNA OSHC 2126, 2129 (No. 78-6247, 1981), *aff'd in pertinent part*, 681 F.2d 69 (1st Cir. 1982). The Secretary has the burden of proving each of these elements by a preponderance of the evidence. *Id.* In addition, for certain standards, such as 29 C.F.R. § 1910.212(a)(3)(ii), the Secretary must also prove the existence of a hazard. *Fabricated Metal Prods., Inc.*, 18 BNA OSHC 1072, 1073 n.4 (No. 93-1852, 1997) (contrasting the specification standard at issue there with § 1910.212(a)(3)(ii)).

13

Section 1910.212 addresses general guarding requirements for all machines.  It mandates guarding for all points of operation if they expose an employee to injury.[9]   29 C.F.R. § 1910.212(a)(3)(ii).   The Secretary alleges that Respondent willfully violated 29 C.F.R. § 1910.212(a)(3)(ii) by failing to guard the points of operation on: (1) the Niagara Press Brake, (2) the Accurpress, (3) the Niagara 18 shear, (4) the 1R10 shear, and (5) the Roll Former.  Any guarding device selected must be in conformance with machine specific requirements, if there are any.[10]   *Id*.  Otherwise, in the absence of a specific standard, the employer has the flexibility to choose among guarding methods as long as the approach taken prevents the operator from having "any part of his body in the danger zone" during operation.  *Id*.

The guarding method chosen must be physical; it cannot depend on training or instruction alone.  *Zachary*, 8 BNA OSHC at 1674-75.  The purpose of the guarding standard is to protect employees from inadvertently entering the point of operation, whether as a result of carelessness, lack of skill, or another reason.  *Id.*; *Oberdorfer,* 20 BNA OSHC at 1327-28 (skill did not negate exposure to unguarded parts); *Am. Luggage,* 10 BNA OSHC at 1682 (rejecting claim that there was no exposure because employer instructed employees to keep out of the point of operation).  "[T]he standard is plainly intended to eliminate danger from unsafe operating procedures, poor

---

[9] Specifically, for hazards created by points of operation, the standard provides:

> The point of operation whose operation exposes an employee to injury, shall be guarded.  The guarding device shall be in conformity with any appropriate standards therefor, or, in the absence of applicable safety standards, shall be designed and constructed as to prevent the operator from having any part of his body in the danger zone during the operating cycle.

29 C.F.R. § 1910.212(a)(3)(ii).

[10] The standard lists various types of guarding methods, such as barrier guards, two-hand tripping devices, and electronic safety devices.  29 C.F.R. § 1910.212(a)(1).

training, or employee inadvertence." *Zachary*, 8 BNA OSHC at 1674-75; *Pass & Seymour, Inc.*, 7 BNA OSHC 1961, 1963 (No. 76-4520, 1979) (concluding that the standard's purpose is "to protect against injury resulting from an instance of inattention or bad judgment as well as risks arising from the operation of a machine"). An employer cannot merely implement work rules that would prevent injury if followed. *Gen. Elec.*, 10 BNA OSHC at 1690. Even with training and work rules, it still must provide a compliant guarding device that prevents entry into the point of operation during the operating cycle. *Id.* at 1690-91 (concluding that the standard "rejects reliance upon the skill or attentiveness of employees … and instead requires physical guarding methods that do not depend for their effectiveness on correct employee behavior" (internal citations omitted).)

1.     **Citation 2, Item 2 - Niagara Press Brake**

    *a)*     *Violation*

Citation 2, Item 2 alleges that there was an unguarded point of operation on the Niagara Press Brake in violation of 29 C.F.R. § 1910.212(a)(3)(ii). Respondent does not appear to dispute that the Secretary made out a prima facie case, but argues that guarding was not feasible.[11] (Resp't Br. at 25, 32-34.) It also contests the characterization of any violation as willful. *Id.* at 34-37.

Although the Niagara Press Brake was disposed of before either party's expert could view it, there is no dispute that it lacked a physical device capable of preventing employees from accessing the point of operation. (Tr. 209, 1691-93.) The CO explained that this lack of guarding created a hazard because an employee could inadvertently get his fingers or hands into

---

[11] Indeed, Respondent explicitly argued that 29 C.F.R. § 1910.212(a)(3)(ii) applies to the Niagara Press Brake. (Resp't Br. at 25-26.)

the point of operation resulting in injury. (Tr. 204.) Indeed, JE had three fingers crushed while using the Niagara Press Brake on July 11, 2014. (Tr. 27-30; Gov. Exs. 16, 17, 187.) While not a prerequisite for finding a violation, evidence of past injuries supports the conclusion that employees are exposed to a hazard when operating the machine. *S&G Packaging Co.*, 19 BNA OSHC 1503, 1505 (No. 98-1107, 2001) (finding, under § 1910.212(a)(1), that evidence of injuries "clearly establish[es] the existence of a hazard").

As for exposure, the Secretary presented uncontested evidence that in addition to Respondent's President, Mr. Lloyd, two other current employees used the machine—one who acknowledged operating the machine as a regular part of his work and another who indicated he operated the machine within six months of the citation's issuance. (Tr. 188-189, 457, 2054.) Mr. Lloyd corroborated this testimony indicating that after the machine crushed JE's fingers he continued to let employees operate it. (Tr. 1689.)

JE and a current employee explained how routine tasks required them to put their hands close to and, on occasion, into the point of operation. (Tr. 86-90, 103-4.) The CO indicated that if an employee had to use the piece of metal that was on the machine at the time of the inspection his hands would be within three and a half inches of the point of operation. (Tr. 207-9, 460-61.) Growney agreed that the operator's fingers would be "very close" or "right next to" the point of operation. (Tr. 664-666.) Mr. Lloyd largely corroborated this testimony, conceding that the operator's fingers come within two to two and a half inches of the point of operation. (Tr. 1684-86.) The proximity of the employees to the point of operation shows that they were exposed to a

hazard.[12]  *Oberdorfer,* 20 BNA OSHC at 1328 (finding exposure to a hazard when employees had their hands three to eight inches from the unguarded parts); *Sheet Metal Specialty Co.*, 3 BNA OSHC 1104, 1105 (No. 5022, 1975) (finding exposure in connection with a violation of 29 C.F.R. § 1910.212(a)(3)(ii) when press brake operator positioned sheet in the die and held it within twelve inches of the point of operation).

Mr. Lloyd acknowledged that he knew the machine lacked any type of physical guarding to prevent access to the point of operation. (Tr. 1691-93.) He operated the machine himself after the accident and the lack of guarding was in plain view. (Tr. 210, 249-50, 1690.) *See Nordam Grp.,* 19 BNA OSHC 1413, 1417 (No. 99-0954, 2001) (finding knowledge when conditions were in plain view and supervisor was regularly in the area), *aff'd,* 37 F. App'x 959 (10th Cir. 2002) (unpublished). Additionally, Respondent was cited twice before for failing to guard the points of operation on machines, including press brakes. (Tr. 218, 256-58; Gov. Exs. 137, 153.)

### b)     *Affirmative Defense of Infeasibility*

While the parties agree that the Secretary made out a prima facie case, they disagree as to whether Respondent established the affirmative defense of infeasibility. This defense requires the employer to show, by a preponderance of evidence, that: (1) literal compliance with the terms of the cited standard was infeasible, and (2) an alternative protective measure was used or there was no feasible alternative measure. *See, e.g., Otis Elevator Co.*, 24 BNA OSHC 1081, 1087 (No. 09-1278, 2013), *aff'd,* 762 F.3d 116 (D.C. Cir. 2014); *Faultless Div., Bliss & Laughlin Indus., Inc. v. Sec'y of Labor,* 674 F.2d 1177, 1189 (7th Cir. 1982) (finding Secretary did not

---

[12] The undersigned notes that there was also evidence that the Niagara Press Brake repeatedly malfunctioned. (Tr. 91, 1686-87; Gov. 278.) During some of these incidents, the machine continued to operate even when the pressure from the foot pedal was removed. (Tr. 91, 191-92.)

have to show feasibility of machine guarding); *E&R Erectors, Inc. v. Sec'y of Labor*, 107 F.3d 157, 163 (3d Cir. 1997) ("[t]he burden of establishing an affirmative defense is on the employer, and every element must be established"). The fact that compliance is difficult or expensive does not excuse compliance with standards. *State Sheet Metal Co.*, 16 BNA OSHC 1155, 1160 (No. 90-1620, 1993) (consolidated) (rejecting defense); *Hughes Bros., Inc.*, 6 BNA OSHC 1830, 1835 (No. 12523, 1978) (finding that difficulty of compliance did not defeat citation). Further, even if complete compliance is not possible, the employer must comply to the extent possible. *Cleveland Consol., Inc. v. OSHRC*, 649 F.2d 1160, 1167 (5th Cir. 1981); *Brock v. Dun-Par Engineered Form Co.*, 843 F.2d 1135, 1139 (8th Cir. 1988) (finding that the employer has the burden of showing both infeasibility and availability of reasonable alternative measures).

As to the first element of the defense—was compliance infeasible—Growney explained that the Niagara Press Brake could have been guarded with a restraint or pullback device, by utilizing two hand controls, or through the installation of a light curtain. (Tr. 668-9, 1014, 1039; Gov. Ex. 247.) The CO agreed that all of these guarding methods could have been used on the Niagara Press Brake. (Tr. 210-11, 216-18.) *Long Beach Container Terminal Inc. v. OSHRC*, 811 F.2d 477, 479 (9th Cir. 1987) (concluding that a workable method of abatement defeated defense); *Gregory & Cook Inc.*, 17 BNA OSHC 1189, 1190-92 (No. 92-1891, 1995) (finding that defense failed when guarding was technologically and economically feasible).

Although Respondent suggests some limitations with each of Growney's guarding proposals, it never establishes that compliance was infeasible and certainly does not show that it complied to the extent possible. Taubitz expressed his belief that operator restraints and

pullback devices preclude employees from crossing their hands or turning all the way around.[13] (Ex. R. 34 at 21.)   But Respondent never explained when these actions were necessary to complete the work.   Likewise, Taubitz criticized pullback devices in general because they can require frequent adjustments.   *Id.*   However, employees only made two parts with the Niagara Press Brake.   (Tr. 942, 961, 1684, 1693.)   Employees did not use the machine for small quantity runs, and the size of the pieces being worked with changed infrequently.   (Tr. 1684; Gov. Ex. 187 at 3.)   Further, Growney explained that the whole course of action necessary for the work— turning, picking up material, inserting it, actuating the machine, adjusting the material and stacking it when complete— would not be inhibited by restraints.[14]   (Tr. 1040; Gov. Ex. 247 at 20.)   To the extent that there were any tasks other than these for which a restraint could not be used, Respondent still needed to guard the device for the tasks for which it was feasible, including the work done the day JE was injured.   Accordingly, Respondent failed to satisfy either element of the defense and the violation is affirmed.

### c)   *Characterization*

It is undisputed that Respondent knew the requirements of the standard and knew that the Niagara Press Brake lacked guarding.   However, Respondent claims it had a good faith belief it could make out the affirmative defense of infeasibility and that this belief precludes characterizing the violation as willful.   It also asserts it was not plainly indifferent to employee safety.

---

[13] Growney disputed that a pullback would preclude an operator from turning around but conceded that they did inhibit some employee movement as that was the purpose of the device. (Tr. 1008-9.)

[14] As discussed above, Growney's testimony about the feasibility of pullbacks for this machine is credited over Taubitz's testimony.   (Gov. Ex. 247 at 20.)

A willful violation of the Act is one "done voluntarily with either an intentional disregard of, or plain indifference to, the Act's requirements." *Bianchi Trison Corp. v. Chao,* 409 F.3d 196, 208 (3d Cir. 2005), quoting *Ensign-Bickford Co. v. OSHRC*, 587 F.2d 1419, 1422 (D.C. Cir. 1983). Critical to a finding of willfulness is the employer's state of mind. *See, e.g., Thomas Indus. Coatings, Inc.,* 23 BNA OSHC 2082, 2091-93 (No. 06-1542, 2012) (finding a violation willful when the employer knew about the standard's specific requirements and the conditions present). "[A]n employer's prior history of violations, its awareness of the requirements of the standards, and its knowledge of the existence of violative conditions are all relevant considerations in determining whether a violation is willful in nature." *MJP Constr. Co.,* 19 BNA OSHC 1638, 1648 (No. 98-0502, 2001), *aff'd*, 56 F. App'x 1 (D.C. Cir. 2003) (unpublished); *Anderson Excavating & Wrecking Co.*, 17 BNA OSHC 1890, 1891 (No. 92-3684, 1997) (finding willfulness may depend on the totality of circumstances), *aff'd*, 131 F.3d 1254 (8th Cir. 1998). An employer's motive for failing to comply with the Act need not be evil or malicious. *Kaspar Wire Works, Inc.,* 18 BNA OSHC 2178, 2181 (No. 90-2775, 2000), *aff'd*, 268 F.3d 1123 (D.C. Cir. 2001).

Respondent has a long history with OSHA that should have made it well aware of the Act's requirement in general as well as the specific responsibility to guard points of operation. It has received eighty violations since 2000, including twenty willful violations and many violations of the same standard cited here, 29 C.F.R. § 1910.212. (Tr. 1489-90.) In 2002, after receiving a complaint, OSHA commenced an investigation that identified multiple serious point of operation guarding violations, including the failure to guard the point of operation on a press brake. (Tr. 1501-3; Gov. Ex. 124.) Three years later, following another employee complaint, Respondent was cited again for failing to guard the points of operation on various machines,

20

once again including a press brake.[15]   (Tr. 1506, 1508; Gov. Exs. 129, 137.)   These citations

were resolved in 2006 through a settlement agreement (2006 Settlement Agreement).   (Gov. Ex.

139.)   This agreement included a promise by Respondent to ensure that "all machines" at its

Facility "are properly guarded" as required by 29 C.F.R. § 1910.212(a)(3)(ii).   (Gov. Ex. 139 at

10.)

    But, Respondent persisted in its failure to abate the point of operation guarding issues and

was cited again in 2008 for, among other things, failing to guard points of operation in violation

of 29 C.F.R. § 1910.212(a)(3)(ii).   (Tr. 1531-32; Gov. Ex. 153.)   The 2008 citations were

resolved by another settlement agreement (2009 Settlement Agreement).   (Tr. 1533-34; Gov. Ex.

157.)   OSHA Area Director Jean Kulp explained how OSHA wanted to bring the company into

compliance so, the 2009 Settlement Agreement included a requirement to retain an independent

consultant to conduct evaluations of the Facility, make recommendations, and provide written

reports.   (Tr. 1534-35; Gov. Ex. 157.)   Consistent with its past, Respondent failed to comply with

the 2009 Settlement Agreement.   (Tr. 1536-37; Gov. Ex. 157 at 10.)

    Respondent's history of citations for violating 29 C.F.R. § 1910.212(a)(3)(ii) gave it a

"heightened awareness" of the need to guard points of operation on press brakes and supports the

willful characterization.   *Active Oil*, 21 BNA OSHC at 1098, 2004-09 (finding heightened

awareness based on a previous citation and a written safety program); *A.J. McNulty & Co., Inc.

v. Sec'y of Labor*, 283 F.3d 328, 338 (D.C. Cir. 2002) (noting that prior citations for similar

violations may sustain a violation's classification as willful); *MJP*, 19 BNA OSHC at 1648

(stating that relevant considerations include prior history of violations and awareness of

---

[15] The 2002 citation refers to a "Chicago Press Brake" and the 2005 citation refers to the "Accurpress Model 7606, serial number 5251 press brake."   (Gov. Exs. 124, 137.)   The Niagara Press Brake that JE was injured on had not been previously cited.   *Id.*

standard's requirements); *Anderson*, 17 BNA OSHC at 1892-93, 1995-97 (relying on history of recent citations for violations of the same standard as part of willful determination).

Violations are willful where an employer exhibits plain indifference with respect to the violative conditions themselves. *A.E. Staley Mfg. Co.*, 295 F.3d 1341, 1350-53 (D.C. Cir. 2002). The Respondent was not only specifically aware of the standard, but it also knew that there was no guarding on the Niagara Press Brake. (Tr. 1691-92; Gov. Exs. 124, 137, 153.) Still, there was no attempt to guard, or even investigate the possibility of guarding the machine. (Tr. 252, 1658, 1691-93, 1941.) Mr. Lloyd's view that the Niagara Press Brake could not be guarded in any way was not the product of research or failed attempts at guarding. [16] (Tr. 252, 1684, 1691-93, 1941.) He did not get involved with training and delegated responsibility for safety to someone without evaluating that employee's knowledge or skill to be responsible for the task. (Tr. 1880.) Even after repeated citations, he neither reviewed any OSHA or ANSI machine guarding standards himself, nor hired a qualified safety and health professional to do so. (Tr. 1658, 1683-84.) Instead, despite no OSHA training, he relied on his own view of "what safe is." (Tr. 1683.) *See Conie Constr., Inc.*, 16 BNA OSHC 1870, 1872 (No. 92-0264, 1994) (finding violation willful when foreman substituted his own judgment for that of the standard), *aff'd*, 73

---

[16] Mr. Lloyd did not indicate he thought the machine was compliant—his assertion was that he did not believe the machine could be guarded. (Tr. 1692.) Certainly, by the time of the hearing, Mr. Lloyd understood that OSHA might not view the machine as compliant as he said he disposed of it to avoid further citation. *Id.*

F.3d 382 (D.C. Cir. 1995). In short, Mr. Lloyd's belief about the feasibility of guarding was not objectively reasonable.[17]

Mr. Lloyd's response to a severe injury suffered on the Niagara Press Brake is indicative of his indifference to safety. (Sec'y Br. at 15.) After an employee's fingers were crushed, Mr. Lloyd did not ask him how the accident occurred or speak to anyone who witnessed it. (Tr. 1697-99.) He assumed the accident was the result of operator error and allowed other employees to use the machine the same day.[18] (Tr. 1071, 1102, 1697.) He did this even though he was aware that the machine sometimes malfunctioned before the accident occurred. (Tr. 1686-88.) Similar to the present matter, in *A. Schonbek & Co., Inc.*, 9 BNA OSHC 1189 (No. 76-3980, 1980), an employee's fingers were partially amputated while he used a power press. 9 BNA OSHC at 1190-91, *aff'd*, 646 F.2d 799 (2d Cir. 1981). The employer undertook an investigation and determined that the machine had not malfunctioned at the time of the accident. *Id.* It then decided to add a barrier guard only to the machine on which the employee was injured. *Id.* The

---

[17] Respondent also cites OSHA Instruction CPL 02-01.025, February 14, 1997 (hereafter, "Press Brake Guidance") and claims that this document shows that Mr. Lloyd's personal belief "aligned with OSHA's." (Resp't Br. at 34.) Respondent withdrew its request to admit the Press Brake Guidance and does not request that the undersigned take judicial notice of it. (Tr. 563-65.) Neither Taubitz, nor Mr. Lloyd, nor any other employee indicated they read or relied on the Press Brake Guidance. (Ex. R-34 at 32.) In any event, even if the undersigned were to find it appropriate to consider the Press Brake Guidance, it does not support Respondent's position. The Press Brake Guidance suggests that when physical guarding is infeasible, for small quantity runs, guarding by location may be sufficient on a limited basis and only when alternative safety measures are taken. The Niagara Press Brake was always unguarded regardless of the part being made and Respondent failed to show that guarding was infeasible for any function, let alone every one. (Tr. 554, 1014; Gov. Ex. 247.) Moreover, although Respondent claims it took all necessary precautions, it fails to point to record evidence that it fulfilled the requirements the Press Brake Guidance sets out.

[18] The undersigned notes that the same malfunction the injured employee said happened when he was operating the Niagara Press Brake was also observed by the CO during the inspection when Mr. Lloyd operated it. (Gov. Ex. 278.)

Commission concluded that failing to take action with respect to other similar machines amounted to careless disregard for employee safety.[19] *Id.* at 1191. Here, Mr. Lloyd did not even undertake the investigation. He simply fired the injured employee and directed other employees to continue to use the machine. Plain indifference is established by an employer's failure to take appropriate corrective action despite actual knowledge that a dangerous condition exists.[20] *Nat'l Eng'g & Contracting Co.*, 18 BNA OSHC 1075, 1080-81 (No. 94-2787, 1997), *aff'd*, 181 F.3d 715 (6th Cir. 1999); *Valdak Corp.*, 17 BNA OSHC 1135, 1139 (No. 93-0239, 1995), *aff'd*, 73 F.3d 1466 (8th Cir.1996).

Mr. Lloyd's claimed good faith belief that the Niagara Press Brake was compliant is rejected. *See McNulty,* 283 F.3d at 338-39 (upholding violation as willful and rejecting claims that belief in an affirmative defense and reliance on ALJ decisions gave the employer a good faith belief it was complying). Respondent acted recklessly by disregarding the requirements of Act and directing employees to continue to use an unguarded machine with a history of malfunctions. *See Kaspar,* 18 BNA OSHC at 2181-82.

---

[19] The Secretary also presented evidence about Mr. Lloyd's view of employee safety and the Act's requirements. *See A. E. Staley Mfg. Co.*, 19 BNA OSHC 1199, 1202-3 (No. 91-0637, 2000) (consolidated) (finding willfulness established by showing plain indifference), *aff'd*, 295 F.3d 1341 (D.C. Cir. 2002). In 2005, following the issuance of several citations, Mr. Lloyd candidly informed Ms. Kulp that he would not allow OSHA to enter his Facility. (Tr. 1508.) He was also uncooperative at the start of the 2008 inspection. (Tr. 1526-27.) Mr. Lloyd believes OSHA should not tell him what to do. (Tr. 1463; Gov. Ex. 145.)

[20] Respondent's failure to take any action despite a heightened awareness of the cited standard distinguishes this violation from the situation the D.C. Circuit confronted in *Dayton Tire v. Sec'y of Labor,* 671 F.3d 1249 (D.C. Cir. 2012).

### d)      Penalty Amount

When setting the penalty amount, the Act requires consideration of the violation's gravity and the employer's size, history, and good faith. 29 U.S.C. § 666(j). The Secretary proposes a penalty of $70,000.[21] The CO indicated that the violation had a high gravity due to the seriousness of injuries that can, and in the case of one employee did, occur. (Tr. 220-21; Gov. Ex. 187.) In terms of size, between fifty and seventy employees work at the Facility, and there are approximately 42 additional workers at other locations. (Tr. 1577, 1599, 1637, 1837, 2480.) While this size could support a penalty reduction, the undersigned finds that the evidence relating to gravity, history, and lack of good faith outweighs the size factor. *See Orion Constr. Co., Inc.*, 18 BNA OSHC 1867, 1868 (No. 98-2014, 1999) (giving less weight to the size and history factors); *Quality Stamping Prods. Co.*, 16 BNA OSHC 1927, 1929 (No. 91-414, 1994) (finding that while gravity is normally the primary factor, a "substantial history of prior violations may skew the importance of gravity"). As noted above, Respondent has an extensive history with OSHA including prior citations of the same standard and related to the same type of machine. Similarly, for the same reasons that the willful characterization is appropriate, the undersigned finds that the record does not support a reduction in the penalty amount. Accordingly, a penalty of $70,000 is appropriate for Citation 2, Item 2.

---

[21] The Inflation Adjustment Act of 2015, Pub. Law 114-74 § 701, 129 Stat. 559-602 (2015) granted OSHA the ability to increase the statutory minimum and maximum penalties for violations of the Act. OSHA has exercised this authority but the revised penalties apply only to violations occurring after November 2, 2015. 81 Fed. Reg. 43430 (July 1, 2016); 29 C.F.R. § 1903.15(d). All of the violations in the instant matter occurred prior to November 2, 2015, so the statutory maximum applicable here is $7,000 for serious violations and $70,000 for willful or repeat violations. 29 U.S.C. § 666(a-b). For the same reason, the statutory minimum for each willful violation presently before the undersigned is $5,000. *Id.*; 29 C.F.R. § 1903.15(d).

2.      **Citation 2, Item 3 - Accurpress**

      *a)*      *Violation*

Citation 2, Item 3 alleges that Respondent willfully violated 29 C.F.R. § 1910.212(a)(3)(ii) by failing to guard the point of operation on the Accurpress, a hydraulic press brake. There is no dispute that the point of operation lacks the required guarding. However, Respondent argues it was denied due process because the machine was not cited in prior inspections and contests the violation's characterization as willful. (Resp't Br. at 38-44.)

The Accurpress' point of operation is where a ram descends and pushes metal down into the die to bend it. (Tr. 243, 684-6; Gov. Ex. 267.) The CO observed and filmed an employee operating the Accurpress during the inspection. (Tr. 687-8; Gov. Ex. 267.) This employee indicated that he used the machine at least two hours per day. (Tr. 1701.) The CO explained that the operator's fingers come within a half inch of the point of operation. (Tr. 243-44; Gov. Exs. 21, 267.)

The testimony from the CO and Growney, along with the videographic evidence, show a hazard and exposure. (Gov. Exs. 21, 247, 267.) The Commission has never required an operator's hands to be placed within the point of operation to find a violation. *See, e.g., Mayhew Steel Prods., Inc.,* 8 BNA OSHC 1919, 1920 (No. 77-3970, 1980) (rejecting the argument that there was no hazard because employees did not place hands or fingers in point of operation). Indeed, the Commission has upheld violations of the cited standard even when employees' hands were much further away from the point of operation. *See, e.g., Sheet Metal*, 3 BNA OSHC at 1105 (finding a violation when press brake operator's hands were twelve inches from the point of operation.) The lack of any physical device preventing the operator's fingers from entering the point of operation violates the cited standard. (Tr. 248-9, 687.)

Mr. Lloyd observed an employee operate the machine and also operated it himself. (Tr. 252, 1641.) He knew that the work brought employees extremely close to the point of operation when they were not using the two hand controls.[22] (Tr. 1701-3.) The employee the CO observed operating the Accurpress was working in a manner compliant with company policy. (Tr. 1702-3; Gov. Ex. 21.) Mr. Lloyd confirmed this observation, indicating that the employee was operating the machine correctly, even when his fingers were right next to the point of operation. *Id.* Mr. Lloyd was aware of the risks to employees. (Tr. 1701-3.) He knew that an error could lead to crushed fingers. *Id.* Thus, the Secretary made out his prima facie case.

### b)    *Infeasibility Defense*

In challenging the characterization, Respondent alleges that it reasonably believed guarding was infeasible when the Accurpress was used for certain parts. (Resp't Br. at 40-43.) However, Respondent does not contend its belief satisfies the requirements of the affirmative defense. *Id.* In any event, the undersigned finds that guarding was feasible and therefore, had Respondent appropriately raised the defense it would have been rejected.

The Accurpress was already equipped with two methods of guarding. (Tr. 687-91, 845-6; Gov. Exs. 29A, 247, 274A.) Rather than using the foot pedal, it could be operated with the two hand control buttons or by using a feature on the machine called two hands down, foot through. (Tr. 690, 1018-20; Gov. Ex. 247.) Growney was not aware of any reason why these features

---

[22] Respondent does not allege it had a work rule, much less an enforced one, requiring the use of two hand controls. The employee who frequently operated the Accurpress said he was told to use the two hand controls depending on the size of the piece he was working with. (Tr. 2120, 2123, 2132-33, 2139.) But, the supervisor did not tell Respondent's expert that two hand controls were ever used. (Tr. 2531, 2638-39.) Similarly, Mr. Lloyd saw nothing wrong when an employee operated the machine with foot pedal instead of the two hand controls. (Tr. 1702-3; Gov. Exs. 21, 267.) Growney believed that either the two hand controls or the two down, foot through method of guarding could be used for all parts worked on with the machine. (Tr. 690.)

could not be used for Respondent's operations. *Id.* In addition, Growney explained that a pullback device or light curtain could be added.[23] *Id.*

Mr. Lloyd knew that the machine had two hand controls and even understood how these controls could prevent injury. (Tr. 1702-5, 2131.) Employees used the machine exclusively to make one type of bend in the metal. (Tr. 1700, 1806.) Besides the existing guarding, the Accurpress could have been equipped with an additional guard capable of stopping the operating cycle if a part of the operator's body "breaks" a light beam. In fact, Respondent did equip the Accurpress with this type of additional guard after the inspection. (Tr. 253-55, 842-46, 1934, Gov. Ex. 274.) This guard does not inhibit work with the machine, further demonstrating the feasibility of guarding. (Tr. 1703-4, 2120, 2137.)

### c)   *Notice – Due Process Claim*

As noted above, OSHA repeatedly inspected the Facility. In 2005, the Respondent received a citation for failing to guard the point of operation on an Accurpress brand press brake. (Gov. Ex. 137.) While the machine cited in 2005 was the same model of the press brake cited in the most recent inspection, it was not the exact same machine.[24] (Tr. 257.) Respondent resolved

---

[23] As discussed above, Growney's opinion is credited over Taubitz's on the feasibility of guarding. Besides the reasons already noted for crediting Growney over Taubitz, there are others applicable to this violation. First, Taubitz was not aware that the Accurpress had two hand controls before the inspection. (Tr. 2637.) Second, his conclusions about when employees were at risk was based on what he was told the work process was, not how the employee actually performed the work or the video taken at the time of the inspection. (Tr. 2645.) Third, the machine operator indicated that he could make all the parts he needed while the laser guard was in place. (Tr. 2136.) Mr. Lloyd corroborated that the laser guard did not need to be adjusted for the work done on the cited Accurpress. (Tr. 1884.)

[24] Mr. Lloyd indicated that there are four or five Accurpress brand press brakes at the Facility that are the same model as the one cited. (Tr. 1699; Ex. R-27.) It is unclear if the exact same machines were present during the prior inspections.

this citation, along with several others, by entering into the 2006 Settlement Agreement. (Tr. 1519-21; Gov. Ex. 139.)  As part of this agreement, Respondent agreed to ensure every machine had point of operation guarding and to submit information about its abatement efforts, including how it addressed the point of operation guarding on the cited press brake. (Gov. Ex. 139.)  In 2008, Respondent submitted a letter to OSHA stating that it was "in compliance" with the 2006 Settlement Agreement but did not provide any details. (Gov. Ex. 231.)  Partially because it viewed Respondent's submission to be lacking, OSHA arranged for an inspection at the Facility. (Tr. 1525-26.)  This inspection identified several violations, including failure to guard "[p]oint(s) of operation of machinery" in violation of 29 C.F.R. § 1910.212(a)(3)(ii). (Gov. Ex. 153 at 7.)  But, the citation does not refer explicitly to any of the Accurpress brand press brakes. *Id.*

Respondent contends that because it did not subsequently receive any citations for the Accurpress brand press brake as a result of the 2008 inspection, it rightfully believed its use of the machine was appropriate. (Resp't Br. at 38.)  It makes a similar argument in connection with Items 2, 5, and 7 of Citation 2.  For the reasons set forth below, the undersigned finds that Respondent had fair notice of its obligations and was not deprived of due process.

First, there is no suggestion that any of the cited standards were invalidly promulgated, not published in Code of Federal Regulations (CFR), or unconstitutionally vague. *See Faultless*, 674 F.2d at 1186 (construing machine guarding requirement as "sufficiently specific ... to reasonably apprise [the employer] in clear terms" of conduct the standard requires).  Second, there is no contention that the citation failed to give adequate notice. *Cf. Alden Leeds, Inc. v. OSHRC*, 298 F.3d 256 (3d Cir. 2002) (finding failure to abate notification lacked sufficient particularity).

Third, the failure to cite a condition in one inspection does not preclude citing the condition in a subsequent inspection.[25] *Columbian Art Works, Inc.*, 10 BNA OSHC 1132, 1133 (No. 78-29, 1981) (holding that failure to cite in past inspection did not result in immunity to cite for failure to guard as required by § 1910.212(a)(3)(iii)); *Lukens Steel Co.*, 10 BNA OSHC 1115, 1126 (No. 76-1053, 1981) (finding a violation of the personal protective equipment standard willful and noting that the "Secretary's failure to cite conditions … during earlier inspection does not 'exculpate' the Respondent or preclude a finding that the violation … was willful"); *Seibel Modern Mfg. & Welding Corp.*, 15 BNA OSHC 1218, 1223-24 (No. 88-821, 1991) (finding that prior inspections neither "give rise to an inference that OSHA made an earlier decision that there was no hazard" nor "preclude the Secretary from pursuing a later citation").

The Accurpress had two hand controls and a programmable ram speed. (Tr. 1702-5.) Neither of these safety features was being used when the CO observed an employee working at the machine in 2014. (Tr. 693-94.) There is no evidence about how (or even if) an Accurpress was in use when OSHA employees were eventually allowed into the Facility to conduct their inspection in 2008. (Tr. 1205, 1526-28.) Without evidence of similar conditions, the undersigned cannot determine why an Accurpress model press brake was not cited in 2008.

---

[25] For example, in this matter, the CO indicated that he did not recommend a citation for Respondent's Connecticut Press Brake as it did not appear to be in use at the time of his inspection and employee interviews did not indicate exposure. (Tr. 250-51.) This does not suggest that he found the Connecticut Press Brake compliant. Likewise, although the foot pedal on the 1R10 machine was not initially cited, the Secretary subsequently argued it represented a violation. While the undersigned does not believe amending the citation is appropriate, this does not preclude citation of the 1R10 in the future.

Finally, and arguably most significantly, OSHA never told Respondent that the machine did not require guarding or that employees did not have to use the existing guarding.[26] *See Fluor Daniel v. OSHRC*, 295 F.3d 1232, 1238 (11th Cir. 2002) (concluding that lack of citations in previous inspections is insufficient to establish the absence of fair notice unless OSHA specifically reviews and approves conditions); *Gen. Dynamics Land Sys. Div., Inc.*, 15 BNA OSHC 1275, 1285 (No. 83-1293, 1991) (holding that past failure to cite does not preclude finding knowledge). Indeed, the 2009 Settlement Agreement explicitly requires Respondent to retain an independent consultant to evaluate the company's compliance with § 1910.212(a)(3) across the Facility, not just on the cited machines. (Gov. Ex. 157 at 8-9.)

Due process requires only that the employer receive a "fair and reasonable warning; it does not demand that the employer be *actually aware* that the regulation is applicable ... ." *Am. Bridge Co.*, 17 BNA OSHC 1169, 1172 (No. 92-0959, 1995) (emphasis in original). The standard provided sufficient notice of the guarding requirement. The past inspections do not preclude the current citation. *Buckeye Indus., Inc.*, 3 BNA OSHC 1837, 1840 n.3 (No. 8454, 1975) (finding that § 1910.212(a)(3)(ii) provided adequate notice "of what is expected in the way

---

[26] Respondent cites to *Trinity Marine Nashville, Inc. v. OSHRC*, 275 F.3d 423 (5th Cir. 2001), where the Fifth Circuit found that because OSHA ultimately withdrew a citation related to an electrical box, the company had a fair expectation that the box was satisfactory. (Resp't Br. at 39-40.) The present situation is distinguishable because OSHA never withdrew a citation related to the Accurpress nor is there evidence OSHA affirmatively approved the equipment. *See Austin Indus. Specialty Servs., L.P. v. OSHRC*, 765 F.3d 434 (5th Cir. 2014) (finding fair notice when nothing in OSHA report indicated a particular procedure was satisfactory). Respondent also attempts to rely on *Miami Industries., Inc.*, 15 BNA OSHC 1258, 1263 (No. 88-671, 1991), *aff'd in relevant part*, 983 F.2d 1067 (6th Cir. 1992). *Miami Industries* concerns a more broadly worded provision of the guarding standard than the one at issue here. 15 BNA OSHC at 1263. Because that provision, 29 C.F.R. § 1910.212(a)(1), is so broadly worded, statements by OSHA personnel can affect the employer's notice of its obligations. *Id.* Not only is the provision at issue here different, so too are other facts. Miami Industries was told that its approach was acceptable and there was a long pattern of conduct by the Area Office that made reliance on that statement reasonable. *Id.*

of guarding"), *aff'd,* 587 F.2d 231 (5th Cir. 1979); *A. Schonbek.,* 9 BNA OSHC at 1190 (upholding willful violation even though past inspection only cited the lack of point of operation guarding on a different machine); *Omaha Paper Stock Co.*, 19 BNA OSHC 1584, 1591 n.16 (No. 99-0353, 2001) (finding that the standard itself provided the employer with the "fair notice" required), *aff'd*, 304 F.3d 779 (8th Cir. 2002).

### d)    *Characterization*

"Proof of willfulness ... requires proof only that defendant was aware of risk, knew that it was serious, and knew he could take effective measures to avoid it, but did not; in short, that he was reckless in the most commonly understood sense of word." *Dukane Precast, Inc. v. Perez,* 785 F.3d 252, 256 (7th Cir. 2015), citing *AJP Constr., Inc. v. Sec'y of Labor*, 357 F.3d 70, 74 (D.C. Cir. 2004); *Valdak Corp. v. OSHRC*, 73 F.3d 1466, 1468–69 (8th Cir. 1996). Here, Respondent knew about the standard's requirements and its applicability to the Accurpress. It also knew that its employees improperly operated these machines without using the guarding. As a result, Respondent knew about the risk the failure to use the guarding created for employees. (Tr. 1701-5, 2139-40; Gov. Exs. 124, 128, 137, 139 at 10, 148 at 1-3, 157 at 9.) It is incumbent on employers to be aware of the requirements of the Act. Deliberate blindness to dangerous conditions or the Act's requirements does not preclude a finding of willfulness. *A.E. Staley*, 295 F.3d at 1353; *A.G. Mazzocchi, Inc.*, 22 BNA OSHC 1377, 1388 (No. 98-1696, 2008) (finding that a violation can be willful even without proof of actual knowledge that action violated the Act).

Without addressing the machine's two hand controls, Respondent argues it had a good faith reasonable belief that guarding was infeasible because OSHA allowed the Accurpress to be operated without a physical guarding device. It bases this belief on the fact that the machine was

32

cited in 2005, but not as a result of the 2008 inspection. (Resp't Br. at 41.) However, the record shows that the machine was equipped with two hand controls, which Growney explained would keep an operator from having any part of his or her body in the danger zone during the operating cycle. (Gov. Ex. 247.) Thus, the machine was equipped with a compliant guarding device.[27] *See Fluor Daniel*, 295 F.3d at 1238-40 (finding that past inspection did not preclude finding violation willful); *Gen. Dynamics*, 15 BNA OSHC at 1285 (same). The violation is as a result of the machine being used without the guarding during the inspection. The citation did not result from some misunderstanding about the feasibility of guarding. It is the result of a failure to require the use of existing guarding. There is no indication that OSHA told Respondent that employees did not need to use the machine's guarding features or that its use of the Accurpress was compliant.[28] Moreover, neither Mr. Lloyd, nor any other employee, indicated that he or she believed that the machine's use was compliant because it was cited in 2005, but not 2008.[29]

---

[27] In *Kaspar Wire Works*, OSHA repeatedly inspected an employer's injury records without issuing citations. 18 BNA OSHC at 2183. At some point, the employer changed its records keeping policies and thus the prior failure to cite did not preclude finding the violation willful. *Id.* at 2184. Here, there is no evidence that conditions at the Facility were the same in 2008 as they were during the most recent inspection.

[28] In its brief, Respondent alleges that OSHA "informed" it that the affirmative steps it took after the prior inspection were sufficient. (Resp't Br. at 43.) In fact, there is no evidence that OSHA ever informed Respondent that any changes it allegedly made were sufficient. (Tr. 252.) On the contrary, the settlement agreement reached after the 2008 inspection required several compliance related actions to be taken. (Gov. Ex. 157.)

[29] According to the CO, during the inspection, Mr. Lloyd expressed his view that it was not feasible to guard the Accurpress. (Tr. 252.) But, considering the machine had two hand controls, it's not clear what Mr. Lloyd meant by this. The only suggestion of Lloyd's belief about compliance is that when the undersigned asked Mr. Lloyd why he failed to be more proactive about health and safety, he indicated, without elaboration, that it was because he received "mixed messages" from OSHA. (Tr. 1729.)

Respondent also alleges that its "good faith response" to the latest citation "militates against a finding of willfulness.[30] (Resp't Br. at 43, citing *Access Equip. Sys. Inc.*, 18 BNA OSHC 1718 (No. 95-1449, 1999).) In *Access Equipment*, the employer took certain steps as result of past violation of the same standard. 18 BNA OSHC at 1727. The Commission declined to reach the parties arguments about the past corrective measures but noted in *dicta* that even if it were to consider the actions they would weigh against willfulness. *Id.* at 1728. Ultimately, relying on a number of factors, including the prompt remedial action taken, the Commission concluded that the violation was not willful. *Id.*

Here, Respondent not only knew about the standard, but it also knew that the standard applied to the Accurpress. Respondent's decision to add a third type of guarding after being cited for the exact same type of machine a second time does not explain its failure to require the use of the existing guarding before the inspection.[31] (Tr. 252; Gov. Ex. 137.) Had Respondent instructed employees to consistently use the two hand controls or the two down foot through feature, the undersigned may have reached different conclusions. (Tr. 690-91, 1018, 1020.)

Plain indifference is present when the employer possesses a state of mind such that if it had been informed of the standard it would not have cared. *Johnson Controls, Inc.*, 16 BNA OSHC 1048, 1051 (No. 90-2179, 1993) (affirming violation as willful). Respondent was well informed that all of its machines, including the Accurpress model press brakes, needed point of operation guarding. It was equally well informed that the existing guarding was not being used.

---

[30] "Good faith" is considered as part of the penalty analysis. 29 U.S.C. § 666(j).

[31] The undersigned notes that during the inspection Mr. Lloyd did not indicate that the Accurpress had been re-programmed or was being operated in some way so as to minimize injury. (Tr. 252.) But, even assuming that employees consistently used a slower ram speed setting, this would go only to the probability of an injury, which is a part of the gravity analysis, not characterization.

Any claimed belief that guarding was infeasible is not objectively reasonable.[32]  *MJP*, 19 BNA

OSHC at 1648.

*e)*          ***Penalty Amount***

The Secretary proposes a penalty of $70,000.  The CO indicated that the violation had a

high gravity due to the seriousness of injuries that can occur and the frequency of the machine's

use.  (Tr. 258; Gov. Ex. 187.)  As with Citation 2, Item 2, although Respondent employs about

100 people, the undersigned finds that the size factor is outweighed by the evidence relating the

gravity, history, and lack of good faith.  *See Quality Stamping Prods. Co.*, 16 BNA OSHC 1927,

1929 (No. 91-414, 1994) (giving more weight to history); *Orion*, 18 BNA OSHC at 1868 (giving

less weight to the size).  Respondent has an extensive history with OSHA including prior

citations of the same standard for the same type of machine.  Similarly, for the same reasons that

the willful characterization is appropriate, the record does not support a reduction in penalty

amount.  Accordingly, a penalty of $70,000 is appropriate for Citation 2, Item 3.

---

[32] Respondent also argues that the Press Brake Guidance supports its position.  (Resp't Br. at 41.)
As noted above, this document was not admitted into evidence or relied on by the experts.  In
any event, the undersigned finds that it has limited relevance to the circumstances present at the
Facility and does not undermine the Secretary's evidence of willfulness.  *See McNulty*, 283 F.3d
at 338 (willful characterization appropriate when company did not have a good faith belief that it
had an infeasibility defense).  For example, the Press Brake Guidance requires physical barriers
or devices whenever feasible.  *See* Press Brake Guidance, ¶¶ D, 5.  Growney explained that
multiple different methods of guarding were feasible, including two methods that did not require
any machine modifications.  (Tr. 690, 1018-20; Gov. Ex. 247.)  Nor does Respondent claim that
the conditions under which the Press Brake Guidance suggests that alternatives to physical
guarding devices might be acceptable were present.  *See* Press Brake Guidance, ¶¶ D, E-K.

35

### 3.   **Citation 2, Item 4- Niagara 18 shear**

#### a)   *Violation*

Citation 2, Item 4 alleges another willful violation of § 1910.212(a)(3)(ii) for failing to guard the point of operation on the Niagara 18 shear, a machine used to cut sheet metal. (Tr. 261; Gov. Ex. 30-32.) To use the Niagara 18 shear, the operator places the sheet metal on a table and then slides it towards the blades. When the operator steps on a foot pedal, a number of vertical cylinders, or "hold down pins," descend and keep the metal in place while a blade makes the cuts. (Tr. 261-65, 271-72, 847-49; Gov. Ex. 30 A, 36A, 37A, 264.) There are two points of operation on the machine: (1) the area where the blade cuts the metal, and (2) the area underneath the hold down pins. (Tr. 266, 273, 847-50; Gov. Exs. 37A, 38A.) Respondent does not dispute that these areas lacked compliant guarding. (Resp't Br. at 44-45.) Rather, it claims that the Secretary did not show exposure and that any citation for the lack of guarding would violate its due process rights. *Id.*

The Niagara 18 shear has metal grating in front of its blades.[33] (Gov. Exs. 33, 37A, 38.) But, the grating is not sufficient to prevent an operator's fingers from entering the point of operation. There is a gap of more than half an inch between the table on which the operator places the metal and the bottom of the grate. (Tr. 266-68, 858-62.) This makes it possible for an employee's fingers to go into the point of operation. *Id.* Thus, while the grating likely precluded an entire hand from being in the point of operation, it was not sufficient because the standard requires guarding capable of preventing any part of the body from entering the point of

---

[33] Respondent notes this guarding but does not contend that it meets the standard's requirements. (Resp't Br. at 11, 44-45.)

operation. 29 C.F.R. § 1910.212(a)(3)(ii). *See A.P. O'Horo Co.*, 14 BNA OSHC 2004, 2007 (No. 85-369, 1991) (noting that partial compliance does not preclude finding a violation).

Further, the grating offered no protection for the point of operation located underneath the hold down pins. (Tr. 267-69; 272-3; 850-1, 866-72.) The distance between the table and the hold down pins was more than 3/8 of an inch. (Tr. 269, 850-51; 866-72; Gov. Ex. 33.) JE testified that on one occasion the hold down pins missed crushing his fingers only "by a hair." (Tr. 68-70.) The unguarded points of operation represented a hazard and Respondent failed to comply with the standard's requirements.

As for exposure, the CO observed an employee operating the Niagara 18 shear during the inspection and an employee indicated that he operates the machine for two to three hours every day. (Tr. 261, 1716-17; Gov. Ex. 30-32.) Mr. Lloyd himself used the Niagara 18 shear and also observed other employees doing so. (Tr. 1717.)

Respondent argues that this is insufficient to show exposure because the employee the CO observed maintained a distance of six inches from the point of operation. (Tr. 271; Gov. Ex. 30; Resp't Br. at 44-45.) While the Commission has occasionally held that employees were too far from a point of operation for there to be exposure, neither the parties, nor the undersigned, has identified any case where the facts are analogous to the ones in this matter—the operator's fingers coming within six inches of an unguarded point of operation while working with materials of a narrow dimension. *Compare Oberdorfer,* 20 BNA OSHC at 1328 (finding exposure when employees' hands were three to eight inches from unguarded parts) *with Jefferson Smurfit,* 15 BNA OSHC 1419, 1421 (No. 89-553, 1991) (concluding there was no exposure when employees never got closer than 16 inches to an in-running nip point).

In claiming that there was no exposure, Respondent relies on a case where the Commission found there was no hazard or exposure. (Resp't Br. at 45 discussing *Buffets, Inc.,* 21 BNA OSHC 1065 (No. 03-2097, 2005).) In *Buffets,* the Secretary alleged that the employee's fingers could come within 10 inches of a moving part but did not explain how they could get any closer than that. 21 BNA OSHC at 1067 (discussing how it would be difficult for employees to depart from the distance of ten inches because of the containers they were using). *See also Armour Food,* 14 BNA OSHC at 1824 (finding no hazard when employees had no reason to put hands in the area near the mixing blades and it was difficult to do so). In contrast, the fingers of Respondent's employee came very close to the point of operation during the inspection and JE explained how a worker's hands could enter the point of operation because nothing inhibited direct contact.[34] (Tr. 69-70, 271; Gov. Ex. 30.) How the Niagara 18 shear functions and the way it is operated at the facility exposed employees to a hazard.[35] *See Fabricated Metal,* 18 BNA OSHC at 1074 (concluding that there is if "it is reasonably predictable either by operational necessity or otherwise (including inadvertence), that employees have been, are, or will be in the zone of danger").

---

[34] The judge in *Buffets* stated that the evidence presented by the Secretary was "exceedingly sparse," and the Commission noted that the compliance officer in that case failed to take any measurements to determine the possibility of exposure. 21 BNA OSHC at 1066. The record here is not lacking as the one in *Buffets.*

[35] Respondent seeks to conflate exposure with the probability of injury. (Resp't Br. at 44-45.) However, the probability of injury is examined in connection when assessing the gravity of a violation for penalty purposes. *Hern Iron Works, Inc.,* 16 BNA OSHC 1206, 1214 (No. 89-433, 1993). In contrast, exposure turns on access to a violative condition. *See, e.g., Tube-Lok Prods.,* 9 BNA OSHC 1369, 1374 (No. 16200, 1981) (finding exposure in connection with a violation of 29 C.F.R. § 1910.212(a)(3)(ii) even though the possibility of an incident was low); *Phoenix Roofing, Inc.,* 17 BNA OSHC 1076, 1079 (No. 90-2148, 1995), *aff'd,* 79 F.3d 1146 (5th Cir. 1996.)

The Secretary also satisfied the knowledge requirement.  Mr. Lloyd used the Niagara 18 shear himself and knew that there was no physical guard between the operator and the hold down pins. (Tr. 1717-18.) He also knew that the grating did not offer any protection from one of the points of operation. (Tr. 1717.)

Respondent's final argument relates to an alleged lack of notice about the standard's requirements. (Resp't Br. at 45-46.) As a threshold matter, OSHA properly promulgated the standard and that it is accurately published in the CFR. 29 C.F.R. § 1910.212. Upon receiving the citation, Respondent suggests that it was not provided with sufficient notice because OSHA inspected the Facility in 2002 and 2005, but, on those occasions, did not issue citations specifically referring to either the Niagara 18 shear or the 1R10 shear.

Consistent with the discussion above regarding Citation 2, Item 3, the undersigned finds that Respondent received sufficient fair notice of the regulation and its requirements. *See, e.g., Simplex Time Recorder Co.*, 12 BNA OSHC 1591, 1596 (No. 82-12, 1985) (upholding citation despite nine previous OSHA inspections when the condition was not cited), *aff'd in pertinent part,* 766 F.2d 575 (D.C. Cir. 1985); *Seibel,* 15 BNA OSHC at 1225 (noting that an employer cannot deny the existence of or its knowledge of a hazard by relying on the Secretary's earlier failure to cite the condition). There is no evidence that OSHA ever told Respondent that the Niagara 18 shear or the 1R10 shear were compliant.[36] *See Fluor Daniel,* 295 F.3d at 1238 (finding that there was no lack of fair notice even though past inspection dealt with the same type of equipment). Nor is there evidence that the machines were in use in the same manner as they

---

[36] The undersigned notes that Lloyd claimed that despite signing it, he never read the 2006 Settlement Agreement. (Tr. 1673-74.) Such an assertion is contrary to finding that anything in the 2006 Settlement Agreement led him to sincerely believe that the machine guarding requirements were not applicable to machines in the Facility.

are currently being used in the prior inspections. The standard provides "fair and reasonable warning," of the requirements. *Buckeye*, 3 BNA OSHC at n. 3. Even after accepting Respondent's argument that Mr. Lloyd was not actually aware of the violative condition, this is not a valid defense to the citation.[37] *See, e.g., Am. Luggage,* 10 BNA OSHC at 1682-83.

### b)    *Characterization*

To support a willful characterization the Secretary must show the violation was committed with intentional disregard or demonstrated plain indifference. *MJP*, 19 BNA OSHC at 1647. As stated before, assessing the employer's state of mind requires consideration of a number of factors. *Id.*

Respondent, having been repeatedly cited for violating 29 C.F.R. § 1910.212(a)(3), was aware of the standard and its requirements.[38] (Tr. 1489-90, 1545-47.) However, unlike the Niagara Press Brake, which lacked any type of guarding, or the Accurpress where the guarding features were not being used, the Niagara 18 shear has a permanently attached grating that consistently provided some protection to employees. (Gov. Exs. 33, 37, 45.) This grating did not protect employees to the extent required, but represents some meaningful effort at compliance. *See Dayton Tire v. Sec'y of Labor,* 671 F.3d 1249, 1255 (D.C. Cir. 2012)

---

[37] Respondent does not pursue the affirmative defense of infeasibility for Citation 2, Item 4 or Citation 2, Item 5. It is undisputed that a barrier guard could have been installed between the operator and the hold down pins that would have prevented the operator's fingers from entering into either point of operation. (Tr. 275-76, 873-74, 1718-19; Gov. Exs. 39, 40.) Indeed, Respondent installed guards after the inspection and Mr. Lloyd acknowledged that they provide additional protection for employees. *Id.* Thus, Respondent cannot meet the burden of the affirmative defense of infeasibility. *See Otis*, 24 BNA OSHC at 1087.

[38] Although the shear machines were not previously cited, the 2005 Settlement Agreement as well as the 2009 Settlement Agreement certainly put Respondent on notice of the standard's applicability to all of the Facility's machines. (Gov. Exs. 139 at 4; 157 at 9.)

(concluding that some effort at compliance was sufficient to rebut finding of willfulness); *Am. Wrecking Corp. v. Sec'y of Labor*, 351 F.3d 1254, 1263 (D.C. Cir. 2003) (determining that violation was not willful when company made a "good faith effort to comply with a standard or eliminate a hazard"). Respondent also took prompt action after the citation to address the violation. *See Access Equip.*, 18 BNA OSHC at 1728 (considering the employer's response to the violation when evaluating willfulness). Accordingly, the Secretary failed to meet his burden on willfulness.

### c)    *Penalty Amount*

Although the violation was not willful, the Secretary established that it was serious because death or serious physical harm could result from the lack of guarding.[39] In terms of the penalty amount, the Secretary proposed a penalty of $70,000. Because the violation is affirmed as serious instead of willful, the maximum penalty that can be imposed is $7,000. 29 U.S.C. § 666(j). The CO indicated that the violation had a high gravity due to the seriousness of injuries that can occur and the frequency of the machine's use. (Tr. 285-87; Gov. Ex. 189.) Respondent has an extensive history with OSHA, including past violations for failure to guard points of operation on machinery. (Tr. 1489-90, 1545-47.) This history also undermines Respondent's claims about acting in good faith. *See Quality Stamping*, 16 BNA OSHC at 1929 (noting the importance of history when there are a number of violations). Respondent failed to abide by past agreements with OSHA to guard all machines at the Facility. It has not demonstrated concern for employee safety such that a reduction for good faith is appropriate. *See Valdak*, 17 BNA OSHC at 1139 (giving no good faith credit when employer had cavalier attitude about employee

---

[39] In his Complaint, the Secretary alleged that each of the "willful" violations were also "serious" within the meaning of the Act.

safety). As with the other violations, while Respondent's size could support a penalty reduction, the undersigned finds that the evidence relating to gravity, history, and lack of good faith outweighs giving a reduction for size. *Orion,* 18 BNA OSHC at 1868 (giving less weight to the size factor). Accordingly, a penalty of $7,000 is appropriate for Citation 2, Item 4.

        4.      **Citation 2, Item 5 – 1R10 shear**

              *a)*    *Violation*

Citation 2, Item 5 alleges a similar violation to Citation 2, Item 4, but relates to a different shear machine: the 1R10 shear. Respondent does not allege that the machine complied with the standard. (Resp't Br. at 44-45.) Rather, as it did with the Niagara 18 shear, Respondent alleges that the Secretary failed to show exposure and also claims it did not receive fair notice of the standard's requirements.

Looking first at the Secretary's prima facie case, the 1R10 shear has the same two points of operation as the Niagara 18 shear —the blades and the hold down pins. (Tr. 874-75; Gov. Exs. 43, 44A.) And, in the same manner as the Niagara 18 shear, the operator's fingers can slide between the blades of the shear or underneath the hold down pins. (Tr. 877-9; Gov. Ex. 44.) Although there is metal grating in front of the shear blades, there is a gap of greater than three-eighths of an inch between the table and the bottom of this grate. (Tr. 282, 880.) This gap permits an operator's fingers to come into contact with the point of operation. *Id.* Further, the grating provided no protection from the point of operation underneath the table where the hold down pins are. *Id.*

Employees used the 1R10 shear for multiple purposes and operated it at least one hour per day. (Tr. 1720-21.) One of the employees who frequently used the machine explained how, on occasion, he placed his fingers between the hold pins, directly next to where the pins clamp

the material into place. (Tr. 1720-21, 2147, 2152.) This same employee acknowledged that an operator's hands can be oily and slip while using the machine. (Tr. 2152.) Mr. Lloyd was familiar with the 1R10 and knew there was no barrier guard in front of the hold downs at the time of the inspection. (Tr. 1720-21.) These facts show employee exposure to the hazardous condition and Respondent's knowledge of it.

As noted above, Respondent's claims about a lack of fair notice are rejected. Other than the prior inspections, Respondent offers no evidence why it did not have notice about the machine guarding standard. The Commission has long held that § 1910.212(a)(3)(ii) provides adequate notice. *Buckeye*, 3 BNA OSHC at n.3. "Whether or not employers are in fact aware of each OSHA regulation and fully understand it, they are charged with this knowledge and are responsible for compliance." *Ed. Taylor Constr. Co. v. OSHRC*, 938 F.2d 1265, 1272 (11th Cir., 1991).

### b)   *Characterization*

As indicated before, a willful violation is one in which the employer's state of mind is that of intentional disregard of the Act's requirements or plain indifference to employee safety. *MJP*, 19 BNA OSHC at 1647. Evidence of attempted compliance may weigh against finding that an employer had the requisite state of mind support the characterization. *See Dayton Tire*, 671 F.3d at 1255 (concluding that some effort at compliance rebutted willfulness characterization).

Respondent suggests that it had a good faith reasonable belief that the machine was sufficiently guarded until the citation alerted it to the deficiencies. (Resp't Br. at 47-48.) The 1R10 shear had two points of operation, one of which was partially guarded by grating. (Gov. Ex. 37, 45.) Although this grating would not prevent an employee's fingers from reaching the

43

shear blades, it did lessen such a possibility. The partial grating also suggests that, in the context of this violation, Respondent did not completely disregard or act plainly indifferent to the requirements of the standard. *Dayton Tire,* 671 F.3d at 1255. Considering the partial effort at compliance before the inspection and its prompt action to come into compliance afterwards by installing additional guarding, the Secretary failed to clear the high bar for willfulness. *See id., Access Equip.*, 18 BNA OSHC at 1728.

### c)   *Penalty Amount*

The Secretary proposed a penalty of $70,000 but because the violation is affirmed as serious, the penalty cannot exceed $7,000. 29 U.S.C. § 666(j). The CO indicated that the violation had a high gravity as the injuries that could result from the violative condition could include amputations of fingers. (Tr. 285.) Employees used the 1R10 shear daily. (Tr. 287.) As with the other violations, the undersigned finds that credit for good faith is not appropriate for the same reasons discussed above. *See Valdak*, 17 BNA OSHC at 1139. Likewise, the violation's gravity, along with Respondent's history, outweighs the size factor. *See Quality Stamping*, 16 BNA OSHC at 1929; *Orion,* 18 BNA OSHC at 1868. Accordingly, a penalty of $7,000 is appropriate for Citation 2, Item 5.

### 5.   **Citation 2, Item 6 –Roll Former**

#### a)   *Violation*

Citation 2, Item 6 alleges that the Roll Former, a machine used to form pieces of sheet metal into frames for access doors, lacked point of operation guarding in violation of 29 C.F.R. § 1910.212(a)(3)(ii). (Tr. 295-96, 1047.) Respondent argues that the cited standard does not apply, and that even if it did, the Secretary failed to make out his prima facie case.

Respondent maintains that the Secretary improperly treated the Roll Former as a single machine, when it is actually two separate machines—a roll former and a seal maker. (Resp't Br. at 49.) It alleges that the seal maker was not in service. *Id.* Although it frames its arguments as being about applicability, it is not Respondent's position that the outboard rolls could be unguarded if they were being used to make seals. Instead, it contends that when the machine is being used as a frame maker, the outboard rolls are not a point of operation. *Id.*

(1)     Applicability and Hazard

Mr. Lloyd designed and built the Roll Former. (Tr. 883, 1892-93). Inside the machine, gears attached to rollers shape the metal as it passes through each roll. (Tr. 883-86; Gov. Ex. 50D, 59C.) This part of the machine is used to make frames for doors. (Tr. 883-84; Gov. Ex. 50D, 59C.) Another part of the machine has several shafts or "outboard rolls," which rotate when the machine is in operation. (Tr. 303, 888.) These outboard rolls can be used to make a completely different part—stainless steel "seals." (Tr. 46-47; 888-91; Gov. Exs. 50A, 59C.)

There are two points of operation on the machine: (1) the rotating gears and rolls where the metal is pressed inside the machine; and (2) the outboard rolls used to make stainless steel seals. (Tr. 300-5, 891-96; Gov. Exs. 50C, 59, 62A, 63.) Respondent does not dispute that the rotating gears that pressed metal into frames are a point of operation. Instead, its complaint focuses on the characterization of the outboard rolls as a point of operation. (Resp't Br. at 49-50.) Following Respondent's rationale, the outboard rolls ceased to be a point of operation when employees used the machine for one function (frame-making) rather than another (seal making). *Id.*

This distinction is inconsistent with the standard's language, meaning, and purpose. The standard defines a "point of operation" as the area where "work is actually performed upon the

45

material being processed." 29 C.F.R. § 1910.212(a)(3)(i). The guarding requirement, however, is not limited to only those times when material is in the point of operation—employees must be protected during the entire "operating cycle." *Id.* The outboard rolls are present on the machine because they are capable of pressing metal into seals. (Tr. 1893.) However, they rotate regardless of whether employees are making a frame, a seal, or both.[40] (Tr. 889.)

Both points of operation exposed employees to the hazards associated with coming into contact with rotating gears or rolls. (Tr. 895.) Such exposure could lead to crushed fingers or even more severe injuries. *Id.* JE explained that material jammed in the machine a couple of times a week. (Tr. 43-44.) To address the issue, employees leaned over the top of the machine to free the lodged material. (Tr. 43-44, 1054-63.) The rotating shafts on the side of the machine also created a hazard when unguarded because employees regularly walked within two feet of the machine, creating an entanglement risk. (Tr. 47-48.) JE experienced this, albeit without injury, when his shirt once became caught on the outboard rolls when he walked by the machine. *Id.* Mr. Lloyd acknowledges that he built a guard for the machine to protect workers from rotating parts both within the machine and the outboard shafts. (Tr. 1897.) This shows his awareness of both the parts and the need to protect workers from them. *Id.*

### (2)   Violation

While the machine was equipped with a sheet metal guard, two former employees testified that this guard was rarely on the machine during use. (Tr. 41-42, 47, 51-53, 1047-48; Gov. Ex. 50, 59D.) MS testified that he saw the machine uncovered on the morning of the inspection before the CO entered the shop floor and also explained that the cover for the machine

---

[40] The undersigned notes that even if there was no point of operation associated with the outboard rolls, guarding of rotating parts is still required under 29 C.F.R § 1910.212(a)(1).

was frequently left off, including in the days prior to the inspection. (Tr. 1048-54, 1091-95.) Thus, the violative condition was present within six months of the issuance of the citation.

### (3)    Exposure

One current and one former employee indicated they used the machine within six months of the citation being issued. (Tr. 538-39, 1045-46, 2034.) To operate the machine, the employee typically stood with his arms and hands about a foot away from it. (Tr. 1062.) When pieces became jammed, he would move to the center of the machine to see where the issue occurred. (Tr. 1054-63.) To clear a jam or make mechanical repairs, the cover needed to be off the machine. (Tr. 51-53, 1054-63.) Two former employees explained that because of the frequency of jams and the need for repairs, the machine was frequently left uncovered. (Tr. 51-53.)

### (4)    Knowledge

MS explained that he saw Mr. Lloyd on the shop floor every day frequently walking by the uncovered Roll Former. (Tr. 1065-66.) He never saw Mr. Lloyd replace the cover or direct anyone else to do so. (Tr. 1066.) JE also testified that Mr. Lloyd regularly saw the machine uncovered. (Tr. 49-50.) Mr. Lloyd agreed that he was regularly in the area. (Tr. 1843.) The lack of guarding was plainly visible and capable of being discovered. *See Nordam*, 19 BNA OSHC at 1417 (finding knowledge when conditions were in plain view and supervisor was regularly in the area).[41]

---

[41] The undersigned notes that even if the outboard rolls are not a point of operation, the Secretary still established a violation based on the point of operation the parties agree upon.

### b)    Characterization

To find willfulness, there must be evidence of intentional disregard of the requirements of the Act or plain indifference to employee safety. *MJP,* 19 BNA OSHC at 1647. Looking first at the evidence of intentional disregard, Respondent previously received citations for failure to guard points of operation. And, Mr. Lloyd acknowledged that the machine potentially exposes employees to injuries and should be guarded. (Tr. 1897.)

The Secretary seeks an inference about Mr. Lloyd's state of mind based on conduct that occurred before the CO entered the shop floor. (Sec'y Br at 28-29.) One former and one current employee explained that on November 13, 2014, the day the inspection began, after the CO arrived but before he was permitted on the shop floor, employees took several steps to address safety issues. (Tr. 1047-48, 1451-58.) These actions involved, among other things, placing guards on several machines, including the Roll Former. *Id.* Respondent does not dispute that the above explained event occurred, but argues that it is wrong to impute any bad motive for the activities. (Resp't Br. at 58.)

The testimony about the rush to guard machines before the CO could view them supports the Secretary's position that the guard was off the machine frequently, including on the day of the inspection. This evidence supports finding that Respondent violated the standard and exposed employees to a hazard. But, it is insufficient to establish willfulness because the guarding may have been off due to carelessness rather than a conscious disregard of the standard's requirements. *Babcock*, 622 F.2d at 1165-66 (concluding a violation of the general duty clause was not willful). Further, the presence of guarding indicates some effort at compliance and distinguishes the Roll Former from the Niagara Press Brake, which was completely unguarded. *Dayton Tire,* 671 F.3d at 1255.

48

### c)   Penalty Amount

The Secretary proposed a penalty of $70,000 but because the violation is affirmed as serious the maximum penalty is $7,000. 29 U.S.C. § 666(j). The CO indicated severe injuries, including amputations that could result from the violative condition. (Tr. 309.) The probability of any injury was greater given the frequency with which employees use the machine and how often the guarding was removed. (Tr. 41-42, 47, 51-53, 309-10, 1047-48.) Credit for history or good faith is not appropriate for the same reasons discussed above. *See Valdak*, 17 BNA OSHC at 1139. Likewise, the gravity of the violation, along with Respondent's history, is such that giving credit for size is inappropriate. *See Quality Stamping*, 16 BNA OSHC at 1929 (giving more weight to history); *Orion*, 18 BNA OSHC at 1868 (giving less weight to the size factor). Accordingly, a penalty of $7,000 is appropriate for Citation 2, Item 6.

### 6.   **Citation 2, Item 7 – Rivet Machines**

#### a)   *Applicability and Hazard*

Citation 2, Item 7 concerns the lack of guarding on the Rivet Machines. There are approximately twenty Rivet Machines at the Facility, which the employees use to connect, or rivet, two or more pieces of metal together. (Tr. 322-23, 903, 910-11, 1898.) To start the process, the operator inserts metal from the side and positions it on top of an anvil, beneath a punch. (Tr. 904-6.) The operator then presses on a foot pedal causing the punch to come down and force a rivet through the metal. *Id.* This spot where the punch makes contact with the metal is the point of operation. (Tr. 321, 325, 910-13; Gov. Ex. 66C, 92A.)

Unguarded Rivet Machines can, and have, caused serious injuries. (Tr. 326, 811.) Mr. Lloyd acknowledges that the Rivet Machines are some of the most dangerous machines at the Facility. (Tr. 1843.) If an operator's finger is in the point of operation when the machine is

49

actuated, he or she can suffer cracked bones, lacerations and/or puncture wounds. (Tr. 326, 915.) Two current employees testified about injuries received while operating one of the Rivet Machines. (Tr. 713-14, 716, 811-13.) One described an incident where he accidentally pressed the foot pedal too soon, and the other indicated that the materials slipped and a rivet went through one of his fingers. (Tr. 713-14; 811-13, 815.) Both were taken to the hospital and missed work. (Tr. 716, 811-13, 815.) A former employee discussed a third similar incident. (Tr. 73-74.)

Respondent does not dispute the standard's applicability to the Rivet Machines, but argues that it was in largely compliance, and to the extent it was not, OSHA failed to provide fair notice of the standard's requirements. (Resp't Br. at 55-58.)

### b) *Violation*

During the inspection, the CO observed guards, referred to as "ring guards," on the Rivet Machines. (Sec'y Br. at 31; Gov. Ex. 67, Tr. 322-23, 535-36.) When installed correctly, the ring guard is approximately a quarter of an inch above the metal to be riveted. (Tr. 907-11.) If an object (including a finger) enters the point of operation on top of the metal, the ring guard should be pushed upward and stop the machine from operating. (Tr. 809-10, 907-11.) Even though the machines had ring guards at the time of the inspection, at least one of them was installed incorrectly. (Gov. Ex. 92A.) The CO observed an employee using a Rivet Machine with a ring guard that was two and a half inches above the metal instead of a quarter of an inch. *Id.* At this

location, the ring guard would not have stopped the machine at a point where injury could be avoided if the employee's fingers slipped into the point of operation.[42]   (Tr. 907-13.)

Although Growney considered any gap in guarding greater than one-quarter of an inch to be ineffective, Respondent argues that the standard does not indicate such a threshold.   (Resp't Br. at 56.)   This argument misses the mark.   The standard requires guarding that prevents "the operator from having any part of his body in the danger zone during the operating cycle."   29 C.F.R. § 1910.212(a)(3)(ii).   A finger could enter the two and a half inch gap present on the Rivet Machine.   The guarding was, therefore, not compliant.   Considering the machine was in use, the Secretary established both a violation and employee exposure.[43]   (Gov. Ex. 91, 92.)   *See F.H. Lawson*, 8 BNA OSHC 1063, 1066-67 (No. 12883, 1980) (finding a violation of § 1910.212(a)(3)(ii) when the Secretary showed that operator's hands were ten to twenty inches from the point of operation on a rivet machine).

The improper ring guard was in plain view and Mr. Lloyd indicated that he was in the work area nearly every day.   (Tr. 1065-67, 1638-41.)   An employer is chargeable with knowledge of conditions that are plainly visible to its supervisory personnel.   *Hamilton Fixture*, 16 BNA OSHC 1073, 1089 (No. 88–1720, 1993) (finding an employer is chargeable with knowledge of conditions which are plainly visible to its supervisory personnel), *aff'd*, 28 F.3d

---

[42] In addition to this improperly installed ring guard, the Secretary also presented evidence suggesting that the ring guards were not consistently used. One current employee acknowledged that ring guards were regularly removed. (Tr. 1452-53.) Mr. Lloyd disputed this testimony and indicated that ring guards were always in place. (Tr. 1901.) The evidence of past injuries and the need to install multiple guards on the morning of the inspection undercuts Mr. Lloyd's testimony.

[43] Besides the employee shown in the CO's photograph, another employee testified that he uses the Rivet Machines for several hours every day. (Tr. 807-8.) He acknowledged that sometimes the ring guards are not on, but denied using an unguarded machine. (Tr. 810.)

1213 (6th Cir.1994) (unpublished); *Am. Airlines, Inc.*, 17 BNA OSHC 1552, 1555 (No. 93-1817, 1996) (consolidated) (finding knowledge when conditions were in plain view and supervisory personnel were present). Respondent also agreed to specifically inspect the Rivet Machines for guarding following past citations for failing to guard. (Tr. 1520; Gov. Ex. 153 at 7, 157 at 7-8.)

The Secretary suggests Mr. Lloyd had employees hastily install ring guards on the Rivet Machines in the time between the CO's arrival at the site and when he was permitted into the work area of the Facility. (Sec'y Br. at 32-33.) Respondent does not directly dispute this but argues it was done so there was no confusion as to whether the employees had permission to remove the guards. (Resp't Br. at 58.) The timing of the ring guard installation, whether it took place before or after the inspection began, does not alter the outcome. The Secretary satisfied his burden by showing that the guarding was not compliant and Respondent knew the machines had to be guarded.

### c)  *Fair Notice*

Respondent argues that it had permission not to use ring guards when manufacturing a particular part—a type of damper with a blanket attached.[44]  (Resp't Br. at 57; Tr. 536-37.) There is, however, no evidence that Respondent was producing this part during the inspection

---

[44] DS, the former plant manager, indicated that he placed a sign on one Rivet Machine, which read: "safety device on this equipment temporarily removed due to current production approved by OSHA, 2009." (Tr. 1792-93; Ex. R-384.) This sign also has several handwritten dates, which DS indicated were specific dates when the safety equipment was removed temporarily. (Tr. 1792-93; Ex. R-384.) Although the sign references OSHA approval, neither the CO nor DS had information about any such approval. (*Id.*, Tr. 537-38.) Further, Respondent does not allege that OSHA indicated ring guards were not necessary whenever feasible, such as on the day of the inspection. (Gov. Ex. 247.) The undersigned notes that the most recent date noted on the sign was several months before the inspection date. (Ex. R-384.) Considering the evidence that the ring guards could remain in place to produce the parts being fabricated during the inspection, the presence of the sign DS made is not relevant.

when the CO observed the employee using a Rivet Machine with an improperly installed ring guard. As Respondent recognizes, OSHA never granted a blanket exception to the guarding requirement. Moreover, Respondent never counters the Secretary's evidence that guarding was feasible. Additionally, Respondent knew about the ring guard requirements and specifically directed employees to install them before the CO saw any machines without them. (Tr. 1454.)

### d)    *Characterization*

As stated above, willfulness requires evidence of intentional disregard of the Act's requirements or plain indifference to employee safety. *MJP*, 19 BNA OSHC at 1647. OSHA previously cited Respondent for failing to guard points of operation on its Rivet Machines. Thus, Respondent was aware of the standard and its applicability to the Rivet Machines. However, the Secretary failed to establish that the use of the Rivet Machines without compliant guarding was the result of intentional disregard or plain indifference. *See Bianchi*, 490 F.3d at 208. In addition, the presence of the ring guards on the majority of Rivet Machines shows some effort at compliance. *Dayton Tire*, 671 F.3d at 1255.

### e)    *Penalty Amount*

The Secretary proposed a penalty of $70,000 but because the violation is affirmed as serious instead of willful, the maximum penalty is $7,000. 29 U.S.C. § 666(j). The CO indicated severe injuries that could result from unguarded Rivet Machines, including having a rivet inserted into a finger. (Tr. 326.) Employees frequently use the Rivet Machines. (Tr. 309.) There have been multiple injuries, and Respondent did not have a strong safety program to ensure that guards were in place. Moreover, there is no evidence of discipline for using an unguarded Rivet Machine. Credit for size, history, or good faith is not appropriate for the same reasons discussed above. *See e.g., Valdak*, 17 BNA OSHC at 1139; *Quality Stamping*, 16 BNA

53

OSHC at 1929; *Orion*, 18 BNA OSHC at 1868.  Considering the gravity of the violation as well as the other factors, a penalty of $7,000 is appropriate for Citation 2, Item 7.

### D.   Serious Safety Violations: Citation 1, Items 3a, 3b, 3c, and 3d

The machine guarding standard has several machine and part specific requirements. Unlike the guarding provision alleged to have been violated in Citation 2 (§ 1910.212), the Secretary does not have to prove a hazard in order to meet his burden of establishing a violation of 29 C.F.R. § 1910.219, the standard at issue in Citation 1, Items 3a-d.  *See ConAgra Flour Milling Co.,* 16 BNA OSHC 1137, 1149-50 (No. 88-1250, 1993) ("Secretary does not have to establish that unguarded pulleys present a hazard"), *rev'd in part on other grounds*, 25 F.3d 653 (8th Cir. 1994).  Citation 1 includes violations for unguarded flywheels (Citation 1, Item 3a), unguarded pulleys (Citation 1, Item 3b), an unguarded horizontal belt (Citation 1, Item 3c), and unguarded vertical belts (Citation 1, Item 3d).  The Secretary grouped all of these alleged violations for penalty purposes.

Respondent does not contest § 1910.219 applicability or its knowledge of the violative conditions.  (Resp't Br. at 61-63.)  Rather, it argues that all of these violations should be vacated because the Secretary did not prove employee exposure to the violative conditions.  *Id.*

Respondent's arguments, although framed as being about exposure, are better understood as relating to the characterization and penalty amount.  *See RPM Erectors, Inc.*, 2 BNA OSHC 1187, 1188 (No. 1114, 1974) (noting that the probability of an injury is related to gravity).  As the Commission has long held, to sustain a violation the Secretary must show that employees were exposed to the violative condition.  *Astra Pharm.*, 9 BNA OSHC at 2129.  Satisfying this obligation does not require an injury or actual exposure to a condition.  *See, e.g., ConAgra,* 16 BNA OSHC at 1149-50.  It is sufficient to "show that it is reasonably predictable either by

operational necessity or otherwise (including inadvertence), that employees have been, are, or will be in the zone of danger." *Delek Refining, Ltd.*, 25 BNA OSHC 1365, 1374 (No. 08-1386, 2015) (finding no exposure in connection with a violation of § 1910.219(c)(2)(i)), *aff'd relevant part*, 845 F.3d 170 (5th Cir. 2016) (not addressing alleged violation of § 1910.219).  How likely exposure would result in injury and the type of injury (if any) that could result from this exposure is examined in connection with determining the characterization and setting the appropriate penalty amount.  29 U.S.C. § 666.  *See also Quality Stamping*, 16 BNA OSHC at 1928-29 (assessing the gravity of the violation involves consideration of the precautions taken and the probability of an injury); *Charles W. Mason, DDS*, 25 BNA OSHC 1792, 1795-96 (No. 10-2313, 2015) (evaluating risk of exposure claims when determining the appropriate characterization of a violation).

For the reasons discussed below, all instances set forth in Citation 1, Items 3a and3c are AFFIRMED, as are instances (a-d) of Item 3b and instances (a-c) of Item 3d.  Instance (e) of Citation 1, Item 3b as well as Instance (d) of Citation 1, Item 3d, both of which relate to the Roll Former, are VACATED.

> 1.     **Citation 1, Item 3a – Serious Violation of § 1910.219(b)(1) for unguarded flywheels on the Niagara Press Brake and certain Rivet Machines**

Citation 1, Item 3(a) alleges four instances of violations of § 1910.219(b)(1) for unguarded flywheels.  Instance (a) is for the flywheel on the Niagara Press Brake while Instances (b), (c), and (d) are for flywheels on three Rivet Machines located in the 75A department.  The cited standard requires: "[f]lywheel located so that any part is seven (7) feet or less above a floor or platform shall be guarded in accordance with the requirements of this subpart."  29 C.F.R. § 1910.219(b)(1).  The standard includes various options for guarding including covering the

flywheels: "[w]ith an enclosure of sheet, perforated, or expanded metal, or woven wire."   29 C.F.R. § 1910.219(b)(1)(i).

### a)   *Instance (a) – Flywheel on the Niagara Press Brake*

The flywheel at the back of the Niagara Press Brake was less than seven feet above the floor and was not guarded in a manner compliant with the standard.  (Tr. 224-26; Gov. Ex. 7.) When an employee powers on the machine, the flywheel begins to move and keeps moving regardless of whether or not the employee presses the foot pedal.  (Tr. 228-9; 635-37.)

At least two employees used the machine.  (Tr. 542.)  Although the sides of the flywheel were partially guarded on two sides the CO explained that the employees were still exposed to the violative condition when they checked the backstops on the machine and in the event of a malfunction.  (Tr. 227-28; Gov. Ex. 265.)  Mr. Lloyd himself demonstrated the possibility of employees going to the back of the machine during the inspection.  (Gov. Ex. 265.)  When the machine malfunctioned during the inspection, Mr. Lloyd promptly went to the back of the machine where the exposed flywheel is visible.  (Tr. 344; Gov. Ex. 265.)  Growney also opined that it is reasonably likely employees would go behind the machine to pick up materials stored there.  (Tr. 676-77; Gov. Exs. 1, 2.)

Mr. Lloyd acknowledges that he is familiar with the Niagara Press Brake and operated in many times.  The exposed flywheels are in plain view and capable of discovery.  *See Nordam*, 19 BNA OSHC at 1417.  Respondent protests that employees kept a safe distance from the flywheel.  (Resp't Br. at 61-63.)  However, safe distance guarding is not permissible when physical devices can be used.  *See Otis*, 24 BNA OSHC at 1087.  The flywheel on the Niagara Press Brake could have been covered by sheet metal or metal mesh.  (Tr. 227-29, 678.)  Indeed, flywheels on other mechanical presses at the Facility were covered this way.  (Tr. 227-29.)

### *b)*     *Instances (b), (c) and (d) on the Rivet Machines*

Respondent failed to guard the flywheels on three Rivet Machines in the 75A department. (Tr. 341-47; Gov. Exs. 68A, 68B.)  Each of these flywheels was located less than seven feet above the floor.  (Tr. 345-46.)

As with the flywheel on the Niagara Press Brake, the flywheels on the Rivet Machines rotate continuously when the power is on even if the foot pedal is not actuated.  (Tr. 346-7; 921-26; Gov. Ex. 69A.)  Employees can come into the vicinity of the flywheel while working at or near the machines and when using the aisle behind them.  *Id.*  Growney considered the back of the Rivet Machines to be "clearly accessible," and noted a tripping hazard in the aisle behind the machines.  (Tr. 922.)  An employee was also seen sitting in a chair near the exposed flywheels. (Tr. 340, 922-24; Gov. Ex. 64, 66, 68.)  Further, the CO noted that employees may come into contact with flywheels when examining a machine in the event of a malfunction.  (Tr. 922.)  In fact, he observed Mr. Lloyd come within inches of a flywheel on one of the Rivet Machines when he examined a ring guard.  (Tr. 342-44, 924; Gov. Ex. 69A.)

This evidence distinguishes the present matter from *Buffets*.  21 BNA OSHC at 1066-67. In *Buffets*, employees had access to an aisle near large mixing bowls, but the Secretary did not show how this access would bring employees into contact with rotating parts contained within mixing bowls.  *Id.*  In contrast, at the Facility, employees could come very close to the flywheels when adjusting the backstops, in the event of a malfunction (as Mr. Lloyd himself did), or if they were to accidentally trip on the pallets that extended into the aisle behind the machines.  (Tr. 352, 928.)  The Secretary presented sufficient evidence of exposure.

The lack of guarding was plainly visible, and Mr. Lloyd indicated that he was routinely on the shop floor.  *See Nordam,* 19 BNA OSHC at 1417 (finding knowledge when conditions

were in plain view and supervisor was regularly in the area).   When the lack of guarding was pointed out to him during the inspection, he acknowledged the possibility of injury but surmised it was no riskier than a car door.   (Tr. 352-53.)   Respondent guarded the flywheels on the Rivet Machines with sheet metal after the inspection and does not allege that guarding was infeasible prior to that time.   (Tr. 348-51; 926-27.)   Because physical guarding was feasible, Respondent could not rely on safe distance guarding.[45]   (Tr. 926-27.)

Accordingly, all five instances of Citation 1, Item 3a are AFFIRMED.   For penalty purposes, this Item is grouped with Items 3b, 3c, and 3d, and the amount assessed is discussed below.

### 2.   Citation 1, Item 3b – Serious Violation of § 1910.219(d)(1) for unguarded pulleys on the Niagara Press Brake, Rivet Machines, and Roll Former

Citation 1, Item 3b alleges five instances of violations of § 1910.219(d)(1).   Each instance concerns a different machine.   The cited standard requires pulleys located seven feet or less from the floor or work platform must be guarded and includes various options for physical guarding.   29 C.F.R. §§ 1910.219(d)(1), (m).   Respondent challenges exposure, implicitly conceding applicability, violation, and knowledge.   It does not assert that compliance was infeasible as the pulleys were guarded after the initial inspection.

---

[45] Further, the Secretary showed that Respondent did not have effective safe distance guarding practices in place.   As noted above, there were materials located behind the Niagara Press Brake and Rivet Machines that could bring workers in contact with unguarded flywheels as part of their regular course of duties.   (Tr. 228-30, 676-77; Gov. Exs. 1, 2.)

### a) Instances (a), (b), (c), and (d)

The Secretary showed that pulleys on the Niagara Press Brake and three of the Rivet Machines were located less than seven feet above the floor and were not covered by a physical barrier as required. (Tr. 541 Gov. Ex. 7, 50, 66.) The pulleys on these machines were located near the flywheels. (Tr. 224, 344-45; Gov. Ex. 7, 66, 68.) In the same manner as the Secretary established exposure to the unguarded flywheels, it was also shown with respect the pulleys. *See Con Agra,* 16 BNA OSHC at 1149-50 (finding exposure when employees worked 1 to 1.5 feet away from unguarded belts and pulleys); *Clement Food Co.,* 11 BNA OSHC 2120, 2123 (No. 80-607, 1984) (finding exposure and a violation of § 1910.219(d)(1) when employees walk within reaching distance of the unguarded parts). Mr. Lloyd knew the backs of these machines were unguarded. The area was covered by mesh guarding after the inspection, so there is no basis for arguing infeasibility of guarding.

### b) Instance (e) – Roll Former

For the Roll Former, the pulley was located on the underside of the machine two to three feet above the ground. (Tr. 357-58; 896-900, 1919; Gov. Ex. 52A, 52B.) The Secretary argues that an employee could reach under the machine and come into contact with the unguarded pulley. The Secretary did not provide evidence about how far from the edge of the machine the pulley was located (i.e., was it within an arm's length of the edge such that inadvertent contact was possible). When pulleys, flywheels, or belts are located at the back of machines, an employee can just walk around the machine and come into contact with the exposed rotating parts. In contrast, with the Roll Former, there is not sufficient evidence establishing that even through inadvertence employees could come in contact with parts underneath the machine. *See Fabricated Metal*, 18 BNA OSHC at 1075 (discussing exposure test).

Accordingly, Instances (a), (b), (c), and (d) of Citation 1, Item 3b are AFFIRMED and Instance (e) of Citation 1, Item 3b is VACATED.

### 3.   Citation 1, Item 3c - Serious Violation of § 1910.219(e)(1)(i) for unguarded horizontal belt on the Niagara Press Brake

Citation 1, Item 3c alleges a violation of § 1910.219(e)(1)(i) for the unguarded horizontal belt on the Niagara Press Brake. The cited standard requires horizontal belts located 42 inches or less from the floor to be "fully enclosed." 29 C.F.R. § 1910.219(e)(1)(i). The standard applies to the Niagara Press Brake because the belt connecting the motor with the flywheel was less than 42 inches from the floor. (Tr. 235; Gov. Ex. 7C.) As was the case with Citation 1, Item 3a, the horizontal belt was located at the back of the machine. Employees checking the back stops or picking up materials stored behind the machine could come into contact with the unguarded belt. (Tr. 227-28; Gov. Ex. 265.) Because the back of the machine was completely open, employees could come into contact with the belt; and, if they did, injuries could include lacerations, fractures, and hair or scalp injuries. (Tr. 234-37; 679; Gov. Exs. 7C, 181.) Mr. Lloyd himself operated the machine and was in a position to observe the violative condition, including during the inspection. Accordingly, Citation 1, Item 3c is AFFIRMED.

### 4.   Citation 1, Item 3d – Serious Violation of § 1910.219(e)(3)(i) for unguarded vertical belts on the Rivet Machines and the Roll Former

Citation 1, Item 3d alleges a violation of § 1910.219(e)(3)(i) for unguarded vertical belts on three different Rivet Machines and the Roll Former. The cited standard requires that "[v]ertical and inclined belts shall be enclosed by a guard conforming to standards in paragraphs (m) and (o) of this section." 29 C.F.R. § 1910.219(e)(3)(i).

### a)   Instances (a), (b), and (c) – Belts on Rivet Machines

For the Rivet Machines, the vertical belts were attached to the flywheels and pulleys discussed above.  None of the belts were covered and employees had access to them for the same reasons they had access to the flywheels and pulleys.  The parts move continuously even if the foot pedal is not actuated and an aisle walkway behind the machines increased the likelihood of exposure.  (Tr. 346-47, 921-28; Gov. Ex. 69A.)  As with the other violations of § 1910.219, Mr. Lloyd used the Rivet Machines many times and knew that the back was unguarded.  (Tr. 352-53; Gov. Ex. 69A.)  Guarding was feasible and added to the Rivet Machines after the inspection. (Tr. 348-50, 926; Gov. Ex. 70A.)

### b)   Instance (d) – Belt on Roll Former

Like the pulleys discussed in connection with Citation 1, Item 3(b), the unguarded belt on the Roll Former was located underneath the machine, a few feet above the floor.  While it was possible for employees to reach under the machine, the Secretary did not show if it was possible to reach far enough under the machine such that an employee could come into contact with the unguarded belt.  Thus, the Secretary failed to show exposure to this violative condition.

Accordingly, Instances (a), (b), and (c) of Citation 1, Item 3(d) are AFFIRMED and Instance (d) of Citation 1, Item 3(d) is VACATED.

### 5.   Characterization and Penalty Amount for Citation 1, Items 3a, 3b, 3c and 3d

Respondent's arguments, although framed as being about exposure, are better understood as relating to the characterization and penalty amount.  The CO explained that the lack of guarding created an entanglement hazard which, if it were to occur, would result in serious injuries.  (Tr. 227, 230-31 347, 359.)  Likewise, Growney explained that injuries could include

crushed fingers, amputated fingers, lacerations, scalp or hair being ripped out. (Tr. 679-80, 921.) While these injuries are severe, the location of the hazard reduced the probability of their occurrence. In particular, the CO conceded that the flywheels, pulleys, and horizontal belts on the Niagara Press Brake were partially guarded and that this lessened the probability of injury on that machine. (Tr. 230-31.)

The Secretary grouped Items 3a, 3b, 3c and 3d for penalty purposes and proposes a single $5,000 penalty for all the violations. Although the gravity of each individual violation is less, the number of affirmed instances, twelve, is notable. The violations relate to four different machines and include multiple unguarded parts. Consistent with the findings above, the undersigned finds that any reduction for size is inappropriate considering Respondent's history and Respondent has not demonstrated sufficient good faith meriting a penalty decrease. *See Quality Stamping*, 16 BNA OSHC at 1929. Accordingly, the undersigned finds that a penalty of $5,000 is appropriate.

### E.     Citation 1, Item 4 – Alleged Serious Violation of § 1910.305(b)(1)(ii) for improperly closed openings on the radial saw and flange machine

Citation 1, Item 4 alleges three instances of violations of § 1910.305(b)(1)(ii), which requires "[u]nused openings in cabinets, boxes, and fittings" to be effectively closed. Instances (a) and (b) allege that a "Square D brand switch gear box mounted to the table of Skill Brand, Model 450 radial saw" had "a knock out opening on the left side that was not effectively closed" as well as "a rectangular shape opening on the front that was not effectively closed." Respondent does not dispute that the condition existed but alleges there was no employee exposure. (Resp't Br. at 63.) This contention is rejected as an employee operated the saw regularly, sometimes multiple times per day, and this work necessitated coming near the gear box. (Tr. 365-69, 373-75; Gov. Ex. 106A.) The violative condition was in plain view and could

62

have been observed by supervisors, including Mr. Lloyd who indicated that he has operated every machine in the Facility and was frequently on the shop floor for hours a day.[46] (Tr. 365-66, 1638.) *See Nordam,* 19 BNA OSHC at 1417.

Instance (c) relates to a switch gear box on the flange machine with an opening that was not effectively closed. (Tr. 370-71; Gov. Ex. 102A, 103.) An employee explained that he used the flange machine to bend materials. (Tr. 371-73, 2145-47.) To do so, he turned the machine on by using the handle located directly above the open gear box. *Id.* Thus, there was employee exposure to the violative condition. *See Fabricated Metal*, 18 BNA OSHC at 1074 (finding exposure if "employees have been, are, or will be in the zone of danger"). In terms of knowledge, the employee who operated the flange machine was a supervisor, and in order to use the machine, he would have to come within inches of the violative condition. (Tr. 371-73, 2145-47.) The condition was in plain view and Mr. Lloyd and other supervisors were capable of observing the condition. (Tr. 370, 1638-41.) *See Nordam*, 19 BNA OSHC at 1417.

The CO explained that the openings could lead to exposure to arc flashes and result in burns. (Tr. 367, 371.) The gravity of the violation was less significant because the typical location of employees relative to the openings reduced the probability of injury. (Tr. 375.) As with the other violations, the undersigned finds that no credit for size, history, or good faith is appropriate. However, given the probability of injury, the gravity of the violations warrants a reduction in the penalty amount. With particular emphasis on the gravity of the violations, the undersigned finds that a single $5,000 penalty for the three instances of violation as set forth in Citation 1, Item 4 is appropriate.

---

[46] Respondent does not argue that it lacked knowledge of the violative conditions.

## II.      Health Inspection- Inspection No. 1009661

### A.      Violations of the Noise Standard

The Secretary alleges five violations of the noise standard, 29 C.F.R. § 1910.95, which requires employers to "establish and maintain an audiometric testing program . . . by making audiometric testing available to all employees whose exposures equal or exceed an 8-hour time-weighted average of 85 decibels."   29 C.F.R. § 1910.95(g)(1).   The 8-hour time-weighted average of 85 decibels is referred to as the action level.   *Id.*   As part of the hearing conservation program, employers must monitor noise exposure levels in a way that accurately identifies employees exposed to noise at or above the action level.   29 C.F.R. § 1910.95(d), (g).   (Tr. 1190-91, 1195.)   The exposure measurement must include all continuous, intermittent, and impulsive noise within the range of 80 decibels to 130 decibels and must be taken during a typical work situation.   29 C.F.R. § 1910.95(d)(2).   Employers must carefully check or calibrate instruments used for monitoring employee exposure to ensure measurements are accurate.   *Id.*

Respondent has a history of known employee exposure to noise above the action level in the assembly area.   (Tr. 1518.)   OSHA investigations in 2005 and again in 2008 identified employees working in that area as being exposed to noise above the action level.   (Tr. 1198; Gov. Exs. 130, 132, 144.)   A 2009 survey by an audiometric testing company Respondent retained also showed exposure above the action level in the same assembly area of the Facility.   (Gov. Ex. 111.)   Because of this exposure, Respondent needed to maintain an audiometric testing program with annual audiograms for affected employees.   29 C.F.R. § 1910.95(g)(6); *Reich v. Trinity Indus., Inc.*, 16 F.3d 1149, 1151 (11th Cir. 1994).

Citation 1, Items 1, 2, and 3 relate to Respondent's alleged willful failure to obtain the required annual audiograms for three employees, referred to herein as FA, FTM, and RG.

Citation 1, Item 4b concerns Respondent's alleged willful failure to conduct annual noise related training as required by 29 C.F.R. § 1910.95(k)(2). And Citation 2, Items 3 and 4 allege that Respondent committed other-than-serious violations by failing to calibrate its instruments or review the monitoring results as required by 29 C.F.R. § 1910.95(g).

### B.   Expert Testimony

Both parties called expert witnesses to testify at the hearing about noise exposure. The Secretary called Brian Liddell, who the parties agreed was an expert in the areas of noise exposure measurement, analysis of noise exposure data, and determining compliance with occupational noise standards. (Tr. 2310.) Respondent called Dennis Driscoll, who the parties agreed was an expert in the areas of occupational noise and noise exposure assessments for both hearing conservation and in regulatory compliance. (Tr. 2179-80.) Each expert also submitted a written report. The undersigned admitted the testimony and reports of both experts with the belief that doing so would assist with an understanding of the evidence, consistent with *Daubert*, 509 U.S. at 593-94.

Having accepted both parties' experts, the undersigned finds that the relative utility of two experts was not equal. Driscoll's testimony was largely limited to theoretical possibilities rather than facts. *See Gulf & W. Energy Prod. Grp.*, 14 BNA OSHC 1968, 1972-73 (No. 79-4053, 1991) (concluding that notwithstanding the errors in the sampling process, the Secretary established a violation). He did not use a sound level meter or noise dosimeter to independently measure noise at the Facility. (Tr. 2284.) Indeed, he never visited the Facility. (Tr. 2331.) His testimony was limited to whether OSHA followed its own procedures and suggesting possible issues with the data collected. (Tr. 2231-32, 2289.) He admitted that he did not know to a

65

degree of scientific certainty whether OSHA's noise exposure measurements were inaccurate. (Tr. 2289.)

In contrast, Lindell focused on whether any of the choices Orach made when conducting the noise surveys resulted in material differences in the data collected. (Gov. Ex. 225.) He also offered a reasonable, coherent view of the OSHA Technical Manual and what it suggests in terms of best practices for data collection and how it relates to the testing that was done at the Facility. *Id.* Lindell's testimony and report were consistent with past analyses of noise exposure at the Facility.

In furtherance of my gatekeeper function under Rule 702 of the Federal Rules of Evidence, the undersigned has weighed the testimony and reports of both experts. The testimony and report of Lindell are accorded more weight than the testimony and report of Driscoll.

1.    **Citation 1, Items 1, 2 and 3 – Willful Failure to Obtain Annual Audiograms**

Orach placed personal noise monitoring devices on three employees (FG, FTM, and RG) who worked in the assembly area. (Tr. 1157-59, Gov. Ex. 225.) An additional employee (FA) who also works in the assembly area arrived late on the day of testing was not individually monitored. (Tr. 1154, 1330-31.) The monitoring devices showed that employees working in the assembly area were exposed to noise above the action level of 85 decibels.[47] (Gov. Ex. 225.)

As noted above, when work conditions expose employees to noise above the action level, employers must establish and maintain audiometric testing programs that make audiometric testing available to all employees whose exposures equal or exceed the action level. 29 C.F.R.

---

[47] Orach also monitored a fourth employee, VM. Because VM did not engage in his typical duties on the day of the monitoring, his results were not used to support any of the violations. (Tr. 1337-38, 1341-43.)

§ 1910.95(g); *Trinity Indus.*, 16 F.3d at 1151.  The audiometric testing program must include a baseline audiogram and then annual audiograms thereafter for all such employees.  *Id.*

Respondent concedes that no audiograms were obtained in 2013 but disputes the accuracy of the results showing exposure above the action level.  Specifically, Respondent argues that the Secretary must individually monitor employees and cannot use the test results from one employee to say another was exposed to noise above the action level.  (Resp't Br. at 65-67.)  Respondent also argues even if there was a violation, the Secretary did not establish it was willful.  *Id.* at 67-68.

For the reasons discussed below, Citation 1, Items 1, 2, and 3 are affirmed as serious and the proposed penalties are assessed.

### a)   *Item 1 – Failure to Obtain Annual Audiogram for FA*

The Citation alleges Respondent violated the standard because "[a]nnual audiograms were not provided between October 2012 and December 2014, or approximately 26 months" for an employee "exposed to the equivalent of an average sound level of 88.6 dBA, which is 1.04 times the Action Level of 85 dBA."  The Secretary explained that Item 1 relates to the employee who was not individually monitored—FA.  (Sec'y Br. at 44.)  According to the Secretary, another employee (FG) performed the same work that FA typically does, so the results from the monitor worn by FG are representative of what an employee working in the assembly area experiences.  *Id.*

### (1)   Applicability & Exposure

The cited standard's applicability depends on whether employees are exposed to noise at or above the action level.  On the day of the sampling, FG worked in the assembly area for the

entire shift.[48]  (Tr. 1157-58.)  His dosimeter recorded noise from 7:59 am to 6:00 pm.  (Tr. 1192; Gov. Ex. 220).  By 2:40 pm, FG was exposed to noise over the action level; and, by the end of the shift, his dose was well above it.  (Tr. 1193-94; Gov. Ex. 220.)

Respondent contests the accuracy of these results, not whether such results trigger the requirements of 29 C.F.R. § 1910.95(g).  (Resp't Br. 66-67.)  Relying on its expert (Driscoll), Respondent asserts that Orach failed to calibrate the dosimeter correctly and improperly included noise exposure that occurred during the employee's lunch.  *Id.*

(a)   Calibration

Each dosimeter had an annual calibration performed at OSHA's Cincinnati Technical Center.  (Tr. 1165, 1176, 1182-83; Gov. Ex. 214.)  In addition, Orach re-calibrated the dosimeters before and after their use at the Facility.  (Tr. 1161, 1189-90.)  Orach, who had previously been to the Facility, believed that the level of noise at the Facility could make it difficult to ensure an accurate calibration if it was done at that location.  (Tr. 1161.)  So, he calibrated each dosimeter at OSHA's Allentown Area Office on Friday, December 12, 2014, using equipment with up to date calibration.  (Tr. 1165, 1168, 1176-77, 1222, 1239; Gov. Ex. 214.)  Orach determined that the dosimeters were functioning properly and recorded the results from his calibration.  (Tr. 1162-63, 1221-22, 1238-39; Gov. Ex. 219, 220, 257.)  After completing the calibration, Orach stored the dosimeters in their foam insulated cases.  (Tr. 1182-83.)  In Orach's experience, the office where the dosimeters were stored after the calibration is

---

[48] Employees in the assembly area cut and formed metal and then finished the products using hand held hammers and the Rivet Machines.  (Tr. 1130, 1243-46.)  The assembly table where employees worked by hand was eight to ten feet long and four feet wide.  (Tr. 799-800, 1136-37.)

not subject to extreme temperature or humidity. (Tr. 1183.) On the day of the testing, he transported the dosimeters in their case in the passenger compartment of a car. (Tr. 1184.) When he arrived at the Facility, Orach conducted a spot check to confirm the accuracy of the calibration. (Tr. 1183.)

At the end of the workers' shift, Orach placed the dosimeters in standby mode and then recorded the results. (Tr. 1187.) The dosimeters were placed back in the case, transported again in the passenger compartment of the car and returned to Orach's office. (Tr. 1187-88.) The following day, Orach performed a post-calibration for each dosimeter. (Tr. 1188-89.) The results were nearly identical to the initial calibration, confirming that the dosimeters functioned properly during the monitoring. (Tr. 1189-1190; Gov. Ex. 219, 220, 225, 257.)

Lindell explained that the precise timing of calibration is not critical. (Tr. 2311-12; Gov. Ex. 225 at 4-5.) He also explained that the need for a quiet environment may make calibration at a worksite impossible. (Gov. Ex. 225 at 5.) The documented test results support the conclusion that the calibration was appropriate and that the dosimeters were functioning properly when Orach used them. *Id.* at 5, 8. Therefore, consistent with Lindell's expert opinion, the undersigned finds that Orach's calibration of the dosimeter did not affect the accuracy of the results such that they cannot be relied upon to show exposure above the action level.

### (b)    Inclusion of lunchtime noise exposure

The appropriateness of including lunch time noise exposure is a fact-specific determination. Orach said he left the dosimeters running during the lunch break if the employee remained in the work area. (Tr. 1193.) He did this because the employee remained exposed to workplace noise in such situations. *Id.* The undersigned finds that Orach properly included the lunchtime exposure since it revealed what the worker typically experienced at the Facility as

69

opposed to at an off-site location. In any event, as Lindell explained, and Driscoll conceded, even if one were to assume that FG was not exposed to any noise during his lunch, his results still would show exposure above the action level, so even if it was error to include the lunchtime noise exposure, this did not affect the finding of exposure above the action level. (Tr. 1194, 2327, 2272; Gov. Ex. 225 at 7-8.)

(c)     <em>Representativeness of the Noise Sample</em>

OSHA's noise sampling protocols permit establishing similar exposure groups (SEGs). If a group of workers has the same general exposure profile, each individual need not be sampled. (Tr. 2334-35.) The samples from one individual can be considered representative of the group. Here, the Secretary argues that the results from the monitor worn by FG can be used to support finding that Respondent failed to obtain an audiogram for a different employee who was not individually monitored (FA). The Secretary contends that because FA and FG work in similar positions the results from FG's monitor are representative of the noise exposure FA experienced.

FA normally worked in the assembly area doing the same type of work as FG. (Tr. 1156-57, 1997-98.) Orach and the CO both observed FA working in the same area close to each other. (Tr. 1136-38, 1157-58; Gov. Ex. 66, 68.) And, Mr. Lloyd and the former plant manager also confirmed that FA regularly worked in the assembly area. (Tr. 1156-57, 1679, 1751-52.) Workers in the assembly area all work at the same table in close proximity to each other. (Tr. 2236.) They all make the same types of parts. Driscoll suggested that FA and FG could have different noise exposure. But, there is no evidence that FA and FG actually had notably different positions, nor is there a reasonable basis to find that their actual exposure differed. *See Gulf,* 14 BNA OSHC at 1972 (finding that hypothetical problems did not invalidate results).

70

Lindell explained that FG's noise sampling results accurately represent the noise levels to which any employee working in that job position would be exposed. (Gov. Ex. 225 at 8.) Along with the dosimeter results, Orach also took several "spot" measurements throughout the day in the area. (Gov. Exs. 225 at 8, 220.) All three samples also showed exposure over the action level. (Tr. 2338.) While on a day to day basis there could be some variability in the noise exposure of individual employees, Lindell concluded that it was highly unlikely that this variability would be enough to reduce exposure below the action level. (Gov. Ex. 225 at 9.) Further, three prior rounds of testing also found that workers in the assembly area were exposed to noise at or above the action level. (Tr. 1208-13; Gov. Exs. 132, 111, 144.) These facts make it reasonable to consider FG, FA, and other workers in the assembly area to be a similar exposure group.

(2)    Violation

Given the acceptance of the noise sampling results showing exposure over the action level, Respondent was required to obtain an annual audiogram for FA. However, Respondent failed to do so in 2013.[49] (Tr. 1148, 1197-98.) FA worked for Respondent during this entire period and should have undergone annual audiograms as required by 29 C.F.R. § 1910.95(g)(6).[50]

---

[49] A few weeks after the November 2014 inspection, Respondent obtained audiograms for employees working in the assembly area. (Tr. 1152.) However, this was over a year beyond the deadline.

[50] The undersigned also notes that the initial requirement to obtain annual audiograms was triggered by the past noise surveys because they identified exposure over the action level for workers in the assembly area. Respondent does not allege that any of these prior surveys were flawed. Nor does it point to any significant changes in operations that would have caused it to believe that noise levels had been reduced below the action level.

### (3)   Knowledge

Mr. Lloyd recognized that the assembly area was the noisiest part of the Facility. (Tr. 1270, 1676.)   In 2008, Orach came to the Facility and notified Mr. Lloyd about employee exposure to noise above the action level.   Orach provided a means to reduce the noise level. (Tr. 1269-70.)   He also showed Mr. Lloyd the noise levels on a sound meter. (Tr. 1270.)   Mr. Lloyd did not take the recommended step of placing rubber on the table and told Orach he liked the noise.   *Id.*   Moreover, because of OSHA's two prior noise surveys, as well as a third independent survey conducted in 2009, Respondent had actual knowledge that employees in the assembly area were exposed to noise levels at or above the action level.[51]   (Tr. 1519-20; Gov. Ex. 126, 146.)

During the investigation, Mr. Lloyd told Orach that there was no audiometric testing done in 2013, and he did not provide any records of it. (Tr. 1198.)   At the hearing, Mr. Lloyd denied knowing that the audiograms were not conducted but admitted that he took no steps to make sure annual audiometric testing was completed. (Tr. 1655-56.)   Particularly considering the length of time that passed, even if Mr. Lloyd lacked personal knowledge, an employer could

---

[51]   Respondent also specifically agreed to conduct audiometric testing as part of the 2005 Settlement Agreement:

> [a]s part of its ongoing abatement obligations, Respondent will further ensure: that the entire facility is in compliance with 29 C.F.R. § 1910.95 ("Occupational Noise Exposure"), including but not limited to compliance with paragraphs (d) ("Monitoring"), (g) ("Audiometric testing program"), and (k) ("Training Program") … .

(Gov. Ex. 139 at 10).   The 2008 citations were similarly resolved with a Settlement Agreement that included specific responsibility to "submit written documentation of all annual audiometric testing for the next three years and training records as well as all baseline testing." (Gov. Ex. 157 at 7.)

discover the violation by exercising reasonable diligence.[52]   *See Hamilton Fixture,* 16 BNA

OSHC at 1089; *L&L Painting Co., Inc.,* 23 BNA OSHC 1986, 1994 (No. 05-0055, 2012)

(concluding that employer would have known about employee exposure if it had conducted the

required monitoring).

(4)    Characterization

Respondent was cited twice before for violating 29 C.F.R. § 1910.95.  Mr. Lloyd signed

settlements in 2006 and 2009 that included specified commitments to conduct audiometric

testing.  (Gov. Exs. 139, 157.)   The Secretary argues that Respondent purposefully violated

audiogram requirements in 2013 because it valued cost savings more than safety.  (Sec'y Br. at

54.)

Mr. Lloyd delegated the responsibility for obtaining the annual audiograms to DS, who

was his plant manager until OSHA issued the citations.  DS acknowledged that he tried to

arrange for the audiograms but indicated that after Mr. Lloyd raised concerns about the price, he

turned the matter over to another employee to handle.  (Tr. 1768-69.)  DS thought that the other

employee may have discussed the price of the testing further with the provider, but was unsure of

what occurred.  (Tr. 1769.)  This is more suggestive of negligence than a willful failure to

comply.

The Secretary points out that DS had little experience in health and safety matters and

Mr. Lloyd took no steps to follow up on whether DS or anyone else actually arranged the annual

audiograms.  (Tr. 1655-57, 1661, 1746.)  Although this failure to follow up and appropriately

delegate is concerning, the Secretary failed to establish that there was a conscious decision to

---

[52] The former plant manager (DS) also had actual knowledge that there were no audiograms
obtained in 2013.  (Tr. 1152, 1767.)

forego the testing in conscious disregard of the standard as opposed to forgetting to obtain the audiograms because of carelessness.

Similarly, while the Secretary put forth evidence suggestive of a lack of commitment to following the Act, he failed to meet the high bar for plain indifference. Respondent obtained audiograms in 2012 and again after the commencement of the 2014 investigation. (Tr. 1147-48, 1152.) *See Dayton Tire,* 671 F.3d at 1255 (finding that some effort at compliance was sufficient to rebut a willfulness characterization). Respondent obtained the audiograms promptly after the inspection before the Secretary issued the citation. *See Access Equip.,* 18 BNA OSHC at 1728 (considering the employer's response to the violation when evaluating willfulness).

While not willful, the violation is serious. Noise at the workplace is a serious health problem, and periodic audiometric testing makes it possible to determine hearing loss resulting from noise in the workplace. *Trinity,* 16 F.3d at 1150-51. Orach explained that the violation could lead to a permanent hearing loss. (Tr. 1218-19.)

(5)    Penalty Amount

The Secretary proposed a penalty of $70,000 but because the violation is affirmed as serious the maximum penalty is $7,000. 29 U.S.C. § 666(j). This is the third time Respondent has been cited for violating OSHA's noise standard thereby making any credit for good faith, history, or size inappropriate. (Gov. Ex. 139, 157.) It should have been well aware of the requirements and in failing to obtain the annual audiogram violated both the standard as well as its past agreement with OSHA. Accordingly, a penalty of $7,000 for this violation is appropriate.

### b)      *Item 2 – Failure to Obtain Annual Audiogram for FTM*

Citation 1, Item 2 relates to the same standard as Item 1 but concerns the exposure of a different employee, FTM.[53]  There is no dispute that Respondent failed to obtain an audiogram for FTM (or anyone else) in 2013.  Respondent only contends that the data relied on to establish the applicability of the cited standard may be inaccurate.  (Resp't Br. at 66-67.)

#### (1)      Applicability & Exposure

Orach monitored FTM from 8:01 am to 6:05 pm, except for a 49-minute lunch break when FTM left the Facility.[54]  (Gov. Ex. 225 at 11.)  Applying three different calculation methods all showed an exposure above the action level for FTM.  *Id.*  As discussed above, the undersigned finds that Orach's calibration of the instruments did not undermine the accuracy of the results.  *Id.* at 4-5, 12.  Because FTM was exposed to noise above the action level, 29 C.F.R. § 1910.95(g) required Respondent to obtain an annual audiogram for him.

#### (2)      Violation & Knowledge

FTM worked for Respondent continuously at least since 2008.  (Tr. 1221.)  Respondent did not conduct any audiometric testing from October 2012 until December 2014.  (Tr. 1148, 1152, 1767.)

---

[53] Specifically, the Citation alleges Respondent violated the standard because: "[a]nnual audiograms were not provided between October 2012 and December 2014, or approximately 26 months" for an employee "exposed to the equivalent of an average sound level of 86.1 dBA, which is 1.02 times the reduced action level of 84.1 dBA."

[54] Driscoll suggested that there was a discrepancy in the amount of time Orach monitored FTM. Orach's explanation that the time gap resulted from him pausing the device is credited.  (Tr. 1227.)  Further, because no noise exposure was assumed for this time period, any error only suggested a lower exposure than the one actually received.  (Gov. Ex. 225.)

As discussed above, Respondent had actual knowledge that employees in the assembly area were exposed to noise levels at or above the action level. Respondent was cited twice before for violating the noise standard and specifically agreed to conduct audiometric testing. (Gov. Exs. 139, 157 at 7-8.) The former plant manager (DS) knew no audiograms were completed. (Tr. 1151-52, 1767, 1907-8.) Mr. Lloyd denied personal knowledge but took no steps to make sure the annual audiometric testing occurred. (Tr. 1655-56.) Respondent missed the annual deadline for testing by many months. A reasonably diligent employer could have discovered the violation. *See Hamilton Fixture*, 16 BNA OSHC at 1089.

### (3)     Characterization & Penalty Amount

For the same reasons discussed above in connection with Item 1, the undersigned finds that the Secretary failed to establish that the violation was willful. The Secretary did not establish that there was a conscious decision not to obtain the annual audiograms or put forth enough evidence to support a finding of plain indifference with respect to hearing conservation.

Still, the violation is serious. *See Trinity*, 16 F.3d at 1150-51, 1155 (discussing the importance of 29 C.F.R. § 1910.95 and upholding a violation as willful). Orach explained how exposure to noise levels experienced in the assembly area could lead to hearing loss and the need for annual monitoring. (Tr. 1218-19.) Respondent has repeatedly been cited for violating this standard and should have been well aware of its requirements. After considering Respondent's size, the undersigned finds that the violation's gravity, along with the other penalty factors, make giving credit for size inappropriate. Respondent's significant history and lack of a good faith effort to comply support a penalty of $7,000 for this violation.

c) *Item 3 – Failure to Obtain Annual Audiogram for RG*

Item 3 alleges Respondent violated the standard because "[a]nnual audiograms were not provided between October 2012 and December 2014, or approximately 26 months" for an employee "exposed to the equivalent of an average sound level of 87 dBA, which is 1.04 times the reduced action level of 83.3 dBA." Consistent with Items 1 and 2, Respondent concedes that there was no audiogram done 2013 for RG (or any other employee). (Resp't Br. at 66-67.) Still, it argues that Item 3 should be vacated due to the methodology employed to conduct the noise survey. *Id.*

(1)     Applicability & Exposure

Orach monitored RG from 7:54 am to 6:01 pm on the day of the testing. (Gov. Ex. 225 at 13.) His analysis found exposure above the action level. (Gov. Ex. 198.) Likewise, Lindell analyzed the data using multiple methods and concluded that RG was exposed to noise above the action level. (Gov. Ex. 225 at 13.) Consistent with the discussion of Items 1 and 2, the undersigned finds that Orach's calibration of the instruments did not undermine the accuracy of these results. *Id.* at 4-5, 13-14. Nor did Orach's decision to continue monitoring RG during lunch have an impact on the results. *Id.* at 13. RG spent the lunch break at the Facility and was still exposed to noise there. (Tr. 1399, 2329.) In any event, even if one were to assume he experienced silence during lunch, the results would still exceed the action level. (Gov. Ex. 225 at 13.) Because RG was exposed to noise above the action level, 29 C.F.R. § 1910.95(g) required Respondent to obtain an annual audiogram for him.

(2)     Violation & Knowledge

Respondent did not conduct any audiometric testing from October 2012 until December 2014. (Tr. 1148, 1152, 1767.) RG worked for Respondent during that entire time period. (Tr.

77

1245.)  The failure to obtain any audiogram over this 26-month period violated the 29 C.F.R. § 1910.95(g)(6).

As indicated above, OSHA cited Respondent twice before for violating the noise standard.  Pursuant to the 2009 Settlement Agreement, Respondent specifically agreed to conduct audiometric testing.  (Gov. Exs. 139, 157.)  Although Mr. Lloyd denied personal knowledge that the audiograms were not conducted, he took no steps to make sure the annual audiometric testing was completed.  (Tr. 1655-56.)  Even if Mr. Lloyd lacked knowledge, DS knew audiometric testing was not completed, and a reasonable, diligent employer could have discovered the violation.  (Tr. 1151-52, 1767.)  *See Hamilton Fixture*, 16 BNA OSHC at 1089.

### (3)     Characterization & Penalty Amount

As with Items 1 and 2, the undersigned finds that the Secretary failed to establish that the violation was willful.  There is insufficient evidence of a conscious decision not to obtain the annual audiograms or plain indifference to the Act's requirements.

The violation, however, is serious.  RG was exposed to noise above the action level and should have been monitored for hearing loss.  (Gov. Ex. 225 at 13.)  Respondent has repeatedly been cited for violating this standard and was well informed about the requirements.  (Gov. Exs. 139, 148, 157.)  This significant history and lack of a good faith effort to comply support a penalty of $7,000 for this violation.  Like the items previously discussed, the undersigned considered Respondent's size but finds that the violation's gravity and the other penalty factors preclude a reduction for size.

2.    **Citation 1, Item 4b – Willful Failure to Provide Annual Noise Related Training**

Citation 1, Item 4b alleges a willful failure to comply with 29 C.F.R. § 1910.95(k)(2) for failure to conduct annual training for three employees exposed to noise above the action level.[55] (Tr. 1250.)  Noise surveys in 2005, 2008, 2009, and 2014 identified noise exposure at or above the action level for employees in the assembly area.  (Tr. 1257-58, 1271, 1532; Gov. Exs. 126, 145, 146.)  Whenever employees are exposed to noise above the action level, employers must have a hearing conservation program that includes annual training for effected employees.  29 C.F.R. § 1910.95(k)(2).  Similar to its arguments concerning Items 1, 2 and 3, Respondent acknowledges that repeat annual training did not occur.  (Resp't Br. 70-71.)  Respondent, however, challenges the accuracy of 2014 test results and argues that even if there was a violation, it was not willful.  *Id.*

a)    *Applicability & Exposure*

Like the three previous noise surveys, the one conducted by Orach in 2014 showed that workers in the assembly area were exposed to noise levels at or above the action level.  (Gov. Ex. 225.)  For the reasons discussed above, Respondent's challenges to how the instruments were calibrated are rejected.  *Id.* at 4-5.  Similarly, the undersigned finds that Orach's case by case decision on whether to include sound exposure occurring during the lunch break was

---

[55] The cited standard provides:

> The training program shall be repeated annually for each employee included in the hearing conservation program.  Information provided in the training program shall be updated to be consistent with changes in protective equipment and work processes.

29 C.F.R. § 1910.95(k)(2).

appropriate.[56]  Likewise, the undersigned finds that because of the similarity of the typical work responsibilities and the other reasons set forth above, FG's noise sampling results accurately represent the noise levels to which any employee working in that job position would be exposed, including FA.[57]  *Id.* at 8.

FA, FTM, and RG all worked for Respondent for several years.  (Tr. 793, 1221, 1245, 1997.)  The Secretary established that they were exposed to noise at or above the action level, triggering the requirement for annual training under 29 C.F.R. § 1910.95(k)(2).  (Tr. 1249-51.)  While Respondent conducted the training in 2012, there was no subsequent training until after the November 2014 inspection.  (Tr. 1251-52, 1402.)  The Secretary presented ample evidence in the form of multiple noise surveys showing that employees were exposed to noise above the action level and therefore Respondent needed to provide annual training required by 29 C.F.R. § 1910.95(k)(2).

### b)    *Knowledge*

Due to the prior testing and citations, Respondent had actual knowledge that employees in the assembly area were exposed to noise levels at or above the action level.[58]  (Gov. Exs. 126,

---

[56] In any event, the decision on whether to include lunchtime noise exposure did not impact the overall results.  (Gov. Ex. 225 at 7-8, 13.)

[57] Further, even if only the results of FTM and RG were utilized the Secretary still would have established that employees working in the assembly area were exposed to noise levels at or above the action level and should have annual training.  (Gov. Ex. 225.)

[58] In 2005, Respondent was cited for violating 29 C.F.R. § 1910.95(k)(1), which requires initial training for employees exposed to noise above the action level.  (Gov. Ex. 225 at 14-15.)  In 2008, it was cited for violating 29 C.F.R. § 1910.95(k)(2), the same subsection at issue here.  RG and FTM were both doing the same job in 2008 as they were at the time of the 2014 inspection.  (Tr. 1271.)  The 2005 and 2008 citations were resolved through settlement agreements.  (Gov. Exs. 139, 157.)

145, 146.)  Respondent also entered into two separate agreements with OSHA that explicitly detailed the requirement to conduct annual training.  (Tr. 1534-35; Gov. Exs. 148, 200.)  Mr. Lloyd denied personal knowledge that the training was not conducted in 2013.  But, he conceded that he did not get involved with training and took no steps to ensure that the company was in compliance.  (Tr. 1151-52, 1653, 1767, 1880.)  Particularly considering the length of time that passed before Respondent conducted the training, the violation should have been discovered by a reasonably diligent employer. *See Hamilton Fixture*, 16 BNA OSHC at 1089.

### c)    *Characterization*

To be willful, a violation must be committed with intentional disregard of the requirements of the Act or the employer must be plainly indifferent to employee safety. *MJP*, 19 BNA OSHC at 1647.  Respondent was cited twice before for violating 29 C.F.R. § 1910.95(k). (Gov. Exs. 126, 145, 146, 200.)  After its second citation, Respondent conducted some hearing conservation training in 2012.  Still, it failed to conduct the required annual re-training until after the inspection that led to this citation.

The Secretary suggests, but does not establish, that the 2013 training was purposely foregone.  Mr. Lloyd delegated the responsibility for the noise training to DS and relied solely on him for compliance.  (Tr. 1653, 1660, 1664; Gov. Ex. 200 at 4.)  Although DS indicated that he discussed the need for audiometric testing with Mr. Lloyd, the record does not indicate whether DS discussed the need for noise training with Mr. Lloyd.  (Tr. 1152.)  Thus, there is insufficient evidence to conclude that there was a conscious decision to intentionally disregard the training requirement.  As with the failure to conduct annual audiograms, Respondent's failure to complete the required training appears to be more the result of negligence than willfulness.

Additionally, the Secretary failed to prove plain indifference. Respondent conducted the required training in 2012 and again after the inspection in 2014 (before any the Secretary issued any citations). Though this is not sufficient, it indicates some effort to comply with the standard, making a finding of plain indifference inappropriate. *See Dayton Tire,* 671 F.3d 1255; *Access Equip.,* 18 BNA OSHC at 1728 (considering response to the violation when evaluating willfulness).

### d)    *Penalty Amount*

The Secretary proposed a penalty of $70,000, but because the violation is affirmed as serious instead of willful, the maximum penalty is $7,000. 29 U.S.C. § 666(j). Lindell explained that training is vital for employees exposed to noise above the action level because not taking the appropriate precautions can lead to a loss permanent of hearing. (Gov. Ex. 225 at 14-15.) Employees were exposed to noise daily without being trained how to minimize the risk to their hearing. (Gov. Ex. 200 at 2.) The undersigned finds that the violation's gravity combined with Respondent's history of violations and lack of good faith supports a penalty of $7,000, with no credit given for size. Although Mr. Lloyd had every reason to know of the annual noise training standard, he delegated the responsibility to an employee without ensuring that the required testing was completed.

### 3.    **Citation 2, Item 3 – Failure to Conduct Compliant Noise Monitoring**

Citation 2, Item 3 alleges that Respondent violated 29 C.F.R. § 1910.95(d)(1)(i) by failing to conduct noise monitoring in a compliant manner because it did not review or analyze

any monitoring results.[59]  Respondent asserts that it had a sufficient program and suggests that the Citation is inappropriate because it previously provided OSHA with information about its monitoring program. (Resp't Br. at 74.)

### a)   Applicability & Exposure

The cited standard requires employers to conduct noise monitoring in a manner designed to identify individuals exposed to noise above the action level so that they may be included in the hearing conservation program.  29 C.F.R. § 1910.95(d)(1)(i).  As discussed above, the 2014 noise survey, as well as three prior ones, identified noise levels at the Facility above the action level.  (Gov. Ex. 111, 126, 144, 225.)  This triggered the need for a hearing conservation program with regular noise monitoring. *Id*.

### b)   Violation

There was no evidence that anyone at the Facility was trained to use a sound meter.  (Tr. 1267-68, 1762.)  The former plant manager, DS, who was charged with conducting the monitoring, was not trained how to use the sound meter, nor did Respondent have an instruction manual. *Id*.  Moreover, DS was not trained to understand the results. *Id*.  He was not aware of the threshold requirements that indicate noise is above the action level. *Id*.

The records of the required monitoring Respondent provided list noise level readings that are inconsistent with the past noise surveys conducted by OSHA and Respondent's own

---

[59] The cited standard provides: "[t]he sampling strategy shall be designed to identify employees for inclusion in the hearing conservation program and to enable the proper selection of hearing protection." 29 C.F.R. § 1910.95(d)(1)(i).

consultant in 2009.[60]  (Gov. Exs. 111, 225.)  Respondent's records show most of the noise level readings as being below 65 decibels, which is within the range for average speech, not a machine shop.  (Tr. 1264; Gov. Ex. 256.)  These results are incompatible with Orach's experience at the Facility as well as Mr. Lloyd's own descriptions about noise at the Facility.  (Tr. 1270.)  Other than noting the results, no one took any action to review the findings to identify individuals for inclusion in the hearing conservation program or even assess basic accuracy.  (Tr. 1264-65, 1764.)

Respondent notes that it submitted documentation regarding its monitoring program to OSHA in March 2008 as part of the agreed upon abatement for past violations of the noise standard.[61]  (Resp't Br. at 74.)  Respondent seems to suggest that this triggered some kind of estoppel against finding that its program violated 29 C.F.R. § 1910.95(d)(1)(i).[62]  *Id.*

As noted above, OSHA cited Respondent for violating the noise standard in 2005. Thereafter, Respondent entered into the 2006 Settlement Agreement, which required various abatement measures, including submitting compliance information to OSHA.  (Gov. Ex. 139 at 10.)  In March 2008, Respondent sent a short one-page letter to OSHA about its compliance efforts.  (Gov. Ex. 231.)  OSHA responded that the information was incomplete and requested further details about Respondent's compliance efforts including information related hearing

---

[60] The 2009 noise survey showed that noise levels were 80 or more decibels in most areas of the Facility.  (Gov. Ex. 111.)

[61] Respondent's Brief refers to exhibits R-11 and R-13.  (Resp't Br. at 39, 74.)  Although an Exhibit 13 was referred to during the hearing, neither party moved for its admission.  (Tr. 1549, 1859.)  Respondent may have been referring to exhibits listed on its Pre-Hearing Statement, but it does not appear that the documents designated R-11 and R-13 were admitted to the record.

[62] Respondent does not allege that the citation was untimely, and would have no basis for such an assertion as the violation was present on the day of the inspection and the citation was issued with six months of the inspection date.  29 USC § 658(c).

conservation. (Gov. Ex. 149.)  When Respondent failed to respond to this letter, the agency inspected the Facility. (*Id.*; Tr. 1525.) This led to additional citations, including violations of the noise standard (but not subsection (d)), which were eventually resolved by the 2009 Settlement Agreement. (Tr. 1530-33, 1536; Gov. Ex. 148, 157.) The 2009 Settlement Agreement did not specifically require submission of information related to Respondent's noise monitoring program. It does not appear that anything was submitted. (Gov. Ex. 157.)

Neither Respondent's submission of some information in 2008, nor the 2009 Settlement Agreement precludes the Secretary from citing Respondent for violations of the noise standard discovered as a result of its 2014 inspection. *See, e.g., Kaspar*, 18 BNA OSHC at 2182-83 (history of citation-less inspections did not preclude finding a violation). OSHA never informed Respondent that its program was compliant. *See Fluor Daniel*, 295 F.3d at 1238. In fact, as Ms. Kulp explained, OSHA was concerned about whether Respondent would comply with the Act and so, as part of the 2009 Settlement Agreement, it specifically required Respondent to retain an independent consultant for two years to address and make recommendations about Respondent's compliance with OSHA standards, including the noise standard. (Tr. 1536; Gov. Ex. 157 at 8.)

Accordingly, the undersigned finds that Respondent failed to conduct noise monitoring in a manner designed to identify individuals exposed to noise above the action level because it did not review the noise monitoring results to determine its accuracy or take appropriate action.

### c)   *Knowledge*

The former plant manager, DS, knew that no one was reviewing the monitoring results.[63] He explained that he feared Mr. Lloyd's reaction to his conducting the monitoring, let alone

---

[63] Respondent does not allege that DS, or any other employee, engaged in misconduct in connection with the noise standard violations. *Cf. Pa. Power & Light Co. v. OSHRC*, 737 F.2d

discussing the results with him. (Tr. 1763-64, 1767.) Further, Mr. Lloyd himself acknowledged that he took no steps to ensure compliance with the monitoring requirements. (Tr. 1653, 1655-56.)

### d)      *Characterization & Penalty Amount*

The Citation characterizes this violation as other-than-serious and proposes no penalty. The Secretary did not argue the classification or lack of penalty. (Sec'y Br. at 56-58.)   The undersigned finds that there was insufficient evidence of that "death or serious physical harm" could result from the violation, making a serious characterization inappropriate.   29 U.S.C. § 666(k).  As such, the violation is affirmed as other-than-serious and no penalty is assessed.

### 4.     **Citation 2, Item 4 – Failure to Calibrate Instruments Used in the Monitoring Program**

### a)      *Applicability, Exposure & Violation*

Citation 2, Item 4, alleges that Respondent violated 29 C.F.R § 1910.95(d)(2)(ii) because it failed to calibrate the instrument used for noise monitoring.[64]  As indicated above, at least three employees in the assembly area were exposed at, or above, the action level triggering the noise

---

350 (3d Cir. 1984) (discussing the special circumstance where knowledge is raised *only* by proof of misconduct).  Here, the Secretary established both DS's actual knowledge as well as a basis for constructive knowledge.  *See ConocoPhillips Bayway Refinery v. Secretary,* 654 F.3d 472, 479-80 (3d Cir. 2011); *W. World Inc.,* 24 BNA OSHC 2116, 2128 (No. 07-0144, 2014), *aff'd,* F.App'x 188 (3d Cir. 2015) (unpublished) (affirming judge's finding of actual and constructive knowledge even though the judge does not discuss *PP&L*); *Jersey Steel*, 16 BNA OSHC 1162, 1164 (No. 90-1307, 1993) (finding that the Secretary did not have to show the violations were foreseeable), *aff'd without opinion,* 19 F.3d 643 (3d Cir. 1994).  Nor does the undersigned find that any employee misconduct claim could stand because there is no evidence DS violated any workplace rule.   Although Respondent had a written hearing conservation plan, it was incomplete and there was no evidence of enforcement.

[64] The cited standard requires: "[i]nstruments used to measure employee noise exposure shall be calibrated to ensure measurement accuracy."  29 C.F.R. § 1910.95(d)(2)(i).

monitoring requirements. 29 C.F.R § 1910.95(d). (Gov. Ex. 225.) Mr. Lloyd indicated that the sound meter used for noise monitoring was calibrated only when received. (Tr. 1266.) DS, who was charged with conducting the monitoring, neither calibrated it himself nor sent it out for calibration. *Id.* Without calibration, Respondent had no way to ensure the monitoring's accuracy. (Tr. 1266-68.) And without accurate monitoring, Respondent could not identify employees who should be included in its hearing conservation program 29 C.F.R. § 1910.95(d) requires.

Respondent asserts, without support, that the company submitted documentation of the results of the instruments it used as part of its abatement effort.[65] (Resp't Br. at 74.) Even assuming this was established, it does not address whether Respondent violated 29 C.F.R § 1910.95(d)(2)(ii), which concerns instrument calibration.

### b)    *Knowledge*

Both Mr. Lloyd and DS knew that the sound meter was not being calibrated. (Tr. 1266.) Further, during the 2008 inspection, Orach specifically raised possible issues with the calibration of Respondent's sound meter. *Id.* Orach offered to provide compliance assistance, but was rebuffed. *Id.*

---

[65] As discussed above, Respondent submitted to OSHA a letter dated March 5, 2008. (Gov. Ex. 231.) The letter does not address calibration of instruments or Respondent's noise monitoring program. *Id.* OSHA let Respondent know that its response was inadequate and the 2009 Settlement Agreement included the requirement that Respondent retain an independent consultant to review the company's compliance and make recommendations for further compliance. (Gov. Exs. 149, 157 at 8.) Kulp explained that this was included to try to ensure future compliance and make sure that the company was taking steps to bring itself into compliance. (Tr. 1535.) Respondent points to no evidence suggesting that OSHA considered its noise monitoring program compliant.

### c)       *Characterization & Penalty Amount*

As with Item 3, the Citation characterizes this violation as other-than-serious and proposes no penalty. The undersigned finds that there was insufficient evidence of that "death or serious physical harm" could result from the violation, making a serious characterization inappropriate. 29 U.S.C. § 666(k). The Secretary did not propose a monetary penalty and the record does not suggest that one is necessary. Accordingly, the violation is affirmed as other-than-serious and no penalty is assessed.

### C.     **Violation of Hazard Communication Standard**

Citation 1, Item 5 alleges that Respondent willfully failed to provide information and training about hazardous chemicals as required by 29 C.F.R. § 1910.1200(h)(1).[66] Respondent contests the standard's applicability, the existence of a violation, the exposure of any employee and, if a violation was established, its characterization as willful. (Resp't Br. at 72-74.)

### 1.     **Applicability**

The hazard communication, or hazcom, standard requires employers to provide information about the identities and hazards of chemicals used in the workplace. 29 C.F.R. § 1910.1200(a). It applies to "any chemical which is known to be present in the workplace in

---

[66] The cited standard requires employers to:

> provide employees with effective information and training on hazardous chemicals in their work area at the time of their initial assignment, and whenever a new chemical hazard the employees have not previously been trained about is introduced into their work area. Information and training may be designed to cover categories of hazards (e.g., flammability, carcinogenicity) or specific chemicals. Chemical-specific information must always be available through labels and safety data sheets.

29 C.F.R. § 1910.1200(h)(1).

such a manner that employees may be exposed under normal conditions of use or in a foreseeable emergency." 29 C.F.R. § 1910.1200(b)(2). The standard broadly defines "chemical" as "any substance or mixture of substances," and a "hazardous chemical" as "any chemical which is classified as a physical hazard or a health hazard, a simple asphyxiant, combustible dust, pyrophoric gas, or hazard not otherwise classified." 29 C.F.R. § 1910.1200(c). An employee need not be actually or purposely exposed to a chemical to trigger the standard's requirements. *Id.*

Exposure for purposes of the hazcom standard includes any route of entry (e.g., inhalation, ingestion, skin contact or absorption) and potential, or the possibility of accidental, exposure is sufficient. *Id.* Employees used silver spray paint daily. (Tr. 71-72, 1076-78.) When applying the spray paint, employees typically did so for 30-45 minutes and used one to two cans of the paint. *Id.* The material safety data sheet ("MSDS") for the spray paint shows that it was both a physical hazard because of its flammability and a health hazard due to inhalation risks.[67] (Gov. Ex. 221.)

Respondent alleges that this evidence of exposure is insufficient for the following two reasons. First, the Secretary is relying on JE's use of the spray paint and he was terminated more than six months before the Citation's issuance. Second, the consumer product exception contained in 29 C.F.R. § 1910.1200(b)(6)(ix) applies. (Resp't Br. at 72-73.) As for the first argument, employees used spray paint during the inspection. (Tr. 1281-82.) Respondent does not deny that even after it fired JE, employees continue to use spray paint regularly. Indeed, MS and the maintenance supervisor both testified that they used it. (Tr. 1077-78, 1278.) The

---

[67] Orach discussed why he believed the spray paint was hazardous and indicated that the manufacturer and distributor confirmed that the spray paint was flammable. (Tr. 1276-77.)

Citation is not limited to any individual employee and the Secretary established that the spray paint was being used within six months of when he issued the Citation. *See* 29 USC § 658(c).

Moving to the consumer product exception argument, the hazcom standard does not apply to consumer products if the employer can show that employees use the product the same way ordinary consumers use it, i.e.:

> it is used in the workplace for the purpose intended by the chemical manufacturer or importer of the product, and the use results in a duration and frequency of exposure which is not greater than the range of exposures that could reasonably be experienced by consumers when used for the purpose intended.

29 C.F.R. § 1910.1200(b)(6)(ix). This exception requires the employer to establish three elements. First, it must show that the spray paint falls within the definition of either a consumer product under the Consumer Product Safety Act, 15 U.S.C. § 2502(a)(5), or a hazardous substance under the Federal Hazardous Substances Act, 15 U.S.C § 1261, *et seq. Id.* Second, the employer must establish the spray paint was used in the same manner as a normal consumer would use it. *Id.* Finally, the employer must show that employees' exposure is of the same duration and frequency as the normal consumer. *Id. See Safeway Store No. 914,* 16 BNA OSHC 1504, 1511 (No. 91-373, 1993).

Respondent did not present specific evidence showing the use of spray paint uses falls within the definition of "consumer product" or "hazardous substance." However, a former employee testified that the spray paint was of a type one could purchase at a retail store and the Secretary concedes that it is "likely" that the product falls within the definition of consumer product. (Sec'y Br. at 60, discussing 15 U.S.C. § 2502(a).) As for its use at the Facility, Respondent presented no evidence that using spray paint on hot welds or on parts manufactured at a plant and intended for sale is within the purpose intended by the manufacturer. (Tr. 1278-79.) Additionally, Respondent did not offer evidence showing that the duration and frequency of

employee exposure were no greater than that expected for consumers. Instead, it asks the undersigned to speculate that the use of a can or more of spray paint a day is typical. (Resp't Br. at 73.)

The Commission examined the use of spray paint in *Atlantic Battery Co.*, 16 BNA OSHC 2131 (No. 90-1747, 1994). It found that the routine, frequent use of spray paint went beyond typical consumer use. 16 BNA OSHC at 2176. MS explained that he used spray paint daily for a total of about five hours per week. (Tr. 1077-78.) Other employees indicated they routinely used one or more cans at a time. (Tr. 1278-79.) Orach observed the use of the spray paint on hot materials and noted the pace at which it was applied. (Tr. 1281-82.) Respondent appears to have recognized the employees' use of the spray paint differed from typical consumer use as it included spray paint on the list of hazardous chemicals used in the workplace and provided an MSDS for it to employees.[68] (Gov. Ex. 221.) Accordingly, the consumer product exception is inapplicable and the cited standard applies.

### 2.   **Violation**

The cited standard requires employers to provide effective information and training. 29 C.F.R. § 1910.1200(h)(1). Respondent had a written hazcom program. (Gov. Ex. 221.) Two former employees testified, however, that they received no training about the hazcom standard, the company's program, or MSDS. Simply having documentation is not enough to satisfy the standard. The information given must be effective and employees must be trained. *ARA Living*

---

[68] The Citation also refers to the use of WD-40 at the Facility. However, the Secretary does not rely on the use of this substance as a basis for supporting the violation in his brief. (Sec'y Br. at 59-62.) Because the use of the spray paint is sufficient to trigger the requirements of the cited standard, the undersigned need not reach whether the use of WD-40 provides another basis for affirming the violation.

*Ctrs. of Tex., Inc.,* 15 BNA OSHC 1417, 1418 (No. 89-1894, 1991) (finding that labeling, information, and training requirements impose separate responsibilities and training must go beyond merely telling employees there is a written program).

Respondent argues that the spray paint was of a type that was widely available and suggests that employees intuitively knew how to avoid any hazard. (Resp't Br. at 73.) These arguments go to the gravity of the violation, not whether it was violated. When asked whether he knew that inhaling spray paint could cause injury, one former employee indicated that it was "common sense." (Tr. 1103.) But, he was not asked whether he knew how to avoid inhalation or whether he knew about the flammability of the substance and how to avoid ignition. (Tr. 1274, 1281-82.) Further, there is no evidence about what the other employees who used the spray paint understood about the hazards related to the product. The MSDS includes risks that might not be readily apparent or be considered "common sense" for use of the product in a non-commercial facility. Additionally, the risks may not be applicable to the way in which Respondent required employees to use this product in the normal course of business. (Gov. Ex. 221.)

### 3.   **Exposure**

The Secretary presented evidence indicating that two current and two former employees used spray paint. (Tr. 71-72, 1076-77, 1461.) As noted above, Orach observed employees using spray paint on the day of the inspection. (Tr. 1282.)

### 4.   **Knowledge**

In 2005, OSHA cited Respondent for failing to provide the required hazcom training for proper spray paint use. (Tr. 1280; Gov. Ex. 137.) Thus, Respondent not only knew that employees were using spray paint, but they also knew that such use necessitated training and

education.[69]  *See Am. Airlines,* 17 BNA OSHC at 1555 (finding knowledge based on the hazcom program coupled with the plain view nature of the violation).  Respondent had a written hazcom program that designated "The President of Lloyd Industries" as the person responsible for training employees on the MSDS information for the chemicals they used. (Gov. Ex. 221.)  Mr. Lloyd, however, acknowledged that he did not get involved with training and there is no indication that he tasked any other employee with performing the training or otherwise ensuring that it occurred. (Tr. 1279, 1880.)  Respondent has its own hazcom program, codified in writing, effectively detailing its training policies, which makes the lack of training readily apparent and discoverable.[70]  (Gov. Ex. 221.)

### 5.    Characterization & Penalty Amount

Respondent was cited for violating 29 C.F.R. § 1910.1200(h) in 2005.  It entered into the 2006 Settlement Agreement in which it promised to provide the information and training required by 29 C.F.R. § 1910.1200(h).  (Gov. Ex. 139.)  While this past violation gives Respondent a heightened awareness of the standard's requirements, the Secretary did not show that anyone was "actually aware" that the company was not in compliance. *See Propellex Corp.,* 18 BNA OSHC 1677, 1684 (No. 96-0265, 1999).

Moreover, with respect to this violation the record contains insufficient evidence that the Respondent had a state of mind such that it would not have cared if it was informed of the non-compliance. *See Eric K. Ho,* 20 BNA OSHC 1361, 1378 (No. 89-1645, 2003) (stating, in

---

[69] In its brief, Respondent does not challenge its knowledge of this violative condition.

[70] FF acknowledged that he did not receive any hazcom training. (Tr. 1462.) He was described as a maintenance man, although he appeared to have significant responsibilities and at least one former employee thought he was a supervisor. (Tr. 53, 150, 1051, 1426.) The Secretary does not rely on his actual knowledge about the lack of training to establish a violation.

connection with a general duty clause violation, that evidence of state of mind for purposes of willfulness characterization must relate to the cited condition).[71]  Respondent had some elements of a hazcom program, including an MSDS sheet for spray paint.  Although employees were not trained as required, they did have some access to information about the hazards faced from chemicals used in the workplace.  Respondent's efforts at compliance with other aspects of the hazcom standard, while insufficient to defeat the violation, support the conclusion that the violation was not willful.  *See Dayton Tire,* 671 F.3d at 1255 (finding that the employer's effort at compliance rebutted a finding of willfulness).

The violation is, however, serious.  Orach explained that while death was not likely, the manner in which the employees used spray paint raised concerns about ignition.  Still, Orach viewed the violation's overall gravity as low.  (Gov. Ex. 201.)  The relatively low gravity of the violation must be viewed in the context of Respondent's significant history, which includes a past violation of the same standard.  *See Quality Stamping,* 16 BNA OSHC at 1929 (finding that significant history can diminish gravity's relative importance).  Similar to the items previously discussed, the undersigned considered Respondent's size, but finds that the other penalty factors outweigh that factor.  Accordingly, the undersigned finds that $3,500 is an appropriate penalty amount.

---

[71] *E. Smalis Painting Co.,* 22 BNA OSHC 1553 (No. 94-1979, 2009) overruled the portion of the *Ho* decision that precluded per employee citation.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

The foregoing constitutes the findings of fact and conclusions of law in accordance with Rule 52(a) of the Federal Rules of Civil Procedure.

### ORDER

Based upon the foregoing Findings of Fact and Conclusions of Law, it is ORDERED that:

1. Citation 1, Item 3a, which was issued as a result of Inspection No. 1008085 and alleges a serious a serious violation of 29 C.F.R. § 1910.219(b)(1), is AFFIRMED and is grouped with Citation 1, Items 3b, 3c and 3d for penalty purposes. A single $5,000 penalty is assessed for the affirmed portions of Citation 1, Items 3a, 3b, 3c and 3d;

2. Citation 1, Item 3b, which was issued as a result of Inspection No. 1008085 and alleges a serious a serious violation of 29 C.F.R. § 1910.219(d)(1), is AFFIRMED with respect to Instances (a), (b), (c), and (d), and VACATED with respect to Instance (e);

3. Citation 1, Item 3c, which was issued as a result of Inspection No. 1008085 and alleges a serious a serious violation of 29 C.F.R. § 1910.219(e)(1)(i), is AFFIRMED;

4. Citation 1, Item 3d, which was issued as a result of Inspection No. 1008085 and alleges a serious a serious violation of 29 C.F.R. § 1910.219(e)(3)(i), is AFFIRMED with respect to Instances (a), (b), and (c), and VACATED with respect to Instance (d);

5. Citation 1, Item 4, which was issued as a result of Inspection No. 1008085 and alleges a serious a serious violation of 29 C.F.R. § 1910.305(b)(1)(ii), is AFFIRMED, and a penalty of $5,000 is assessed;

6. Citation 2, Item 1, which was issued as a result of Inspection No. 1008085 and alleges a willful violation of § 5(a)(1) of the Act, is VACATED;

7. Citation 2, Item 2, which was issued as a result of Inspection No. 1008085 and alleges a willful violation of 29 C.F.R. § 1910.212(a)(3)(ii), is AFFIRMED as WILLFUL and a $70,000 penalty is assessed;

8. Citation 2, Item 3, which was issued as a result of Inspection No. 1008085 and alleges a willful violation of 29 C.F.R. § 1910.212(a)(3)(ii), is AFFIRMED as WILLFUL and a $70,000 penalty is assessed;

9. Citation 2, Item 4, which was issued as a result of Inspection No. 1008085 and alleges a willful violation of 29 C.F.R. § 1910.212(a)(3)(ii), is AFFIRMED as SERIOUS and a $7,000 penalty is assessed;

10. Citation 2, Item 5, which was issued as a result of Inspection No. 1008085 and alleges a willful violation of 29 C.F.R. § 1910.212(a)(3)(ii), is AFFIRMED as SERIOUS and a $7,000 penalty is assessed;

11. Citation 2, Item 6, which was issued as a result of Inspection No. 1008085 and alleges a willful violation of 29 C.F.R. § 1910.212(a)(3)(ii), is AFFIRMED as SERIOUS and a $7,000 penalty is assessed;

12. Citation 2, Item 7, which was issued as a result of Inspection No. 1008085 and alleges a willful violation of 29 C.F.R. § 1910.212(a)(3)(ii), is AFFIRMED as SERIOUS and a $7,000 penalty is assessed;

13. Citation 1, Item 1, which was issued as a result of Inspection No. 1009661 and alleges a willful violation of 29 C.F.R. § 1910.95(g)(6), is AFFIRMED as SERIOUS and a $7,000 penalty is assessed;

14. Citation 1, Item 2, which was issued as a result of Inspection No. 1009661 and alleges a willful violation of 29 C.F.R. § 1910.95(g)(6), is AFFIRMED as SERIOUS and a $7,000 penalty is assessed;

15. Citation 1, Item 3, which was issued as a result of Inspection No. 1009661 and alleges a willful violation of 29 C.F.R. § 1910.95(g)(6), is AFFIRMED as SERIOUS and a $7,000 penalty is assessed;

16. Citation 1, Item 4b, which was issued as a result of Inspection No. 1009661 and alleges a willful violation of 29 C.F.R. § 1910.95(k)(2), is AFFIRMED as SERIOUS and a $7,000 penalty is assessed;

17. Citation 1, Item 5, which was issued as a result of Inspection No. 1009661 and alleges a willful violation of 29 C.F.R. § 1910.1200(h)(1), is AFFIRMED as SERIOUS and a $3,500 penalty is assessed

18. Citation 2, Item 3, which was issued as a result of Inspection No. 1009661 and alleges an other-than-serious violation of 29 C.F.R. § 1910.95(d), is AFFIRMED as other-than-serious and no penalty is assessed; and

19. Citation 2, Item 4, which was issued as a result of Inspection No. 1009661 and alleges an other-than-serious violation of 29 C.F.R. § 1910.95(d), is AFFIRMED as other-than-serious and no penalty is assessed.

SO ORDERED.

Keith E. Bell

Judge, OSHRC

Dated:

Washington, D.C.

**EMPLOYER**

Brandon J. Brigham, Esq.
Jonathan L. Snare, Esq.
Morgan, Lewis & Bockius LLP
1701 Market Street
Philadelphia, PA   19103-3921
Email: bbrigham@morganlewis.com
Email: jsnare@morganlewis.com

Fred Braker, Business Agent
Sheet Metal Workers Local 19
1301 South Columbus Boulevard
Philadelphia, PA   19147
Email: fbraker@lu19.com

I hereby certify that a copy of the decision in this case has been served upon the parties whose names and email addresses appear on this notice.

*Tasheeka Hawkins*

_____6/7/17_____(Date)

**REGIONAL SOLICITOR**

Michael D. Felsen
Regional Solicitor
Office of the Solicitor, U.S. DOL
John F. Kennedy- Federal Office Building,
Government Center, Rm. E-375
Boston, MA 02203
Attn: Judson H.P. Dean, Esq.
Attn: Jordana Greenwald, Esq.
Email: dean.judson@dol.gov
Email: greenwald.jordana@dol.gov
Email: zzsol-phi-docket@dol.gov

**Exhibit C to Lloyd Industries Warrant Application**

United States of America
**OCCUPATIONAL SAFETY AND HEALTH REVIEW COMMISSION**
**1120 20th Street, N.W., Ninth Floor**
**Washington, DC 20036-3457**

Phone: (202) 606-5400
Fax: (202) 606-5050

Secretary of Labor,

Complainant,

v.                                              Region 3

Lloyd Industries, Inc.,                         OSHRC Docket No. 15-0846 and 15-0847

Respondent.

OSHA Inspection No.   1008085

### Notice of Docketing of Administrative Law Judge's Decision

The Administrative Law Judge's Report in the above referenced case was docketed with the Commission on 06/21/2017. The decision of the Judge will become a final order of the Commission on 07/21/2017 unless a Commission member directs review of the decision on or before that date.

Any party desiring review of the Judge's decision by the Commission must file a petition for discretionary review. Any such petition must be received by the Executive Secretary on or before 07/11/2017 in order to permit sufficient time for its review. See Commission Rule 91, 29 C.F.R. 2200.91. All further pleadings or communications regarding this case shall be addressed to the Executive Secretary with a copy to the DOL Solicitor at the address below.

**Executive Secretary**                         **Charles F. James, Counsel for Appellate**
**Occupational Safety and Health Review**       **Litigation Heather R. Phillips, Counsel for**
**Commission**                                  **Appellate Litigation Office of the Solicitor, U.S.**
**1120 20th St., N.W., Suite 980**              **DOL Room S4004 200 Constitution Avenue, N.W.**
**Washington, D.C. 20036-3419**                 **Washington, D.C. 20210**

If directed for Review by the Commission, then the Counsel for Appellate Litigation will represent the Department of Labor. If you have questions, please contact the Executive Secretary's Office at (202) 606-5400.

John X. Cerveny
Executive Secretary

*/s/*

Date: 06/21/2017

Sontia Myles, Legal Clerk

This notice has been sent to:

Brandon Jay Brigham Esq. and Jonathan L. Snare Esq.
Morgan Lewis & Bockius LLP
1701 Market Street
Philadelphia, Pennsylvania 19103

Michael D. Felsen
Office of the Solicitor, U.S. DOL-Boston
John F. Kennedy Federal Building, E-375, 15 New Sudbury Street
Boston, Massachusetts 02230

Fred Nicholas Braker
SMART Local 19
1301 S Columbus Blvd
Philadelphia, Pennsylvania 19147

Office of Executive Secretary
U.S. Occupational Health &
Safety Review Commission
1120 20th St, N.W., Suite 980
Washington, DC 20036

Fred Nicholas Braker
SMART Local 19
1301 S Columbus Blvd,
Philadelphia, PA 19147

Office of Executive Secretary
U.S. Occupational Health &
Safety Review Commission
1120 20th St, N.W., Suite 980
Washington, DC 20036

Michael D. Felsen
Office of the Solicitor, U.S. DOL-Boston
John F. Kennedy Federal Building, E-375, 15 New
Sudbury Street
Boston, MA 02230

Office of Executive Secretary
U.S. Occupational Health &
Safety Review Commission
1120 20th St, N.W., Suite 980
Washington, DC 20036

Brandon Jay Brigham Esq. and Jonathan L. Snare Esq.
Morgan Lewis & Bockius LLP
1701 Market Street,
Philadelphia, PA 19103

Office of Executive Secretary
U.S. Occupational Health &
Safety Review Commission
1120 20th St, N.W., Suite 980
Washington, DC 20036

Jonathan L. Snare
1111 Pennsylvania Avenue, N.W.,
Washington, DC 20004

**Exhibit D to Lloyd Industries Warrant Application**

UNITED STATES OF AMERICA
OCCUPATIONAL SAFETY AND HEALTH REVIEW COMMISSION


SECRETARY OF LABOR            ) Case Nos. 15-0846, 150847
                              )
vs.                           )  Philadelphia, PA
                              )
LLOYD INDUSTRIES, INC.        )  October 17, 2016
and SHEET METAL WORKERS'      )
                              )  Volume I
                              )
                              )  9:54 a.m.-5:57 p.m.



BEFORE HON. KEITH E. BELL,
ADMINISTRATIVE LAW JUDGE


APPEARANCES:

For Complainant:              JUD DEAN, ESQ.
                              JORDANA L. GREENWALD, ESQ.
                              U.S. DEPARTMENT OF LABOR
                              Office of the Solicitor
                              Region 3
                              The Curtis Center
                              170 S. Independence Mall West
                              Suite 630 E
                              Philadelphia, PA  19106


For Respondent:               DENNIS J. MORIKAWA, ESQ.
                              BRANDON J. BRIGHAM, ESQ.
                              MORGAN LEWIS
                              1701 Market Street
                              Philadelphia, PA  19103

                              JONATHAN L. SNARE, ESQ.
                              MORGAN LEWIS
                              1111 Pennsylvania Ave., N.W.
                              Washington, DC  20004




BURKE COURT REPORTING, LLC
1044 Route 23 N, Suite 206
Wayne, NJ  07470

```
1    if we have a union there at the site, we try to

2    include them in there also.

3         Q.   Why did you ask for the presence of the

4    union steward?

5         A.   Because they're -- they have the option of

6    attending the opening conference and other items of

7    the inspection.  So in order for expedience to try to

8    get -- instead of repeating ourselves again, we wanted

9    the union steward there while we did all that opening

10   conference.

11        Q.   What happened after that?

12        A.   Mr. Lloyd left to go out to get the union

13   steward.

14        Q.   What happened next?

15        A.   He came back a few minutes later, maybe five

16   minutes and he asked to see a copy of the complaint,

17   and he also said that the union steward was trying to

18   contact the business agent for the union.

19        Q.   So Mr. Lloyd returned after about five

20   minutes alone?

21        A.   Yes.

22        Q.   Did you give him a copy of the complaint?

23        A.   Yes.

24        Q.   What happened next?

25        A.   He left the conference room again and I
```

1    think he was gone approximately 15 minutes, and then

2    he returned with the union steward, and we continued

3    with the opening conference.

4         Q.   When he came back the first time after about

5    5 minutes and you gave him the complaint, did he

6    mention that there was anyone else at the plant who

7    was in charge of safety and health?

8         A.   I don't recall it, no.

9         Q.   Did he mention Dino Sanna, the plant manager

10   at that time?

11        A.   At that time, no.

12        Q.   So you said Mr. Lloyd then left and was gone

13   about 15 minutes?

14        A.   Approximately, yes.

15        Q.   And did he take a copy of the complaint with

16   him?

17        A.   He took the complaint as he walked out,

18   where he took the complaint I don't know, but he did

19   take it with him.

20        Q.   What happened next?

21        A.   Approximately 15 minutes he returned, and he

22   had the union steward with him.

23        Q.   And the union steward is who?

24        A.   Russell Murphy.

25        Q.   What happened next?

1    A.   Well, over the -- when they put blankets on

2    the machine -- on the -- when they put blankets on the

3    ceiling radiation dampers they take the ring guards

4    off because they can't do the job with them on.

5        Q.   So you're talking about the CRD department?

6        A.   Yes.

7        Q.   And you're talking about a particular kind

8    of product that they make; is that right?

9        A.   Yes.

10       Q.   And what is that product?

11       A.   It's a CRD -- it's a ceiling radiation

12   damper and it gets a fireproof blanket on it.

13       Q.   And -- okay.  And why -- how does that

14   relate to the ring guards?

15       A.   They can't do the job if that's on there.

16   They can't get the -- the machine doesn't work if it's

17   on there.

18       Q.   But those are not the only rivet machines in

19   the shop where you have seen ring guards missing?

20       A.   No.  A lot of times if they break one it

21   will be off and then I'll have to -- they don't tell

22   me about it, for one thing.  And if Bill sees it he'll

23   tell me to put them on.

24       Q.   And in addition to putting ring guards on

25   during that period of time before OSHA came onto the

```
1    shop floor you did some other stuff, right?
2         A.   I was mostly working on those.
3         Q.   Right.  But you did do some other stuff?
4         A.   Yeah.  Right.  We had to move some things
5    around.
6         Q.   Yeah, because OSHA was there?
7         A.   They -- well, because I was told to.
8         Q.   Because OSHA was there?
9         A.   I didn't know that at first until I saw them
10   come out on the floor.
11        Q.   So you were told to put ring guards on?
12        A.   Yes.
13        Q.   You were told to adjust ring guards?
14        A.   Yes.
15        Q.   You were told to move a scale?
16        A.   Yes.
17        Q.   You were told to move a press?
18        A.   Yes.
19        Q.   You were told to move a fan?
20        A.   Fan?  Yeah, I guess so.
21        Q.   All within the same 15, 20 minute period of
22   time, right?
23        A.   No.  I just -- when I had a chance to do it
24   I did it.
25        Q.   That morning?
```

```
1       A.    That day, yes.

2       Q.    That morning before OSHA came in?

3       A.    No, while OSHA was there.

4       Q.    But OSHA didn't see you doing any of that?

5       A.    I don't think so.  No.

6       Q.    You also moved a grinder, right?

7       A.    Yes.

8       Q.    What else did you do before OSHA came in?

9       A.    That's about it, I guess.

10      Q.    You didn't put any guards on any other

11   machines?

12      A.    No.

13      Q.    And now that we're here today and we're

14   sitting in front of a judge and you're under oath,

15   you're pretty sure it was Mr. Lloyd who told you to do

16   this, right?

17      A.    Yes.

18      Q.    Yeah.  It almost certainly was?

19      A.    Yes.

20      (Pause)

21      Q.    All right.  Let's look at Government Exhibit

22   91.

23            MR. DEAN:  May I approach?

24            JUDGE BELL:  Yes, you may.

25      Q.    Mr. Fadule, I've put in front of you
```

## UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

In re                                          :
Inspection of                                  :
                                               :       NO. 21-mj-1854
Lloyd Industries, Inc.                         :
located at 231 Commerce Drive                  :
Montgomeryville, Pennsylvania 18936            :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

### WARRANT FOR INSPECTION

TO:                                    Jean G. Kulp, Area Director
                                       Allentown Area Office
                                       Occupational Safety and Health Administration,
                                       Region III
                                       United States Department of Labor

Application having been made, probable cause having been demonstrated, and a reasonable scope of inspection having been proposed:

IT IS HEREBY ORDERED that, pursuant to section 8 of the Occupational Safety and Health Act of 1970, 29 U.S.C. § 657 (the OSH Act), YOU OR YOUR DULY DESIGNATED REPRESENTATIVE(S) ARE AUTHORIZED to enter the workplace of Lloyd Industries, Inc., at 231 Commerce Drive, Montgomeryville, Pennsylvania during regular working hours and to conduct a follow-up inspection.

The safety and health inspection shall entail an assessment of whether Lloyd Industries, Inc. is committing violations similar to the violations that were affirmed in Docket Nos. 15-0846 and 15-0847, which became a final order of the Occupational Safety and Health Review Commission on July 21, 2017, and any hazards in plain view, to determine whether this employer is furnishing to its employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees, and whether this employer is complying with the occupational safety and health standards promulgated under the OSH Act and the rules, regulations and orders issued pursuant to the OSH Act.

Such inspection may include the taking of photographs and/or videotaping for evidentiary purposes and the questioning of any employer, owner, operator, agent or employee of the workplace privately on the employer's premises during working hours, as authorized by 29 C.F.R. § 1903.7(b).  The inspection may also include the affixing of monitoring devices upon employees to determine the extent of their exposure to airborne contaminants and/or noise, as authorized by 29 C.F.R. § 1903.7(b).

The inspection and investigation shall also include the opportunity for a representative of the employer and a representative authorized by employees to accompany the Compliance Officer during the physical inspection of the workplace.  If there is no authorized representative of the employees, the compliance officer shall consult with a reasonable number of employees during the inspection of the worksite concerning matters of health and safety in the workplace, pursuant to section 8(e) of the Act, 29 U.S.C. § 657(e), and 29 C.F.R. § 1903.8.

The inspection shall commence within fourteen (14) days after the issuance of the warrant, and shall proceed for a reasonable period of time in order to make the assessments described above. OSHA may return to the worksite on subsequent days if the inspection cannot be completed within one day.  A return shall be made to this Court within seven (7) calendar days following the completion of the inspection.

BY THE COURT:

Date: December 10, 2021         /s/ Elizabeth T. Hey
                               ELIZABETH T. HEY
                               UNITED STATES MAGISTRATE JUDGE

## RETURN OF SERVICE

I hereby certify that a copy of the within warrant was duly served (indicate by check method used).

: on a duly authorized agent
: by leaving at principal office
: or place of business, to wit:
:_____
:_____
:_____

On the company named hereon

_____
(Month) (Day) (Year)

_____
(Name of person making service)

_____
(Official Title)

## RETURN

Inspection of the establishment described in the warrant was made on _____, 202_.

_____
Compliance Officer